UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

                            Plaintiff,

          v.

EARL MCCOY and MATTHEW NIX,

                        Defendants.

_____

REPORT & RECOMMENDATION
and DECISION & ORDER

14-CR-6181W

## PRELIMINARY STATEMENT

By Orders of Hon. Elizabeth A. Wolford, United States District Judge, dated November 25, 2014 and November 20, 2015, all pretrial matters in the above-captioned case have been referred to this Court pursuant to 28 U.S.C. §§ 636(b)(1)(A)-(B).  (Docket ## 8, 80).

On November 19, 2015, the grand jury returned a ten-count second superseding indictment against defendants Earl McCoy ("McCoy") and Matthew Nix ("Nix").  (Docket # 79).  McCoy had been charged in the original and the first superseding indictment.  (Docket ## 7, 36).  Nix had not been charged in those indictments.  (*Id.*).

Count One of the Second Superseding Indictment ("the indictment") charges McCoy and Nix with conspiring with each other and with Clarence Lambert, Gary Lambert, Jecovious Barnes, and Jessica Moscicki between in or about February 2014 and October 2014 to obstruct, delay, and affect commerce by robbery, in violation of 18 U.S.C. § 1951(a) (the "Hobbs Act").  (Docket # 79).  Count Two charges McCoy and Nix with possessing and brandishing firearms during and in relation to the Hobbs Act conspiracy charged in Count One, in violation

of 18 U.S.C. §§ 924(c)(1)(A)(ii) and 2.  (*Id.*).   Counts Three and Nine charge both defendants

with violating the Hobbs Act, 18 U.S.C. §§ 1951(a) and 2, by attempted robbery on September

15, 2014 (Count Three) and robbery on October 7, 2014 (Count Nine).  (*Id.*).   Count Four

charges McCoy with possessing and brandishing a firearm during and in relation to the

September 15, 2014 attempted robbery, and Count Ten charges McCoy and Nix with possessing

and brandishing a firearm during and in relation to the October 7, 2014 robbery, both in violation

of 18 U.S.C. §§ 924(c)(1)(A)(ii) and 2.  (*Id.*).   Count Five charges both defendants with

conspiring on September 23, 2014 to possess with intent to distribute and to distribute marijuana,

heroin, and cocaine, in violation of 21 U.S.C. § 846.  (*Id.*).   Count Six charges both defendants

with possessing a firearm in furtherance of the charged September 23, 2014 conspiracy, in

violation of 18 U.S.C. §§ 924(c)(1)(A)(i) and 2.  (*Id.*).   Finally, McCoy is charged in Count

Seven and Nix is charged in Count Eight with possession of firearms after having been convicted

of felony offenses, in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2) and 2.  (*Id.*).

Currently pending before the Court are various pretrial motions filed by McCoy

and Nix.  (Docket ## 69, 95, 109, 118).   McCoy has been represented by counsel throughout the

proceedings against him, while Nix was granted permission to represent himself *pro se*

approximately two months after his arraignment.  (Docket # 98).   Nix's pretrial motions consist

of two submissions, both of which were filed *pro se*.  (Docket ## 95, 118).

Both defendants have moved to dismiss certain counts in the indictment and to

suppress identification testimony.[1]  McCoy has also moved for discovery of co-conspirator

---

[1]  McCoy's original motion papers also sought an order suppressing statements he made in the back of a
police vehicle following his November 12, 2014 arrest on the indictment.  (Docket ## 69-1 at ¶¶ 58-61; 69-2).  In
support of the motion, he submitted an affidavit stating that he did not recall receiving *Miranda* warnings and thus
could not have waived his rights.  (Docket # 69-2 at ¶¶ 5-6).  The government, in response, submitted affidavits
from two law enforcement officers affirming that McCoy was provided *Miranda* warnings at the time of his arrest.
(Docket # 76).  In addition, the Court reviewed a videotape of the interaction between one of the officers and
McCoy in the police vehicle; the tape shows that when the officer placed McCoy in the vehicle, the officer asked

2

statements and disclosure of the identities of confidential informants, and Nix has moved for disclosure of grand jury minutes and a bill of particulars.  (*Id.*).

Separate evidentiary hearings were conducted on their motions to suppress identification testimony: November 16, 2015 for defendant McCoy, and April 26, 2016 for defendant Nix.  (Docket ## 81, 124).  McCoy submitted a post-hearing memorandum on February 23, 2016, which the government opposed on March 4, 2016.  (Docket ## 109-1, 112). Nix, despite being provided the opportunity, did not submit a post-hearing memorandum. (Docket ## 129, 131).

## REPORT AND RECOMMENDATION

### I.   Dismissal of Various Counts

#### A.   Multiplicity (McCoy and Nix)

McCoy moves to dismiss Count Two as multiplicitous of Counts Four, Six, and Ten.  (Docket ## 69-1 at ¶¶ 6-12; 109-2 at ¶¶ 9-15).  Nix moves to dismiss Count Ten, or in the alternative Count Two, on the grounds that the counts are multiplicitous.  (Docket # 95 at 26-27). Nix also moves to dismiss Counts Four and Nine on the grounds that they are multiplicitous of Counts One and Two.  (Docket # 118 at ¶ 64).

Count Two charges McCoy and Nix with possessing and brandishing firearms in furtherance of the February through October 2014 Hobbs Act conspiracy charged in Count One.

---

McCoy whether he remembered being advised of his rights, and McCoy responded affirmatively.  (Docket # 90 at 3).  On these facts, and for the reasons explained more fully on the record on November 16, 2015, I determined no evidentiary hearing was warranted.  (*Id.* at 3-5).  Because McCoy was advised of his rights, confirmed that he had received them, and because no evidence exists that his subsequent statements were involuntary or obtained after he had requested an attorney or that the questioning cease, I recommend that his motion to suppress statements be denied.

Both defendants' motions also sought other forms of relief that were decided by the undersigned or resolved by the parties in open court at the time of oral argument.  (Docket ## 72-73, 116-17, 120-21).

(Docket # 79).  Counts Four and Ten charge additional Section 924(c) offenses during and in relation to the substantive Hobbs Act robbery and attempted robbery occurring on or about September 15, 2014 (Count Three against McCoy) and October 7, 2014 (Count Nine against McCoy and Nix).  (*Id.*).  Count Six charges both defendants with possessing a firearm in furtherance of the September 23, 2014 narcotics conspiracy charged in Count Five.  (*Id.*). McCoy maintains that because the indictment does not specify any gun-related conduct by him other than the September 15, September 23, and October 7, 2014 incidents, Count Two appears multiplicitous and should be dismissed to avoid any prejudice that would result from the suggestion to the jury that he was involved in other gun-related conduct.  (Docket ## 69-1 at ¶¶ 6-12; 109-2 at ¶¶ 9-15).  Nix argues more generally that Counts Two and Ten are multiplicitous, and the government should be required to elect between them or the Court should dismiss one or the other.  (Docket # 95 at 27).

"An indictment is multiplicitous when it charges a single offense as an offense multiple times, in separate counts, when, in law and fact, only one crime has been committed." *United States v. Chacko*, 169 F.3d 140, 145 (2d Cir. 1999) (citing *United States v. Holmes*, 44 F.3d 1150, 1153-54 (2d Cir. 1995)).  A multiplicitous charge risks violating the double jeopardy clause of the Fifth Amendment by punishing a person for the same crime more than once.  *See United States v. Dixon*, 509 U.S. 688, 696 (1993).  "When . . . the same statutory violation is charged twice, the question is whether the facts underlying each count were intended by Congress to constitute separate 'units' of prosecution."[2]  *United States v. Ansaldi*, 372 F.3d 118,

---

[2]  To determine whether an indictment impermissibly charges a defendant more than once for the same conduct, courts often apply a test from *Blockburger v. United States*, 284 U.S. 299 (1932), which "examines whether each charged offense contains an element not contained in the other charged offense."  *United States v. Chacko*, 169 F.3d at 146.  That analysis is inapplicable here because the issue is not whether one act falls within two distinct statutes, but whether the defendant's alleged conduct may sustain two charges under the same statute.  *See United States v. Ansaldi*, 372 F.3d 118, 125 n.3 (2d Cir.), *cert. denied*, 543 U.S. 949 (2004).

124 (2d Cir.) (citing *Bell v. United States*, 349 U.S. 81, 83-84 (1955)), *cert. denied*, 543 U.S. 949 (2004).

For Section 924(c) charges, the Second Circuit has held that the appropriate unit of prosecution is the underlying drug-trafficking or violent crime rather than the number of firearms. *United States v. Lindsay*, 985 F.2d 666, 674 (2d Cir.), *cert. denied*, 510 U.S. 832 (1993). The mere fact that multiple predicate offenses occurred during the course of a single conspiracy does not foreclose multiple 924(c) charges as a matter of law. *United States v. Mejia*, 545 F.3d 179, 205 (2d Cir. 2008) (924(c) charges not multiplicitous where based on separate assaults even where assaults linked by single conspiracy; "the existence of a single conspiracy connecting the three assaults does not preclude treating them as separate [924(c)] predicate offenses"); *United States v. Quashie*, 162 F. Supp. 3d 135, 144 (E.D.N.Y. 2016) (rejecting multiplicity challenge to two 924(c) charges where indictment included Hobbs Act conspiracy charge spanning period of time from one robbery to second robbery, separate substantive Hobbs Act charges arising out of each of the two robberies, and separate 924(c) charges relating to each robbery). Nor are multiple 924(c) charges relating to separate but chronologically-overlapping conspiracies multiplicitous as a matter of law. *United States v. Arline*, 2016 WL 4524463, *5 (2d Cir. 2016) (two 924(c) convictions arising out of possession of firearms in connection with both racketeering conspiracy and narcotics conspiracy not multiplicitous even though conspiracies overlapped in time where government provided evidence of possession of different firearms on different occasions in connection with each conspiracy; "although these incidents may have occurred within the same five-year period – or even in the same month or year – the evidence and trial, and the [g]overnment's presentation of that evidence and argument to the jury demonstrated that the guns were neither linked to a single crime, . . . nor based on the continuous

possession of a firearm in furtherance of simultaneous predicate offenses consisting of virtually the same conduct") (internal quotations and citations omitted).  Where multiple predicate offenses arise from the same event or conduct undertaken simultaneously, however, multiple Section 924(c) counts may amount to multiplicitous charges.  *United States v. Mejia*, 545 F.3d at 205.

First, as a matter of fact, the government has represented that the discovery in this case includes evidence of firearms activities on "multiple dates other than those charged" in the indictment.  (Docket # 112 at 10).  Assuming the government were to offer that evidence at trial, defendants conceivably could be convicted on Count Two and acquitted on the other challenged counts – an outcome that would not appear to implicate the double jeopardy clause.

Second, the indictment on its face does not charge Section 924(c) violations that are clearly based upon "co-terminous predicate offenses involving essentially the same conduct." *See United States v. Barnes*, 560 F. App'x 36, 43 (2d Cir.) (multiple Section 924(c) charges are multiplicitous "when they 'punish a defendant twice for continuous possession of a firearm in furtherance of co-terminous predicate offenses involving essentially the same conduct'") (quoting *United States v. Wallace*, 447 F.3d 184, 187-88 (2d Cir.), *cert. denied*, 549 U.S. 1011 (2006)), *cert. denied*, 134 S. Ct. 2715 (2014).  Specifically, the unit of prosecution charged in Count Two is the nine-month Hobbs Act conspiracy, while the units of prosecution for the other counts are substantive Hobbs Act robberies or attempted robberies (Counts Four and Ten) and one narcotics conspiracy (Count Six), each of which is alleged to have been committed on a single day during the course of the charged nine-month conspiracy.  *See, e.g., United States v. Acosta*, 207 F. App'x 39, 43-44 (2d Cir. 2006) (rejecting double jeopardy challenge to convictions on multiple 924(c) charges corresponding to both substantive and conspiracy charges

under same statute; "[t]he conspiracy conviction under § 241 is a separate offense from the substantive § 242 offenses, and as explained . . . , the conspiracy charge involved more and broader conduct than the substantive § 242 offenses[;] . . . [b]ecause the conspiracy involved broader conduct than the substantive offense and the jury could have reasonably convicted on this conduct, there was no error") (citations omitted), *cert. denied*, 552 U.S. 1037 (2007); *United States v. Campbell*, 300 F.3d 202, 216 (2d Cir. 2002) ("[a]lthough only one § 924(c) violation can be appended to any single crime of violence, a substantive offense and the conspiracy to commit that offense are separate crimes"; upholding defendant's convictions on seven 924(c) counts relating to seven separate substantive robberies where defendant was convicted of substantive offenses, in addition to conspiracy to commit robberies) (citations omitted), *cert. denied*, 538 U.S. 1049 (2003).

       Considering the possibility that the government's trial proof will include evidence that defendants possessed guns on dates other than September 15, September 23, and October 7, 2014, their dismissal motions are premature. *See, e.g.*, *United States v. Josephberg*, 459 F.3d 350, 355 (2d Cir. 2006) ("[w]here there has been no prior conviction or acquittal, the Double Jeopardy Clause does not protect against simultaneous prosecutions for the same offense, so long as no more than one punishment is eventually imposed"); *Untied States v. Medina*, 2014 WL 3057917, *3 (S.D.N.Y. 2014) ("since *Josephberg*, courts in this Circuit have routinely denied pre-trial motions to dismiss potentially multiplicitous counts as premature"). As the government correctly observes, any risk of multiplicity may be addressed by an instruction to the jury that includes the admonition that "to convict on [Count Two,] the jury must find that the guns were possessed on a day/time other than . . . the dates of the substantive counts." (Docket # 70 at 4). I

agree with the government that dismissal of Counts Four, Six and Ten on the grounds that they are multiplicitous of Count Two would be premature and is not justified.[3]

I further recommend denial of Nix's motion to dismiss Count Nine as multiplicitous of Count One. His motion is squarely foreclosed by settled precedent. *See Callanan v. United States*, 364 U.S. 587, 593-94, 597 (1961) (convictions under both conspiracy and substantive provisions of Hobbs Act are not multiplicitous and can be basis for consecutive sentences).

### B.    Insufficiency and Particularization (McCoy and Nix)

McCoy also urges dismissal of Count Two on the grounds that it is impermissibly vague because it does not particularize the date or dates on which McCoy is alleged to have possessed or brandished firearms, but rather charges a single 924(c) count relating to a nine-month period. (Docket ## 69-1 at ¶¶ 21-24; 109-1 at 6-8; 109-2 at ¶¶ 24-27). If dismissal is not ordered, McCoy alternatively seeks further particularization of Count Two, namely, "the dates, times and places of all incidents between February 2014 and October 2014 which constitute[] the [d]efendant's participation in . . . [the] use of a [f]irearm pursuant to [the Hobbs Act] conspiracy."[4] (Docket ## 69-1 at ¶¶ 28-30(A); 109-2 at ¶¶ 31-33(A)).

McCoy cites no relevant authority in his submissions, and the Court is aware of none, supporting his proposition that a 924(c) charge that does not specify the date or dates on which the firearms were possessed with greater particularity than Count Two does in this case

---

[3]  Count Four only charges McCoy, so Nix also lacks standing to move to dismiss that charge.

[4]  It is unclear based upon oral argument whether McCoy is still pressing his other bill of particulars requests. (*See* Docket ## 69-1 at ¶¶ 28-29, 30(B)-(J); 109-2 at ¶¶ 31-32, 33(B)-(J)). If so, the boilerplate requests are hereby denied in the absence of any explanation or argument as to why they are material to his defense of the charges in this case. *See United States v. Rutkoske*, 394 F. Supp. 2d 641, 648 (S.D.N.Y. 2005) ("[d]efendant offers no valid explanation as to why a bill of particulars is needed, only that he lacks information that a bill of particulars could provide[;] [t]his does not satisfy the criteria required for particulars [and] [d]efendant's motion for a bill of particulars is therefore denied").

must be dismissed as insufficient.[5]  Of course, a Section 924(c) charge may factually be predicated upon the continued possession of a firearm over a course of time in furtherance of a crime.  The mere fact that Count Two alleges a 924(c) offense based upon a nine-month period does not, standing alone, justify dismissal of the charge.  *See generally United States v. Flaharty*, 295 F.3d 182, 198 (2d Cir.) (indictment not insufficient where it alleged that the conduct occurred over the course of approximately six years), *cert. denied*, 537 U.S. 936 (2002); *see United States v. Kernan*, 2009 WL 606146, *3 (N.D.N.Y. 2009) (count alleged in indictment was "clearly sufficient to withstand a motion to dismiss" where it alleged a time frame of approximately three years during which the defendant allegedly committed the charged crime).  Accordingly, I recommend denial of McCoy's motion to dismiss Count Two.

As for McCoy's request for further particularization, the government has represented in its responsive submission that, in addition to the firearms incidents that are the subjects of Counts Two, Six, and Ten, the discovery includes information concerning defendants' possession of firearms on other dates.  (Docket # 112 at 10).  For example, the government explained at oral argument on March 10, 2016, that one of those other acts not charged relates to an incident in June 2014 during which McCoy was present at a Motel 6 in Amherst, New York, from which a handgun was seized.  According to the government, its discovery includes reports relating to the incident, including a report identifying the particular make, model, and serial number of the firearm seized.[6]  The government also made clear at oral

---

[5]  In the case that McCoy relies upon, *United States v. Rapalo-Amador*, 2010 WL 2813389, *2 (E.D.N.C. 2010), the court determined that a 924(c) charge spanning a period of more than eight years was insufficiently particular to enable the defendant to prepare his defense and interpose a plea of double jeopardy and ordered the government to provide a bill of particulars.  The court did not dismiss the charge.  *Id.*

[6]  Following oral argument, the government provided a letter to the Court dated March 10, 2016, identifying by date and location three other home invasion robberies or burglaries for which police reports were provided to the defense in discovery and about which the government expects to offer evidence at trial in support of Count Two.  (Docket # 135).

argument that it intends to offer testimony from cooperating witnesses that McCoy possessed

firearms for the purpose of committing home invasion robberies and that he went to various

locations for the purpose of robbing them and sometimes succeeded and other times did not.

Courts routinely deny requests for further particularization of 924(c) counts,

including specific dates and places of firearms possession, that span a period of time. *See*, *e.g.*,

*United States v. Simmons*, 2016 WL 285176, *16 (W.D.N.Y.) (collecting cases), *report and

recommendation adopted*, 2016 WL 1127802 (W.D.N.Y. 2016).  Based upon this authority, and

the government's representations that further information is in fact included in the discovery

materials, I deny McCoy's broad request that the government specify every date, time and place

on which McCoy is alleged to have possessed a firearm in furtherance of the Hobbs Act

conspiracy.

Although the government has represented that the discovery includes information

as to defendants' possession of firearms on dates other than those charged in Counts Four, Six,

and Ten, the government has not represented that the discovery includes information about all of

the robberies or attempted robberies about which it intends to offer evidence at trial in support of

Counts One and Two.  Courts have broad discretion to determine whether to grant a motion for a

bill of particulars, *Will v. United States*, 389 U.S. 90, 98-99 (1967), the purpose of which is to

enable the defendant "to identify with sufficient particularity the nature of the charge pending

against him, thereby enabling [the] defendant to prepare for trial, to prevent surprise, and to

interpose a plea of double jeopardy should he be prosecuted a second time for the same offense."

*United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987) (citations omitted) (per curiam).

Here, given the scope of the charge and the representations concerning the discovery provided, I

will require the government to provide, by no later than thirty days after the district court's

decision on this report and recommendation, a bill of particulars identifying (by general location and approximate date) any uncharged robberies or attempted robberies in furtherance of which McCoy allegedly possessed, used or brandished a firearm about which the government will offer evidence in support of Count Two.  I find that such particularization is necessary to enable McCoy to prepare his defense.

Finally, McCoy seeks dismissal of Counts Three and Nine (and related Counts Four and Ten) because they do not explicitly charge that McCoy acted "knowingly" or "willfully" to obstruct commerce.  (Docket ## 69-1 at ¶¶ 13-20; 109-1 at 6; 109-2 at ¶¶ 16-23). These counts charge him with "unlawfully" obstructing or attempting to obstruct commerce "by robbery, as that term is defined in Title 18, United States Code, Section 1951(b)(1)."  (Docket # 79).  The definition of robbery under Section 1951(b)(1) is:

> the unlawful taking or obtaining of personal property from the person or in the presence of another, *against his will*, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property.

18 U.S.C. § 1951(b)(1) (emphasis added).  As the Second Circuit has recognized, "robbery" under Section 1951(b)(1) implies "knowing" and "willful" conduct, *United States v. Tobias*, 33 F. App'x 547, 549 (2d Cir. 2002), *cert. denied*, 538 U.S. 933 (2003), and a Hobbs Act charge that alleges it is based on Section 1951 robbery is sufficient even if it does not explicitly articulate the terms "knowingly" or "willfully," *United States v. Jackson*, 513 F. App'x 51, 55 (2d Cir.), *cert. denied*, 133 S. Ct. 1848 (2013).  Because McCoy's argument is foreclosed by controlling Second Circuit authority,[7] I recommend that the district court deny McCoy's motion to dismiss Counts Three, Four, Nine, and Ten on this basis.

---

[7] Indeed, McCoy himself acknowledges that his motion is precluded by controlling authority, but indicates that he is advancing it in order to preserve it in the absence of controlling Supreme Count authority.  (Docket # 109-1 at 6).

C.   **Vindictive Prosecution (Nix)**

Nix moves for dismissal of the indictment or, in the alternative, for disclosure of grand jury minutes, on the grounds of vindictive prosecution.  (Docket ## 95 at 10-11, 18-19; 118 at ¶¶ 5-30).  He argues that the pending charges against him were initiated in retaliation for his rejection of a plea offer by the same prosecutor in a separate narcotics case.  (Docket # 118 at ¶ 14).  As proof, he cites to the fact that he was not charged in either the original or the first superseding indictment in this case, but was charged only in the second superseding indictment after he rejected the plea offer in the other case,[8] and the apparent absence of references to him in the discovery.[9]  (Docket # 118 at ¶¶ 11-12, 23).  Considering the apparent paucity of discovery relating directly to him and the timing of the charges, Nix concludes that "[t]he only explanation . . . is either the knowing presentation of perjured testimony by the [g]overnment, necessitating dismissal or the [g]rand [j]ury having been intentionally or unintentionally misled by [g]overnment presentment."  (Docket # 118 at ¶ 29).  On this basis, he maintains that he should be permitted to review grand jury minutes "to determine whether a motion to dismiss on

---

[8]  Nix includes a copy of a July 17, 2015, email from the prosecutor to his then-attorney in the other case stating, "We have information from multiple cooperators concerning his involvement in robberies."  (Docket # 95 at 12).  This email was sent approximately three months after the first superseding indictment in this case, which did not charge Nix, and approximately four months before the return of the second superseding indictment, which charges Nix.  (Docket ## 36, 79).

[9]  Although Nix contends that the discovery includes only one mention of him in relation to the charged robberies, the government has explained that much of its trial evidence against Nix will consist of cooperating and civilian witness testimony as to his role in the charged robberies including:

> obtaining and providing information about the suitability of individuals and locations for robberies, providing the information to co-conspirators, transporting co-conspirators to and from robbery locations, directing co-conspirators to approach/enter locations, providing guns to co-conspirators for robberies, waiting nearby while co-conspirators perpetrated robberies, taking possession of the proceeds of robberies, distributing proceeds of robberies to co-conspirators, and disposing/selling the proceeds of robberies.

(Docket # 119 at 3).  The government has represented it will provide those witnesses' prior statements and testimony two weeks before trial or at the pretrial conference.  (*Id.*).  The government also notes that the discovery that Nix attached to and referenced in his motions was a fraction of what the government had produced to him on a computer disk.  (Docket # 119 at 2 n.1).

12

prosecutorial misconduct grounds or other grounds is appropriate."  (Docket ## 95 at 18; 118 at

¶¶ 29-36).

   The record before the Court justifies neither form of relief that Nix seeks.  First, a

presumption of vindictiveness does not arise during the pretrial plea negotiation process, even if

the prosecutor makes clear an intent to subject a defendant to additional charges if the defendant

rejects the prosecutor's plea offer.  *United States v. Goodwin*, 457 U.S. 368, 380, 384 (1982)

("just as a prosecutor may forgo legitimate charges already brought in an effort to save the time

and expense of trial, a prosecutor may file additional charges if an initial expectation that a

defendant would plead guilty to lesser charges proves unfounded[;] . . . [t]he possibility that a

prosecutor would respond to a defendant's pretrial demand for a jury trial by bringing charges

not in the public interest that could be explained only as a penalty imposed on the defendant is so

*unlikely* that a presumption of vindictiveness certainly is not warranted") (citing *Bordenkircher

v. Hayes*, 434 U.S. 357, 365 (1978) ("the course of conduct engaged in by the prosecutor in this

case, which no more than openly presented the defendant with the unpleasant alternatives of

forgoing trial or facing charges on which he was plainly subject to prosecution, did not violate

the Due Process Clause of the Fourteenth Amendment")); *United States v. Jackson*, 818 F.2d

867, *1 (6th Cir.) (defendant alleged no reasonable likelihood of vindictiveness despite

allegations that government official threatened to pursue additional criminal charges against

defendant and his family if he did not cooperate; "[i]t is certainly within the discretion of

prosecutors to attempt to induce criminal defendants to supply information"), *cert. denied*, 484

U.S. 933 (1987); *United States v. Sainato*, 53 F. Supp. 2d 316, 320 (E.D.N.Y. 1999)

("defendants' assertion that the [g]overnment's current prosecution is somehow tainted because

of their 'threats' in conjunction with the rejected plea-bargains[] is undermined by the

well-established and constitutional prerogative of the [g]overnment to bring otherwise legitimate charges to induce a defendant to accept a plea bargain, and 'present[ing] the defendant with the unpleasant alternative[] of foregoing trial or facing charges on which he is plainly subject to prosecution[;]' . . . [s]uch 'threats'. . . , which are fairly commonplace in plea negotiations, do not support the defendants['] vindictiveness claim") (quoting *United States v. Stanley*, 928 F.2d 575, 579 (2d Cir.), *cert. denied*, 502 U.S. 845 (1991)).  Applying this well-established authority, I conclude that Nix has failed to "meet the high standard required for dismissal of an indictment based on selective or vindictive prosecution," *see United States v. Korn*, 2016 WL 525870, *3 (W.D.N.Y. 2016), because he has failed to demonstrate actual vindictiveness through a showing that the prosecutor harbored genuine animus toward him, *see Johnson v. United States*, 2014 WL 4545845, *10 (E.D.N.Y. 2014), and no presumption of vindictiveness is created by the circumstances of this case.

In one sentence in his memorandum, Nix also urges dismissal on the grounds that he has been prejudiced by the period of pre-indictment delay between the date that the charges were brought against the other defendants and the date that he was first charged in the case. (Docket # 118 at ¶ 25).  He does not explain or demonstrate how he has been prejudiced, and no evidence exists to suggest that his ability to defend against the charges has been impaired by that lapse of time.  *See United States v. Schaefer*, 859 F. Supp. 2d 397, 414 (E.D.N.Y. 2012) (denying motion to dismiss based upon pre-indictment delay where defendant failed to demonstrate any actual prejudice due to the delay), *aff'd*, 519 F. App'x 71 (2d Cir. 2013); *United States v. Bishop*, 2010 WL 984676, *2 (E.D.N.Y. 2010) (denying motion to dismiss where defendant failed "to describe or indicate any prejudice resulting from the delay" and included only conclusory assertions of government's bad faith); *United States v. Ma*, 2006 WL 708559, *9 (S.D.N.Y.

2006) (defendant failed to meet "heavy burden" of demonstrating substantial prejudice where "[d]efendant allege[d] no actual substantial prejudice, beyond speculative notions of poor memory and lost evidence[,] . . . [and] although a significant amount of time ha[d] passed since the crimes allegedly occurred and the [i]ndictment was filed, [d]efendant has not shown that the [g]overnment delayed the filing of the [i]ndictment for its own tactical advantage"); *United States v. Avendano*, 2002 WL 31496219, \*3 (S.D.N.Y. 2002) (defendant failed to establish elements of pre-indictment delay under the Fifth Amendment; "[d]efendant . . . has made no argument and has presented no facts indicating that any delay in the [i]ndictment has caused prejudice in his ability to present his defense[,] . . . [n]or has [defendant] argued that the [g]overnment intentionally delayed indicting him to gain a tactical advantage").  His contention that he was charged only because the grand jurors must have been "exhausted" by a lengthy investigation is pure speculation and neither warrants dismissal of the indictment nor further examination of the grand jury proceedings.

Nor do Nix's speculative assertions that he was charged in this case out of vindictive retaliation for refusing to accept a plea offer in another case entitle him to inspect the grand jury minutes to see if he can bolster his contention or find evidence of perjured testimony or other prosecutorial misconduct.  There is a presumption that grand jury proceedings are lawful and regular, *United States v. Torres*, 901 F.2d 205, 232 (2d Cir.) (quoting *Hamling v. United States*, 418 U.S. 87, 139 n.23 (1974)), *cert. denied*, 498 U.S. 906 (1990), *abrogated on other grounds by United States v. Marcus*, 628 F.3d 36 (2d Cir. 2010), and disclosure of grand jury proceedings is available only by order of the Court.  Fed. R. Civ. P. 6(e).  A party seeking disclosure bears the burden of establishing a "particularized need" or "compelling necessity" for such disclosure that outweighs the policy of grand jury secrecy.  *Douglas Oil Co. of Cal. v.*

*Petrol Stops Nw.*, 441 U.S. 211 (1979); *Pittsburgh Plate Glass Co. v. United States*, 360 U.S.

395, 400 (1959); *In re Rosahn*, 671 F.2d 690, 695 (2d Cir. 1982). Unspecified allegations of

impropriety or mere speculation are not sufficient to satisfy this heavy burden. *United States*

*Calandra*, 414 U.S. 338, 345 (1974). Therefore, "review of grand jury minutes is rarely

permitted without specific factual allegations of government misconduct." *United States v.*

*Torres*, 901 F.2d at 233.

Nix's motion for grand jury disclosure is based solely on speculation.

Speculation is no more a basis to overcome the presumption of grand jury secrecy than it is to

justify dismissal of the indictment. For these reasons, I recommend that the district court deny

Nix's motion to dismiss the indictment or, in the alternative, for disclosure of grand jury minutes,

on the grounds of vindictive prosecution.


## II.   Suppression of Identification Testimony (McCoy and Nix)

### A.   McCoy's Motion and Evidentiary Hearing

McCoy moves to suppress identification testimony of the two victims of the

September 15, 2014 home invasion attempted robbery (the subject of Counts Three and Four).

(Docket ## 69-1 at ¶¶ 46-57; 109-1 at 2-5). This Court held an evidentiary hearing on the

motion on November 16, 2015, at which the government offered testimony from two Rochester

Police Department ("RPD") investigators.[10] (Docket # 90). The defense did not call any

witnesses. (*Id.*).

As an initial matter, the government made clear at the hearing that one of the two

victims, Yolanda Delgado ("Delgado"), did not identify McCoy in any of the photographic

arrays she was shown. (Tr. A 54-55). The government further represented that it did not intend

---

[10]   The transcript of the November 16, 2016 hearing shall be referred to as "Tr. A __." (Docket # 90).

to ask Delgado to identify McCoy at trial.  (Tr. A 55).  On the basis of that representation, the defense did not question the investigators about Delgado's pretrial identification procedure. (*Id.*).  On this record, this Court recommends that McCoy's motion to suppress identification testimony of Delgado be granted.

### 1.  __Testimony of Kathleen Springer__

At the hearing, Kathleen Springer ("Springer") testified that she had been employed as an RPD investigator for the past three years and with RPD for over fifteen years. (Tr. A 7).  On September 15, 2014, she was called to assist in an investigation of a home invasion that had occurred earlier that day at 218 Haywood Avenue in Rochester.  (Tr. A 8).  She responded to 218 Haywood and observed one of the victims, Daniel Rosario Gomez ("Gomez"), bleeding from the head and the other victim, Yolanda Delgado, "visibly upset."  (Tr. A 8-9). With the assistance of a Spanish-speaking officer and Delgado's two adult daughters, Investigator Springer spoke to Delgado about what had happened during the invasion.  (Tr. A 9).

Gomez was transported to the hospital, and Springer interviewed him there later that day with the assistance of a retired Spanish-speaking police officer.  (Tr. A 8-10).  Springer testified that Delgado and Gomez were both fluent in Spanish; unlike Delgado, who spoke some English, Gomez spoke only Spanish.  (Tr. A 10, 46).  Springer does not speak or understand Spanish.  (Tr. A 47).

Delgado described the assailants as in their early to mid-twenties, one of whom was 5′11″ to 6′, the other of whom was smaller and thinner.  (Tr. A 38).  At the hospital, Gomez described the two perpetrators as black men in their mid-twenties, both of whom were approximately 5′6″ and weighed between 120 and 150 pounds.  (Tr. A 11, 38).

On October 7, 2014, Springer returned to Gomez and Delgado's home at 218 Haywood Avenue to obtain DNA samples from them.  (Tr. A 12).  At that time, Springer spoke to them with the assistance of their adult daughters and asked them if they would be willing to look at photographs.  (Tr. A 12).  They said they would, although no photographs were shown to them that day.  (Tr. A 12).

Springer thereafter made arrangements through one of their daughters to return to their home on October 28, 2014 to show them some photographs.  (Tr. A 12-13).  Investigators Springer and Dennis Gonzalez ("Gonzalez") met with Gomez and Delgado at their home on October 28 shortly after 5 p.m.  (Tr. A 13).  Gonzalez, who was not otherwise involved in the investigation, accompanied Springer in order to translate the communications between English and Spanish.  (Tr. A 13, 66-67).  When the investigators first arrived, they asked Delgado to go upstairs so that they could conduct the identification procedure with Gomez out of Delgado's presence.  (Tr. A 15-16).  Before they began, Gomez advised the investigators that Delgado was extremely nervous because the perpetrators had threatened to kill her.  (Tr. A 16).  Springer responded that the investigators understood Delgado's concern and intended "to arrest the people that did this to them and put them in jail."  (Tr. A 17).

At that point, Springer provided instructions to Gomez for viewing the arrays. (Tr. A 17).  She testified that she read the following instructions directly from a police form, and Gonzalez translated each instruction into Spanish:

- As part of the ongoing investigation into a crime that occurred on [*date*:____9/15/14____] at [*location*:___218 Haywood Ave___], I am going to show you a photo array.
- It consists of six photos, and each photo has a number above it.
- Take as much time as you need to view the photos.
- The person who committed the crime may or may not be included in the photos you will be viewing.
- Do not assume I know who committed the crime.

- Do not look to me or anyone else in the room for guidance during the procedure.
- Persons shown in the photos may not appear exactly as they did on the date of the incident because features, such as head and facial hair, are subject to change.
- Photos may not always show the true complexion of a person; it may be darker or lighter than shown in the photo.
- Pay no attention to any markings that may appear on the photos, or any other differences in the type or style of the photos.
- Do not discuss with any other witness what you see, say, or do during this procedure.
- After you have had an opportunity to view the photo array, I will ask you the following three questions:
    1) Do you recognize anyone in the photo array?
    2) If you do, what is the number of the person you recognize?
    3) From where do you recognize that person?
- I may also ask you follow up questions.

(Tr. A 17-22; Government's Exhibit ("G. Ex.") 1). Gomez affirmed that he understood the instructions and, at the investigator's request, signed the instruction sheet to reflect that he understood them. (Tr. A 17, 22; G. Ex. 1).

After Gomez signed the instruction form, Springer handed him the first of three arrays and asked him if he recognized anyone. (Tr. A 23). He pointed to the photograph in position number three – a photograph of co-conspirator Clarence Lambert – gave an "aha laugh" and nodded his head up and down. (Tr. A 23, 49). Gomez continued to look at the array and then pointed to photograph five and spoke in Spanish. (Tr. A 24). Gonzalez reported to Springer that Gomez was confused and recognized two people. (Tr. A 23, 49).

Springer removed the first array and told Gomez that she had more photographs to show him. (Tr. A 25). Springer handed Gomez the second array, and he looked at it and said, "No." (Tr. A 26). Springer asked Gomez whether his response meant that he did not recognize anyone, and Gomez indicated that was what he meant. (Tr. A 26). At Springer's request, Gomez signed and dated the second array. (Tr. A 26).

19

Springer removed the second array and handed Gomez the third array, which contained a photograph of McCoy in the fifth position. (Tr. A 14-15, 27; G. Ex. 2). He "immediate[ly]" pointed to photograph five and said, "That's the one who hit me in the face with the .38." (Tr. A 27-28). At Springer's request, Gomez circled and initialed the photograph and signed the form. (Tr. A 29; G. Ex. 2).

After removing the third array, Springer re-displayed the first array. (Tr. A 30). As she did so, Gonzalez spoke to Gomez in Spanish and reported to Springer that he asked Gomez if he recognized anyone from that night. (Tr. A 30-31). Gomez pointed to photograph three and, according to Gonzalez's report to Springer, stated, "No. 3 is the person that came in with the Uzi." (Tr. A 31). In response to Springer's question, Gomez estimated his level of certainty in his identification to be 90%, explaining that he had only seen him from an angle. (Tr. A 31-32). Springer also asked him why he had previously pointed to the fifth photograph as well, and Gomez explained that he recognized the person in that photograph from his neighborhood. (Tr. A 32). At Springer's request, Gomez circled and initialed photograph three and signed the array. (Tr. A 32).

Springer told him that the name of the person depicted was Clarence Lambert. (Tr. A 55). She also told him that the name of the person he had identified in the previous array was Earl McCoy. (Tr. A 56). Springer acknowledged that RPD's written instructions direct officers not to comment on identifications even after a procedure has concluded, but testified that they are trained to inform the witness of the name of the individual identified after the completion of an identification procedure. (Tr. A 57-59).

Springer testified that McCoy is approximately 5′11″ to 6′ and weighs over 200 pounds and recalled that Lambert is approximately the same height but 25 pounds lighter. (Tr. A

39-40).  At the time the arrays were prepared, McCoy had been identified as a suspect in the

home invasion, and the arrays were prepared with the use of a computer system designed to

select photographs of individuals with similar characteristics to the suspect for inclusion in the

array.  (Tr. A 42-45).

Springer testified that neither she nor Gonzalez gestured towards any photographs

or otherwise suggested which photographs Gomez should identify during the identification

procedure.  (Tr. A 35).  She also confirmed that she had not shown Gomez any photographs of

McCoy before showing him the third array.  (Tr. A 35).

## 2.     Testimony of Dennis Gonzalez

Gonzalez testified that he had been employed as an RPD investigator for over

sixteen years.  (Tr. A 64).  He testified that he is a fluent Spanish and English speaker and

routinely translates between the English and Spanish languages during the course of his RPD

duties.  (Tr. A 65).  On October 28, 2014, he accompanied Investigator Springer to 218

Haywood Avenue to assist with identification procedures in connection with a home invasion

investigation with which she was involved.  (Tr. A 66).  His role was to translate between

English and Spanish for the benefit of the witnesses, who spoke Spanish, and Springer, who

spoke English.  (Tr. A 67).

When they arrived, they spoke with Daniel Gomez, whom Gonzalez had never

spoken to before that day.  (Tr. A 67, 87).  Gomez advised them that his wife was extremely

scared that the perpetrators would return to her home and harm her.  (Tr. A 67, 80).  In response,

Springer told Gomez that they were trying to identify the perpetrators, who they believed had

been involved in other crimes, and "hopefully lock them up for a long time."  (Tr. A 68-69,

80-81).

Gonzalez translated into Spanish the instructions that Springer read from the police form. (Tr. A 69-71; G. Ex. 1). Gomez responded that he understood the instructions and signed the form. (Tr. A 72). Springer handed Gomez the first array, and Gomez pointed to photograph three and grunted without saying anything. (Tr. A 73). Seconds later, he also pointed to the fifth photograph and said he also recognized him. (Tr. A 73). Gonzalez informed Springer that Gomez appeared slightly confused, and Springer told Gonzalez that they would move on and show Gomez other photographs that might clear up his confusion, which Gonzalez communicated to Gomez in Spanish. (Tr. A 73-74, 83).

Springer removed the first array, and Gomez viewed the second array and indicated that he did not recognize anyone depicted. (Tr. A 75, 83). After signing the second array, Gomez was shown the third array. (Tr. A 75). According to Gonzalez, Gomez immediately pointed to the fifth photograph and stated, "That's the individual that struck me in the face with the gun, the .38." (Tr. A 76). Gomez initialed and circled the photograph. (Tr. A 76).

After that array had been removed, the first array was presented again to Gomez. (Tr. A 77). This time, Gonzalez told Gomez to look at the photographs again and asked him whether he recognized anybody "who entered his home on the day of the crime." (Tr. A 77, 85). According to Gonzalez, Gomez immediately pointed to photograph three and said, "That's the guy that entered my house with the Uzi." (Tr. A 77-78, 85). Springer asked Gomez if he was certain, and Gomez responded that he was 90% certain. (Tr. A 78). The investigators then asked Gomez how he recognized the individual in the fifth photograph, and Gomez explained he recognized him from his neighborhood. (Tr. A 78-79).

**B.** **Nix's Motion and Evidentiary Hearing**

Nix moves to suppress identification testimony of various witnesses.  (Docket # 118 at ¶¶ 51-58).  This Court held an evidentiary hearing on Nix's motion on April 26, 2016, at which Sean Martineck ("Martineck"), an agent with the Bureau of Alcohol, Tobacco and Firearms ("ATF"), testified about identification procedures he conducted on March 5, April 6, and May 11, 2015.[11]  (Docket # 128).

Following Martineck's testimony, Nix asked for permission to subpoena RPD Investigator Ed Bernabei ("Bernabei") to testify at the hearing.  (Tr. B 86).  The Court indicated that it was not inclined to grant the request in the absence of a further explanation from Nix regarding the purpose of his testimony.  (Tr. B 90-93).  The Court directed Nix to file a written memorandum after he had received and reviewed the hearing transcript if, based upon that review, he still wished to called Bernabei.  (*Id.*).  Nix did not submit any post-hearing memorandum or otherwise indicate that he wished to call Bernabei.

Nix's original motion papers also sought suppression of identification testimony of a witness who met with Martineck on March 19, 2015.  (Docket # 118 at ¶¶ 51-58).  At the hearing, the government represented that the witness did not identify Nix from a photographic array containing his photograph and that it did not intend to offer in-court identification testimony from that witness at trial.  (Tr. B 86-87).  Accordingly, this Court recommends that the district court grant Nix's motion to suppress any testimony by that witness relating to identification of Nix.

Martineck testified that he had been employed as a Special Agent with ATF since 2001.  (Tr. B 5).  Beginning in 2014, he became involved in an investigation of Nix.  (Tr. B 5).

---

[11]  The transcript of the April 26, 2016 hearing shall be referred to as "Tr. B __."  (Docket # 128).

On March 5, 2015, Martineck, accompanied by Special Agent Matt Allen ("Allen") with the Federal Bureau of Investigation ("FBI"), met with a cooperating witness and the witness's defense attorney at the United States Attorney's Office in the federal building. (Tr. B 6-8). At the time of the meeting, the witness was in custody. (Tr. B 6). Prior to the March 5, 2015 procedure, the cooperating witness had advised Martineck that the witness would be able to identify Nix, whom the witness knew as "Meech," if shown a photograph of him. (Tr. B 6-7).

During the March 5, 2015 meeting, Martineck showed the witness various six-photograph arrays, one of which included a photograph of Nix. (Tr. B 8). Before displaying the first array to the witness, Martineck instructed the witness:

> I'm going to show you a piece of paper with six photographs. You may or may not know anyone in these photographs. I want you to look at each photograph carefully. If you recognize anyone in these photographs, I want you to let me know which number and what you know that person as.

(Tr. B 8). Martineck displayed the arrays to the witness one at a time. (Tr. B 8-9). When the witness was shown the array with Nix's photograph, the witness immediately pointed to photograph five and said the witness thought the individual was "Meech," but "I'm not a hundred percent sure or certain." (Tr. B 9). Martineck asked the witness to circle the photograph and write the name by which the witness knew the individual. (Tr. B 9). The witness circled the number "5" and wrote the name "Meech" above Nix's photograph and, at Martineck's instruction, signed or initialed next to the "witness" line. (Tr. B 9; G. Ex. 1.1). At no time did Martineck gesture towards or otherwise indicate to the witness a particular photograph that the witness should select. (Tr. B 10).

Approximately five minutes after the witness signed the array with Nix's photograph, Martineck showed the witness a photograph of Nix leaning against a sports car parked in a driveway next to a white house.  (Tr. B 16-19; G. Ex. 1.2).  Martineck told the witness:

> I'm about to show you a piece of paper which contains a photograph.  You may or may not recognize what's in this photograph.  I want you to carefully look at this photograph and let me know if you recognize anything in this photograph.

(Tr. B 16).  The witness immediately responded, "That's Meech, and it looks like Meech's mom's house driveway."  (Tr. B 16).  At Martineck's direction, the witness initialed or signed the photograph.  (Tr. B 17; G. Ex. 1.2).  No other photographs of Nix were shown to the witness on March 5, 2015.  (Tr. B 20).

On April 6, 2015, Martineck met with another cooperating witness, who was in custody, in order to conduct an identification procedure.  (Tr. B 21-22).  The meeting took place at the United States Attorney's Office and, in addition to Martineck and the witness, FBI Agent Allen, Investigator Bernabei, Assistant United States Attorney ("AUSA") Robert Marangola ("Marangola"), and the witness's defense attorney were also present.  (Tr. B 23).  Prior to the procedure, the witness had informed Martineck that the witness knew "Meech" and could identify a photograph of him.  (Tr. B 22).

Martineck began the procedure by providing the witness with the same instructions that he had given the witness on March 5.  (Tr. B 23-24).  When Martineck placed the array in front of the witness, the witness immediately put a finger on Nix's photograph, which was photograph five, and said, "Meech."  (Tr. B 24).  As before, Martineck directed the witness to circle the number of the photograph of the person the witness believed to be "Meech" and to write the name by which the witness knew him.  (Tr. B 26).  The witness circled the

number "5" above Nix's photograph and wrote "Meech" underneath it.  (Tr. B 26; G. Ex. 2).

The witness also signed or initialed the "witness" line.  (Tr. B 26; G. Ex. 2).  During the

procedure, Martineck did not make any gestures towards or otherwise suggest a particular

photograph that the witness should select.  (Tr. B 25).

On May 11, 2015, Martineck met with a third cooperating witness and conducted

an identification procedure.  (Tr. B 29-30).  Like the other witnesses, this witness had told

Martineck that the witness knew "Meech" and would be able to identify a photograph of him.

(Tr. B 30).  They met at the United States Attorney's Office, and the meeting was attended by

the witness, the witness's attorney, Martineck, Allen, Bernabei and AUSA Marangola.  (Tr. B

31).

Martineck provided the same instructions to this witness as he had to the other

two witnesses.  (Tr. B 31-32).  After he handed the witness the array with Nix's photograph, the

witness pointed to the fifth photo and stated, "That's Meech."  (Tr. B 33).  The witness circled

the number "5," wrote "Meech" under Nix's photograph, and signed or initialed on the "witness"

line.  (Tr. B 33; G. Ex. 3.1).  Martineck made no gestures or other suggestions to the witness as

to which photograph to select.  (Tr. B 34).

Several minutes later, Martineck showed the witness a copy of the same single

photograph of Nix that he had shown the first witness on March 5, preceded by the same

directions.  (Tr. B 40; G. Ex. 3.2).  The witness immediately responded that the photograph was

of "Meech's mom's house and Meech," and the witness recorded that description on the copy.

(Tr. B 44; G. Ex. 3.2).  After removing the first photograph, Martineck stated, "I'm about to

show you another piece of paper with a photograph.  The instructions remain the same."  (Tr. B

41).  He showed the witness a copy of a different single photograph of Nix leaning on a car, and

the witness responded immediately, "That's Meech."  (Tr. B 46; G. Ex. 3.3).  The witness wrote

"That's Meech" on the photograph, and Martineck removed the photograph.  (Tr. B 46, G. Ex.

3.3).  Martineck showed the witness a third single photograph and told the witness that the

instructions remain the same.  (Tr. B 46).  A copy of a third photograph of Nix leaning on a

different car was displayed to the witness, and the witness again responded, "That's Meech."

(Tr. B 47).  The witness wrote the identification on the bottom of the copy.  (Tr. B 47, G. Ex.

3.4).  Martineck explained that the three single photographs of Nix that he showed the witness

were of "particular interest" in the investigation.  (Tr. B 50).  Specifically, the investigators were

interested in identifying vehicles that Nix drove and the location of Nix's mother's residence.

(Tr. B 75-76).

During further examination of Martineck, he testified that each witness was

interviewed concerning the investigation before being shown any photographic arrays.  (Tr. B

64, 66, 67).  During the interview, each witness discussed various individuals, including the

person the witness knew as "Meech."  (Tr. B 64, 66-68).  None provided a physical description

of Nix before looking at the photographic arrays.  (Tr. B 65, 67, 68).  In addition, two of the

witnesses (the March 5 and May 11 witnesses) were shown other arrays that did not contain

photographs of Nix; the witness on April 6 was not.  (Tr. B 65-66, 68-69).  Martineck

acknowledged that the March and May witnesses knew each other, although he testified that they

were in different jail facilities during the period spanning the meetings about which Martineck

testified.  (Tr. B 79-80).

C.     **Discussion**

1.     **Applicable Caselaw**

Evidence of an out-of-court photographic identification will be suppressed under the due process clause if "the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968).  In determining whether to exclude evidence of a pretrial identification, a court must first consider whether the identification procedure was unduly suggestive.  *Id.*  To decide whether a photographic array is unduly suggestive, a court should consider several factors, including "the size of the array, the manner of presentation by the officers, and the array's contents."  *United States v. Maldonado-Rivera*, 922 F.2d 934, 974 (2d Cir. 1990), *cert. denied*, 501 U.S. 1233 (1991).  Specifically, the court must consider "whether the picture of the accused . . . so stood out from all the other photographs as to suggest to an identifying witness that [the accused] was more likely to be the culprit."  *Jarrett v. Headley*, 802 F.2d 34, 41 (2d Cir. 1986) (internal citations omitted).

If the identification procedure was unduly suggestive, the court must proceed to determine whether the identification nevertheless possesses "sufficient aspects of reliability." *United States v. Bubar*, 567 F.2d 192, 197 (2d Cir.) (citing *Manson v. Brathwaite*, 432 U.S. 98, 109-17 (1977)), *cert. denied*, 434 U.S. 872 (1977).  "Even if the procedure was unnecessarily (or impermissibly) suggestive . . .[,] a district court may still admit the evidence 'if, when viewed in the totality of the circumstances, it possesses sufficient indicia of reliability.'"  *United States v. Bautista*, 23 F.3d 726, 729-30 (2d Cir.) (footnote omitted) (quoting *United States v. Simmons*, 923 F.2d 934, 950 (2d Cir.), *cert. denied*, 500 U.S. 919 (1991)), *cert. denied*, 513 U.S. 862 (1994).

2.      **McCoy's Suppression Motion**

McCoy moves to suppress Gomez's identification on the grounds that the pretrial identification procedure was suggestive.  (Docket # 109-1).  He argues that the procedure was tainted by the investigators' failure to remain neutral and silent and by various comments that they made during their interaction with Gomez on October 28, 2014.  (*Id.* at 3-5).  Specifically, McCoy notes that the investigators told Gomez (1) before the procedure, that they were trying to identify the perpetrators, who they believed were involved in other crimes, and "put them in jail," (2) during the procedure, that Gomez was only supposed to recognize one person in the array, and (3) after the procedure, that the names of the individuals he had recognized were Earl McCoy and Clarence Lambert.  (*Id.* at 3-5).  I disagree that the procedure was unduly suggestive.

With respect to the investigators' comments to Gomez when they first arrived, although they never informed Gomez that the arrays included photographs of the suspected perpetrators, their comments reasonably implied that the arrays were designed to assist in identifying and prosecuting the perpetrators.  While law enforcement officers must be careful not to inform a witness that a suspect's photograph is among those included in an array, the investigators' comments to Gomez, which were in response to his reports of his wife's security concerns, did not render the procedure unduly suggestive.  *See Jenkins v. City of New York*, 478 F.3d 76, 93 (2d Cir. 2007) ("[t]his Court . . . has held that although the police generally should refrain from informing a witness that the suspect is in the lineup, a lineup is not unduly suggestive merely because they do"); *Sales v. Harris*, 675 F.2d 532, 538 (2d Cir.) ("[a]s to the lineup, the only hint of suggestiveness emanated from the police officer's statement to [the witness] just prior to viewing the lineup that a suspect was in custody[;] [a]lthough this [C]ourt has expressed disapproval of such a statement, . . . the suggestiveness in this case was minimal

since the statement preceded an otherwise acceptable lineup"), *cert. denied*, 459 U.S. 876 (1982);

*United States v. Gambrill*, 449 F.2d 1148, 1151 n.3 (D.C. Cir. 1971) ("[i]t must be recognized

. . . that any witness to a crime who is called upon to view a police lineup must realize that he

would not be asked to view the lineup if there were not some person there whom the authorities

suspect"); *cf. Floyd v. Conway*, 2010 WL 3420630, *7 (W.D.N.Y. 2010) ("[e]ven if [the officer]

were to have advised the witness that a photograph of the suspect was included in the array, this

would nonetheless not have been fatal to the propriety of the procedure") (internal quotation

omitted).  Here, neither investigator told Gomez that the suspected perpetrators were included in

the arrays, and the fact that Gomez recognized two people in one array, one of whom was

someone he knew from the neighborhood, and none in another strongly suggests that he was not

in fact influenced by any suggestion that he should find a photograph of the suspected

perpetrators in the arrays.

   With respect to the comments during the procedure, as a factual matter, the record

refutes McCoy's contention that the investigators told Gomez he was supposed to recognize only

one person in each array.  Gonzalez testified that he thought Gomez was confused when he

viewed the first array because he believed Gomez was supposed to recognize only one

perpetrator from the array.  (Tr. A 83).  After providing that testimony, defense counsel asked

him, "Did you tell him he was only supposed to identify one person?"  (Tr. A 83).  Gonzalez

replied, "I did not, sir."  (Tr. A 83).  There is simply no evidence in the record to support

McCoy's contention that the investigators told Gomez that he was expected to recognize only

one person, and indeed the evidence is to the contrary.  Moreover, nothing in the record suggests

that Gomez in fact recognized more than one person in the array that contained McCoy's

photograph, and the fact that he told the investigators that he did not recognize anyone in the

second array demonstrates that he did not feel compelled to make an identification from each array he was presented.

With respect to the investigators' later disclosure of the names of the individuals whom Gomez identified, the record shows that those disclosures occurred after Gomez had made his identifications, had signed the arrays, and after Delgado had also completed the identification procedure. (Tr. A 56). With respect to McCoy, the testimony reveals that the investigators provided only his name to Gomez and Delgado. (Tr. A 56). As to Lambert, they told Gomez and Delgado that Lambert was in custody at that time and "looking at a lot of time and if all goes well, he will not be getting out for years to come." (Tr. A 56). The investigators did not inform Gomez and Delgado that there was any relationship between McCoy and Lambert. (Tr. A 56).

Any variance between the disclosures and RPD's written rules is not proof that the disclosures rendered the already completed procedures unduly suggestive, and McCoy cites no authority supporting that proposition. Significantly, neither investigator told Gomez that he had correctly identified the individuals whom they suspected to be the perpetrators. Although they told Gomez that Lambert was currently in jail, they did not tell him that Lambert was in jail on charges stemming from the home invasion and, importantly, did not tell him anything about McCoy other than his name. Thus, it cannot be said that the mere disclosure of McCoy's name, well after Gomez had identified him and had completed the entire identification procedure, was suggestive, let alone so unduly suggestive as to render unreliable any subsequent identification of him. This Court can conceive of no basis on which McCoy's argument justifies suppression in this case.

Nor is there anything about the McCoy array itself that was unduly suggestive. The array contains six color photographs of different African-American men of apparently

similar ages.  (G. Ex. 2).  All are head shots and feature men with short hair, all of whom have closely groomed facial hair.  (*Id.*).  All men appear to have thin moustaches, and most appear to have slight beards.  (*Id.*).  For some of the individuals, it is difficult to discern whether the darker area on the individual's lower chin is a close beard or a shadow from the photograph.  In any event, none of the photographs of the individuals, including McCoy, stand out from the others in terms of the characteristics of the individuals depicted or the photographs themselves.  *See*, *e.g.*, *United States v. Christner*, 2015 WL 6508058, *17 (W.D.N.Y. 2015) (array not suggestive where "individuals depicted have similar physical characteristics"), *report and recommendation adopted*, 2016 WL 324546 (W.D.N.Y. 2016); *United States v. De La Rosa*, 2008 WL 2595173, *6 (W.D.N.Y.) (array not suggestive where it contained "photographs of other men with similar physical characteristics (age, complexion, facial hair, hair style and hair length)"), *report and recommendation adopted*, 2008 WL 2595171 (W.D.N.Y. 2008).  That Gomez initially described the assailants as taller and heavier than McCoy is immaterial because neither height nor weight are characteristics revealed by the photographs.  Although McCoy was older (thirty-three years old) than the perpetrators Gomez described, his age appears generally consistent with the age of the other individuals in the array.  *See United States v. Guzman*, 2015 WL 774211, *8 (W.D.N.Y. 2015) ("[i]rrespective of whether [defendant] and the other individuals actually shared similar physical characteristics, the physical characteristics depicted in the array are similar").  Because he was a suspect, the array was appropriately prepared with reference to him, rather than with reference to the description of someone eight to thirteen years younger.  Had McCoy been included in an array with five individuals obviously younger than he, his photograph might well have stood apart in a manner to draw attention to it.

Finally, McCoy's contention that suppression is warranted under the five-factor analysis in *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972), is misplaced. (*See* Docket # 109-1 at 5). The *Biggers* analysis applies to determine whether an identification that was made in a suggestive procedure nonetheless has a sufficiently reliable basis to be admitted. Because the procedure in this case was not unduly suggestive, the *Biggers* analysis is inapplicable.

### 3.     Nix's Suppression Motion

As an initial matter, Nix did not submit a post-hearing memorandum despite indicating at the hearing that he intended to do so. (*See* Tr. B 91). Assuming that his failure to do so does not reflect an intention to withdraw his motion, this Court has carefully considered Martineck's credible hearing testimony and finds that it does not justify suppression of identification testimony by any of the three witnesses about whom he testified.

First, the procedures themselves were not suggestive. Martineck never advised the witnesses that the arrays and photographs they were shown contained photographs of "Meech." He did not gesture towards any photographs or provide any verbal suggestions or clues about which photographs to select. Rather, Martineck simply said he would be showing the witnesses photographs and they may or may not recognize any of the individuals depicted. *See United States v. Williams*, 2015 WL 429087, *17 (W.D.N.Y.) (manner of presentation of array not unduly suggestive where it did not suggest to the witness which, if any, photograph to select); *report and recommendation adopted*, 2015 WL 3454430 (W.D.N.Y. 2015); *United States v. Guzman*, 2015 WL 774211 at *7 (same). In each case, the witness's identification of Nix's photograph was unhesitating. Although two of the witnesses were shown single photographs of Nix, those photographs – which had value to the investigation – were not displayed until the photographic array procedure had been completed. On this record, it cannot

be said that the single photographic identifications influenced the earlier unequivocal

photographic array identifications or would unduly influence any in-court identifications at trial.

Second, the arrays themselves are not suggestive. According to Martineck, none

of the witnesses provided a physical description of Nix before viewing the array with his picture.

Thus, the array could not have been designed to emphasize any particular physical characteristic

of Nix described by the witness. Moreover, the array contains photographs of six

African-American men with many similar features. (G. Exs. 1.1, 2, 3.1). All appear to be of

similar age, have short hair and similar facial hair, and comparable skin tones. Five of the men,

including Nix, have noticeably large heads and full faces; the exception is the first man who

appears to have a thinner face. Although Nix's forehead seems higher and his hairline farther

back on his head, these features are hardly pronounced enough to make Nix's photograph stand

out from the others. *See Jarrett v. Headley*, 802 F.2d at 41 (court must consider "whether the

picture of the accused . . . so stood out from all the other photographs as to suggest to an

identifying witness that [the accused] was more likely to be the culprit") (internal citations

omitted).

For these reasons, I recommend that the district court deny Nix's motion to

suppress identification testimony from the March 5, April 6, and May 11, 2015 witnesses.


## DECISION AND ORDER

### I.   Disclosure of Confidential Informants (McCoy)

McCoy also moves for disclosure of confidential informants. (Docket ## 69-1 at

¶¶ 87-92; 109-2 at ¶¶ 87-92). Without any specificity, McCoy argues that "[d]isclosure of

informant information in this prosecution is essential to a fair determination of the charges

against [him]."  (Docket ## 69-1 at ¶ 90; 109-2 at ¶ 90).  In response, the government acknowledges its obligation to identify any confidential informants whom it expects to call as witnesses at trial, as well as to produce associated *Jencks* and *Giglio* material.  (Docket # 70 at 17-19).  The government opposes, however, McCoy's motion to identify non-testifying confidential informants or to identify testifying informants earlier than two weeks before trial or at the pretrial conference.  (*Id.*).

        The disclosure of a confidential informant's identity is within the sound discretion of the district court, *DiBlasio v. Keane*, 932 F.2d 1038, 1042 (2d Cir. 1991), and the government generally is not required to disclose the identity of confidential informants, *Roviaro v. United States*, 353 U.S. 53, 59 (1957).  In order to obtain such disclosure, the defendant must show that without it, "he will be deprived of his right to a fair trial."  *United States v. Fields*, 113 F.3d 313, 324 (2d Cir.), *cert. denied*, 522 U.S. 976 (1997); *United States v. Saa*, 859 F.2d 1067, 1073 (2d Cir. 1988) (defendant entitled to identity of confidential informant only upon showing that it is essential or material to the defense), *cert. denied*, 489 U.S. 1089 (1989).  A defendant's mere suggestion that disclosure will be of assistance to the defense of the case is insufficient.  *United States v. Fields*, 113 F.3d at 324.  "[T]he district court must be satisfied, after balancing the competing interests of the government and the defense, that the defendant's need for disclosure outweighs the government's interest in shielding the informant's identity."  *Id.* (citing *Roviaro v. United States*, 353 U.S. at 62).  Such a need is established, according to the Second Circuit, "where the informant is a key witness or participant in the crime charged, someone whose testimony would be significant in determining guilt or innocence."  *United States v. Saa*, 859 F.2d at 1073.

In the instant matter, McCoy has failed to show how disclosure of the informants' identities would be material to his defense. Although McCoy maintains that the identity of the informants could potentially assist his defense, "[m]ateriality is not . . . established simply by showing that the confidential informant was a participant in and a witness to the crime charged." *United States v. Rijo*, 2006 WL 3056526, *2 (W.D.N.Y.), *report and recommendation adopted*, 2006 WL 3056523 (W.D.N.Y. 2006); *see also United States v. Flaharty*, 295 F.3d at 202 ("speculation that disclosure of the informant's identity will be of assistance is not sufficient to meet the defendant's burden") (quoting *Fields*, 113 F.3d at 324). Accordingly, I deny McCoy's motion for disclosure of confidential informants.

## II.    <u>Discovery (McCoy)</u>

The only aspect of McCoy's motion for discovery that remains pending is his request for disclosure of co-conspirator statements. (Docket ## 69-1 at ¶¶ 25-27; 109-2 at ¶¶ 28-30). The government maintains that his request exceeds the scope of Rule 16 of the Federal Rules of Criminal Procedure. (Docket # 70 at 7). I agree.

The plain language of Rule 16 authorizes disclosure of statements made directly by the defendant. The Second Circuit has rejected the interpretation of Rule 16 advanced by McCoy – that it requires disclosure of co-conspirator statements that the government expects to offer as evidence against the defendant under Rule 801(d)(2)(E) of the Federal Rules of Evidence. *In re United States*, 834 F.2d 283, 286-87 (2d Cir. 1987); *United States v. Percevault*, 490 F.2d 126, 128-32 (2d Cir. 1974); *see also United States v. Weishan*, 2016 WL 75166, *2 (W.D.N.Y. 2016) ("[i]t is well established that the statements of co-conspirators are not discoverable under Rule 16(a)"); *United States v. Barrera*, 950 F. Supp. 2d 461, 475 (E.D.N.Y.

2013) ("[t]he ambit of Rule 16 is far narrower and only entitles [d]efendant to disclosure of statements he himself made"); *United States v. Aquart*, 2006 WL 2684304, *5 (D. Conn. 2006) ("[t]o the extent that [d]efendant seeks discovery of statements made by co-conspirators, such statements are not discoverable") (collecting cases).

McCoy argues that under the reasoning of *United States v. Nakashian*, 635 F. Supp. 761, 773 (S.D.N.Y. 1986), *rev'd on other grounds*, 820 F.2d 549 (2d Cir.), *cert. denied*, 484 U.S. 963 (1987), the government should be required to produce co-conspirator statements of named co-conspirator Clarence Lambert. In *Nakashian*, the court ordered disclosure of non-testifying co-conspirator statements made in furtherance of the charged conspiracy; the court reasoned that disclosure of those statements, unlike statements of testifying co-conspirators which are subject to *Jencks* Act disclosures, was not governed and limited by the *Jencks* Act and would not unnecessarily reveal sensitive information. *United States v. Nakashian*, 820 F.2d at 773-74. First, it is far from clear whether the reasoning in *Nakashian* has any force in view of the Second Circuit's subsequent decision in *In re United States*, 834 F.2d 283 (2d Cir. 1987). In that case, the Court explicitly noted that "if the [g]overnment did not intend to call anyone to testify concerning co-conspirators' statements, they were not discoverable at all." *Id.* at 286-87 & n.2. *See, e.g.*, *United States v. Lino*, 2001 WL 8356, *16 (S.D.N.Y. 2001) ("absent a requirement that they be produced under *Brady*, statements of non-testifying co-conspirators are not discoverable"); *United States v. Nachamie*, 91 F. Supp. 2d 565, 578 (S.D.N.Y. 2000) (footnote 2 in *In re United States* "makes clear that the statements of non-testifying co-conspirators are not discoverable absent a requirement that they be produced under the *Brady* doctrine") (collecting cases). Second, as a factual matter, it is also unclear whether Lambert will

or will not be testifying.  On this record, I deny McCoy's broad request for disclosure of all co-conspirator statements.

III.    **Bill of Particulars (Nix)**

Finally, Nix has moved for a bill of particulars as to Counts Two, Five, Six, and Eight.  (Docket ## 95 at 20-25).  The government opposes his motion.  (Docket # 102 at 10-12).

The purpose of a bill of particulars is to enable the defendant "to identify with sufficient particularity the nature of the charge pending against him, thereby enabling [the] defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense."  *United States v. Bortnovsky*, 820 F.2d at 574 (citations omitted) (per curiam).  A bill of particulars is not to be used as a discovery device to obtain "evidentiary detail" about the government's case.  *See*, *e.g.*, *Torres*, 901 F.2d at 234 (citation omitted).  In other words, a bill of particulars should be granted where the information sought is "necessary" to prepare a defense and to avoid double jeopardy, not where it is merely "useful" to the defense in ascertaining the government's proof.  *See United States v. Henry*, 861 F. Supp. 1190, 1197 (S.D.N.Y. 1994); *see also United States v. Love*, 859 F. Supp. 725, 738 (S.D.N.Y.), *aff'd sub nom. United States v. Roberts*, 41 F.3d 1501 (2d Cir. 1994), *cert. denied*, 519 U.S. 951 (1996).  Where the charge against the defendant is broad in scope, a bill of particulars may be more appropriate than where the charged conduct is more narrow.  *See*, *e.g.*, *United States v. Barnes*, 158 F.3d 662, 666 (2d Cir. 1998); *United States v. Davidoff*, 845 F.2d 1151, 1154-55 (2d Cir. 1988).

To warrant a bill of particulars, the indictment's charges against a defendant must be so general that they fail to advise him of the specific acts of which he is accused.  *See Torres*,

901 F.2d at 234; *United States v. Henry*, 861 F. Supp. at 1198.  In determining that question, the court may consider whether the information sought by the defendant has been made available in alternative forms, such as in discovery or prior court proceedings.  *See United States v. Panza*, 750 F.2d 1141, 1148 (2d Cir. 1984); *United States v. Kelly*, 91 F. Supp. 2d 580, 583-84 (S.D.N.Y. 2000); *United States v. Ahmad*, 992 F. Supp. 682, 684 (S.D.N.Y. 1998); *United States v. Feola*, 651 F. Supp. 1068, 1133 (S.D.N.Y. 1987), *aff'd*, 875 F.2d 857 (2d Cir.), *cert. denied*, 493 U.S. 834 (1989).

The majority of the particularization sought by Nix is in the nature of evidentiary detail.  For example, Nix seeks identification of the "precise date" on which he possessed a firearm in Count Two and the brand and model of any firearm he possessed.  (Docket # 95 at 22).  This degree of detail is generally beyond the scope of a bill of particulars.  *See, e.g.*, *United States v. Simmons*, 2016 WL 285176 at *16 (denying motion for further particularization of Section 924(c) count relating to multi-year drug conspiracy in view of information known to defense through other charges in indictment, detailed criminal complaint, voluminous discovery, and detailed government proffer during detention hearing); *United States v. Calvente*, 2013 WL 4038952, *1 (S.D.N.Y. 2013) (denying request for additional particularization of 924(c) charge, including "the dates, times, and locations that each defendant possessed firearms[,]" because "[n]one of the requests for particularity are necessary for the [d]efendants to prepare for trial, prevent surprise, or interpose a double jeopardy claim"); *United States v. Mason*, 2007 WL 541653, *4-5 (S.D.N.Y. 2007) (denying request for particulars including "the dates and places that [defendant] possessed firearms, and the types of firearms he possessed").  I will nonetheless order the government to provide Nix (as I have ordered it to provide McCoy), by no later than thirty days after the district court's decision on these motions, a bill of particulars identifying (by

general location and approximate date) any uncharged robberies or attempted robberies in furtherance of which Nix allegedly possessed, used or brandished a firearm about which the government will offer evidence in support of Count Two. That particularization will enable Nix to adequately prepare his defense to Count Two by apprising him of the robberies in which he is alleged to have possessed a firearm.

Nix also seeks further particularization as to "how" he allegedly possessed the controlled substances and firearms charged in Counts Five and Eight (*e.g.*, "[s]tate specifically how Matthew Nix or anyone listed in count (5) had [p]hysical possession or had intent to distribute the [controlled substances]"; [s]tate specifically [h]ow Matthew Nix [was] allegedly in possession of said [f]irearms") and when he possessed firearms in Counts Six and Eight (*e.g.*, "[s]tate specifically during the time frame that Matthew Nix allegedly possessed the [f]irearms Matthew Nix was in possession of [c]ontrolled [substances]"; "[s]tate specifically the period of time that is encompassed by the terminology 'on or about' September 23, 2014"; "[s]tate specifically [w]hen Matthew Nix allegedly unlawfully did knowingly in affecting commerce"; "[s]tate specifically the period of time Matthew Nix allegedly [possessed] said [f]irearms"). (Docket # 95 at 23-25). Counts Five, Six and Eight charge crimes arising from events occurring on a single day, September 23, 2014.

As the government explained in its submission and further at oral argument on January 27 and April 8, 2016, materials disclosed to Nix in discovery include police reports of a robbery that occurred on September 23, 2014 at 1099 Maple Street. (*See* Docket # 119 at 3). According to the government, cooperating witnesses who participated in the robbery are expected to testify that Nix was involved in an agreement to steal drugs from 1099 Maple Street, traveled with the co-conspirators to that location, waited outside while others, who were armed,

broke in and stole drugs, firearms, and currency, some of which were then put into Nix's vehicle before he left the scene.  The government also explained that cell phone records provided in discovery demonstrate that Nix's phone was in the vicinity of the robbery at the time of its commission.

Other reports provided in discovery describe the subsequent recovery in March 2015 of an Uzi firearm identified in Count Eight.  The discovery also includes photographs of that firearm.  The government expects that some of the victims of the robbery and the cooperating witnesses will identify that firearm and others in Count Eight and the controlled substances in Count Five as having been stolen in that September 23, 2014 robbery.  On this record, Nix has sufficient information about the charges against him to prepare his defense; no additional particularization is warranted.

Nix's request for a bill of particulars identifying "the names of any witnesses who claim that Matthew Nix allegedly possessed the [f]irearms" (Docket # 95 at 24) at issue in Count Six plainly exceeds the scope of a proper request for a bill of particulars.  *See*, *e.g.*, *United States v. Muhammad*, 2010 WL 2232438, *7-8 (D. Conn. 2010) (function of bill of particulars is not to obtain names of witnesses); *United States v. Mandell*, 710 F. Supp. 2d 368, 384-85 (S.D.N.Y. 2010) (same).  I also deny his request for further information regarding the quantities of the controlled substances (Docket # 95 at 23).  *See*, *e.g.*, *United States v. McIver*, 2010 WL 1038682, *3 (W.D.N.Y. 2010) (denying request for "information about where the offenses occurred, the quantities involved, and proof that the substance was cocaine" on the grounds that these details were "beyond the scope of a [b]ill of [p]articulars"); *United States v. Sylvia*, 2009 WL 778105, *1 (W.D.N.Y. 2009) (denying request for additional particularization of "the exact quantity of the cocaine involved" where the indictment, "along with the discovery materials provided or to

be provided by the government . . . clearly inform the defendant of the essential facts of the crime charged").

In sum, other than the further particularization ordered with respect to Count Two, Nix's motion for a bill of particulars is denied.


**CONCLUSION**

For the reasons stated above, McCoy's motions for disclosure of confidential informants and co-conspirator statements **(Docket ## 69, 109)** are **DENIED**.  With respect to McCoy's and Nix's motions for a bill of particulars relating to Count Two **(Docket # 69, 95, 109)**, the government is directed to provide, by no later than thirty days after the district court's decision on this report and recommendation, a bill of particulars identifying (by general location and approximate date) any uncharged robberies or attempted robberies in furtherance of which McCoy and Nix allegedly possessed, used or brandished a firearm about which the government will offer evidence in support of Count Two.  Defendants' motions for further particularization **(Docket ## 69, 95, 109, 118)** are **DENIED**.

Further, for the reasons stated above, I recommend that the district court deny McCoy's and Nix's motions to dismiss, Nix's related request for disclosure of grand jury minutes, and McCoy's motion to suppress post-arrest statements.  **(Docket ## 69, 95, 109, 118)**. I further recommend that the district court grant in part and deny in part McCoy's and Nix's motions to suppress identification testimony.  Specifically, I recommend that McCoy's motion to suppress the identification testimony of Delgado and Nix's motion to suppress the identification testimony of the witness who met with Martineck on March 19, 2015 be granted.  **(Docket ## 69,**

**95, 109**).  I recommend that defendants' motions to suppress identification testimony be denied

in all other aspects.  (**Docket ## 69, 95, 109, 118**).

**IT IS SO ORDERED.**


                       *s/Marian W. Payson*
                     MARIAN W. PAYSON
               United States Magistrate Judge

Dated: Rochester, New York
       September 21, 2016

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

      **ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

      **ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York.[12]

      The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See, e.g., Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.,* 840 F.2d 985 (1st Cir. 1988).

      **Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir. 1988).

      The parties are reminded that, pursuant to Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 59(b) may result in the District Court's refusal to consider the objection.**

      Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

                                        *s/Marian W. Payson*
                                        MARIAN W. PAYSON
                              United States Magistrate Judge

Dated: Rochester, New York
       September 21, 2016

---

[12]  Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation. Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed. *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).