UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK



UNITED STATES OF AMERICA,

**DECISION AND ORDER**

v.

6:14-CR-06181 EAW

MATTHEW NIX and EARL McCOY,

Defendants.

Presently before the Court is a motion filed by counsel for defendant Earl McCoy, Robert W. Wood, Esq., asking that the undersigned recuse herself pursuant to 28 U.S.C. § 455(b)(1), on the grounds of bias or prejudice against Defendants and/or their counsel. (Dkt. 322). The Government has filed papers opposing the recusal motion, and it also seeks to strike certain paragraphs contained in Mr. Wood's supporting affirmation. (Dkt. 336). Mr. Wood sent a letter to the Court dated June 8, 2017, seeking oral argument on the motion and requesting that he be able to respond orally to the Government's motion to strike.

For the reasons set forth below, the recusal motion is denied. In addition, the Court denies the Government's motion to strike, and because oral argument is unnecessary to a resolution of any of the pending motions, the request is denied.

## BACKGROUND

Defendants Matthew Nix and Earl McCoy ("Defendants") were convicted after a five-week jury trial of all counts in a 12-count Third Superseding Indictment alleging

violations of the Hobbs Act, 18 U.S.C. § 1951(a), and related firearms and narcotics charges, in connection with a spree of home invasions in 2014. (Dkt. 165). After the return of the verdict, and prior to sentencing, Defendants filed post-trial motions pursuant to Fed. R. Crim. P. 29(c) and 33. (Dkt. 286; Dkt. 289). In those post-trial motions, Defendants argue, *inter alia*, that one of the jurors who served during the trial—identified as "J.B." or "Juror No. 3"[1]—had been convicted of prior felonies, and, as a result, he was ineligible to serve on the jury pursuant to 28 U.S.C. § 1865(b)(5), and his failure to disclose this information during *voir dire* requires a new trial because of juror bias.

The Court has conducted two separate court appearances since Defendants filed their post-verdict motions: an initial appearance for oral argument on the post-verdict motions occurred on May 15, 2017, at which time the Court indicated that it would hold an evidentiary hearing on the issue of Juror No. 3's alleged bias (Dkt. 310); and an appearance on May 25, 2017, at which time Juror No. 3 appeared, was appointed counsel, and a hearing date of June 12, 2017, was scheduled. (Dkt. 313).

On June 2, 2017, after the most recent court appearance, Mr. Wood moved for the undersigned to recuse herself from any further proceedings pursuant to 28 U.S.C. § 455(b)(1) "on the ground that the presiding judge has a bias or prejudice concerning a p0arty [sic]. . . ."[2] (Dkt. 322 at 1). Mr. Wood argues that the undersigned has "a hostility

---

[1]     This juror was mistakenly identified in previous filings, including this Court's Order filed on May 3, 2017 (Dkt. 302), as Juror No. 4. In fact, the juror in question was Juror No. 3.

[2]     In his affidavit in support of the motion, Mr. Wood alternatively argues that the undersigned should at least recuse herself "from any proceedings concerning the issue of

to the defense," and particularly, to counsel for defendant Matthew Nix, Michael Jos. Witmer, Esq., which was purportedly demonstrated at the court appearance on May 25, 2017, and, as a result, the undersigned must recuse herself pursuant to 28 U.S.C. § 455(b)(1). (Dkt. 322-1 at ¶¶ 17-18). Mr. Wood contends that although the undersigned "has appropriately admonished" Mr. Witmer for his inappropriate post-verdict conduct, such as contacting jurors without notice to the other parties, "the court has never once thanked Mr. Witmer for discovering the truth about juror 'J.B.'" (*Id.* at ¶ 7). Mr. Wood complains that the undersigned has held three court appearances since Defendants filed their post-verdict motions[3] and "has taken occasion to verbally criticize Mr. Witmer for the same conduct which was also addressed in the court's order of May 3, 2017," (*id.* at ¶ 8), arguing that this continual criticism has "no relevance to the proceedings," (*id.* at ¶ 14). According to Mr. Wood, this Court should be directing any annoyance toward Juror No. 3 for his alleged deceptive or negligent conduct rather than admonishing Mr. Witmer. (*Id.* at ¶ 17).

Mr. Wood goes on to argue that on May 25, 2017, the undersigned "went further, criticizing counsel for Mr. McCoy, who had suggested that Mr. McCoy should not be punished for Mr. Witmer's conduct." (*Id.* at ¶ 9). Mr. Wood suggests that the

---

juror bias which is scheduled for an evidentiary hearing on June 12, 2017." (Dkt. 322-1 at ¶ 2). This alternative request does not seem appropriate under the circumstances. In other words, partial recusal is not proper: the undersigned is either biased, necessitating recusal, or not biased, meaning that no recusal is required. In any event, the alternative request is denied for the same reasons that the request for wholesale recusal is denied.

[3]    This statement is incorrect. The Court has conducted two court appearances since the filing of the post-verdict motions, not three. (*See* Dkt. 310; Dkt. 313).

undersigned possesses "a belief that it would have been better if juror 'J.B.'s' true criminal background had not been discovered and the Court would never have learned of these misrepresentations made by 'J.B.,'" (*id.* at ¶ 10), and that the undersigned has criticized counsel for bringing the issue of Juror No. 3's prior criminal history to its attention, (*id.* at ¶ 9).

The crux of Mr. Wood's motion complains about the procedures that this Court intends to employ at the evidentiary hearing scheduled for June 12: the undersigned will ask questions of the juror based, in part, on proposed questions from counsel. Mr. Wood disagrees with this procedure, arguing:

> Especially given the serious charges here, and the potential sentences, it is essential that the hearing regarding potential juror bias should be a fair, probing and searching inquiry with cross examination permitted by all counsel as was suggested by the Court in. [sic] [*United States v. Boney*, 68 F.3d 497 (D.C. Cir. 1995)] **Boney II.** It should also take place before a neutral judge who bears no favoritism toward either side or in particular, a hostility to the defense, which was demonstrated at the May 25, 2017 proceedings.

(*Id.* at ¶ 18). In sum, the recusal motion argues that the undersigned intends to severely limit the scope of the evidentiary hearing concerning the alleged bias of Juror No. 3 so as to essentially cause the result to be a *fait accompli* because of the undersigned's alleged predisposition against the defense.

## MR. WITMER'S POST-VERDICT CONDUCT

Because so much of the recusal motion is based upon Mr. Wood's apparent belief that this Court has excessively criticized Mr. Witmer's conduct, it is first necessary to address that conduct and this Court's responses to it. Although the Court recognizes that

further discussion of the Court's criticism of Mr. Witmer will likely draw even more complaints from defense counsel, Mr. Wood bases his motion in large part on that criticism, and the Court does not see how it can address the recusal motion without first delving into those issues.

As discussed below, this Court has been and is troubled by Mr. Witmer's conduct, including his misuse of the jury list in this case and failure to return all copies of it when directed, his improper use of the subpoena process under Fed. R. Crim. P. 17, his alteration and public disclosure of a sealed transcript, and his investigator's attempts post-verdict to surreptitiously video record jurors at their homes.

Mr. Wood's recusal motion references this Court's prior decision filed on May 3, 2017. (Dkt. 301). That Decision and Order dealt with the Government's motions to quash various subpoenas served following return of the jury's verdict by both Mr. Wood and Mr. Witmer with no prior Court approval and with no court appearances or hearings scheduled. (*Id.* at 1). The Court concluded that both defense counsel had failed to comply with the procedural and substantive requirements of Fed. R. Crim. P. 17(c), and therefore, it granted the Government's motions to quash. (*Id.* at 1-2). In addition to addressing the substance of the motions to quash, the Court also addressed its discovery that Mr. Witmer had violated the provisions of Fed. R. Crim. P. 17(c)(3) on at least two separate occasions during the course of the trial, when he—without Court approval—served subpoenas seeking personal and confidential victim information. (*Id.* at 7). The undersigned was particularly troubled that counsel had been expressly cautioned about the requirements of Rule 17(c)(3) at an appearance on February 10, 2017, and yet on that

same date (and then two weeks later), Mr. Witmer, without leave of Court, proceeded to issue subpoenas seeking information protected by Rule 17(c)(3). (*Id.* at 7-8).

In a footnote in its discussion of Mr. Witmer's disregard of the requirements of Rule 17(c)(3), the Court referenced Mr. Witmer's employment of a private investigator post-verdict to interview jurors at their homes without any notice to the Court or opposing counsel, in violation of clear Second Circuit precedent. (*Id.* at 8 n.4).

In regard to the post-verdict juror interviews, on March 27, 2017, this Court learned through contact from a juror and the Government (who was contacted separately by another juror) about Mr. Witmer's retention of a private investigator to conduct post-verdict juror interviews. The Court issued a Text Order that day requiring that any such contact by any of the parties cease immediately, and it scheduled an appearance for March 29, 2017. (Dkt. 270).

At the March 29 appearance, among other issues, the Court addressed the fact that Mr. Witmer had improperly retained the "jury list" in violation of the District's Jury Plan which provides that the jury list containing names and personal information of prospective jurors may be provided to the attorneys in a case set for trial, but the attorneys "may not share the jury list or information therein except as necessary for purposes of jury selection" and following its use for jury selection, the jury list (and any copies) must either be returned to the clerk or destroyed. United States District Court, Western District of New York, *Jury Plan* (Oct. 2016), *available at* www.nywd.uscourts. gov/sites/default/files/2016%20Jury%20Plan%20-%20FINAL-WebVersion.pdf.

Mr. Witmer not only retained his copy of the list, but he provided another copy to his investigator to conduct these post-verdict interviews. At the March 29, 2017, appearance, the Court directed Mr. Witmer to return all copies of the jury list within his possession, custody and control, and confirmed that requirement in a Text Order entered on that same date. (*See* Dkt. 275). When Mr. Witmer failed to comply with that direction (by returning only his copy of the jury list, and not his investigator's), the Court issued another Text Order on March 31, 2017, which, in part, reiterated the requirement that Mr. Witmer return all jury lists. (Dkt. 278). At the March 29, 2017, appearance, the Court also addressed the purpose of Mr. Witmer's post-verdict juror interviews, and the fact that he engaged in this conduct without complying with clear Second Circuit precedent. Mr. Witmer denied knowledge of this Second Circuit precedent, although he did admit that he was familiar with Fed. R. Evid. 606, and that the subject areas that he sought to explore with the jurors included their discussions during deliberations.

Thereafter, Defendants filed their post-verdict motions. (Dkt. 286; Dkt. 289). The Government filed its papers in opposition on April 25, 2017 (Dkt. 296), and Defendants filed papers in reply on May 2, 2017 (Dkt. 299; Dkt. 300). In his publicly-filed reply affirmation, Mr. Witmer quoted extensively from portions of a sealed transcript and added his own editorialized comments and language, so as to alter the official transcript. (Dkt. 299).

As referenced above, on May 3, 2017, the Court issued its Decision and Order concerning the Government's motions to quash post-verdict subpoenas served by both defense counsel (Dkt. 301), and, on that same date, the Court issued an Order requiring

counsel for all parties to submit information to the Court under oath concerning contact with and investigation of the jurors and prospective jurors in this case (Dkt. 302). That Order was prompted, in part, by the parties' competing allegations against each other with respect to their contact and investigation of the jurors in this case, including the Government's allegation that defense counsel potentially knew about Juror No. 3's prior felony convictions in advance of the jury's deliberations, but kept the information in "reserve" to utilize in the event of convictions. (Dkt. 296 at 10).

Counsel filed affidavits in response to the Court's Order (Dkt. 306; Dkt. 308; Dkt. 309), and an appearance concerning Defendants' post-verdict motions was held on May 15, 2017. (Dkt. 310). At that appearance, this Court admonished Mr. Witmer for publicly filing portions of a sealed transcript and for attempting to alter the transcript. This Court also questioned Mr. Witmer about his affidavit concerning contact and investigation of the jurors. (Dkt. 309). By Mr. Witmer's own admissions at that appearance, his affidavit contained typographical errors and mistakes.

The affidavit indicated that the date of the background check concerning Juror No. 3 was March 29, 2017—the same date of the last court appearance in this case prompted by Mr. Witmer's post-verdict contact with the jurors. Mr. Witmer did not reference this background check at any point during the appearance on March 29, 2017, including when the Court questioned Mr. Witmer as to what had prompted him to attempt contact with Juror No. 3. When questioned on May 15, 2017, as to whether he was aware of Juror No. 3's alleged prior felony convictions at the time of the March 29, 2017, court appearance, Mr. Witmer was uncertain. The undersigned asked Mr. Witmer why he had conducted a

criminal background check on Juror No. 3; he responded that it was "just a hunch," and stated that the background check of Juror No. 3 was the only one conducted.

When questioned about the interview of another juror (identified as D.F.) at the appearance on May 15, 2017, it was revealed for the first time that there was a recording of Mr. Witmer's investigator's contacts or attempted contacts with jurors. Specifically, the following exchange occurred during the Court's questioning of Mr. Witmer concerning his contact with D.F.:

| | |
|---|---|
| THE COURT: | [I]s there some kind of documentation that your investigator created summarizing his interview? |
| MR. WITMER: | Yes, your Honor. |
| THE COURT: | And how long is that documentation? |
| MR. WITMER: | It's an hour, I don't know. |
| THE COURT: | He taped the conversation? |
| MR. WITMER: | Yes. |
| THE COURT: | So you have a tape recording of the conversation? |
| MR. WITMER: | Yes. |
| THE COURT: | Between your investigator and D.F.? |
| MR. WITMER: | Yes, as far as I understand, he tapes the conversations to ensure that no one claims that he is intimidating jurors. |
| THE COURT: | Did he disclose that to D.F. or he just taped it? |
| MR. WITMER: | He just taped it. |

(Dkt. 327 at 13-15). When asked whether the recording was transcribed, Mr. Witmer responded that it was not and that it was "a CD." (*Id.* at 15).

Based on that exchange, the Court mistakenly understood that the investigator had created audio recordings of his interviews. In fact, the recordings contained both audio and video—they were not on a "CD," as stated by Mr. Witmer, but a DVD. The recording equipment had been concealed by the investigator so as to surreptitiously record the statements of two individuals—a juror (D.F.) and the father of juror V.D. (prompting the initial call to the U.S. Attorney's Office by V.D.). The Court has reviewed the investigator's video recordings. The time and date stamp on the recording involving D.F. indicates "2017.03.02" thus suggesting that the interview took place during the trial of this matter—although from the context of the recording, that appears impossible. Moreover, as opposed to a length of one hour, as represented by Mr. Witmer during the appearance on May 15, 2017, the interview with D.F. actually lasted less than 10 minutes.

Thus, it was not until the May 25, 2017, appearance that this Court had an opportunity to address with Mr. Witmer the fact that his investigator actually surreptitiously videotaped the jurors. At that point, the full context of the post-juror interviews was finally known to the Court: Mr. Witmer improperly utilized the jury list, post-verdict, to identify for his investigator jurors that Mr. Witmer wished to be interviewed; with no notice to the Court or opposing counsel, the investigator appeared at the homes of these jurors in an attempt to interview them about the subject matter of their deliberations and other topics plainly outside the allowable scope of Rule 606(b); and the investigator surreptitiously videotaped the subjects of the interviews. Not only would this type of intrusion into jurors' lives be troubling in any case, but given the subject

matter of this case—involving violent home invasions—the Court was particularly disturbed by the conduct.

## LEGAL STANDARD FOR RECUSAL

Defendant McCoy bases his motion to disqualify on 28 U.S.C. § 455(b)(1)[4] which provides that a judge shall disqualify herself "[w]here [s]he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding. . . ." *Cf.* 28 U.S.C. § 144. When faced with a recusal motion, a court must ensure that the judge assigned to the case is free of bias or prejudice, and similarly the court must be sure not to recuse herself "'on unsupported, irrational, or highly tenuous speculation' lest 'the price of maintaining . . . the appearance of justice . . . be the power of litigants or third parties to exercise a veto over the assignment of judges.'" *United States v. Helmsley*, 760 F. Supp. 338, 342 (S.D.N.Y. 1991) (quoting *United States v. Greenough*, 782 F.2d 1556, 1558 (11th Cir. 1986)). "The pertinence of these considerations is heightened when a disqualification motion is made in a litigation that is not new, but has advanced considerably before the judge in question." *Id.*; *see In re Drexel Burnham Lambert Inc.*, 861 F.2d 1307, 1312 (2d Cir. 1988) ("In deciding whether to recuse himself, the trial judge must carefully weigh the policy of promoting public confidence in the judiciary against the possibility that those questioning his

---

[4]     Defendant McCoy has not based his motion on 28 U.S.C. § 455(a) which would require recusal not for actual bias or partiality, but rather where a reasonable observer would question the judge's bias or partiality—in other words, whether the objective facts suggest bias. However, even if McCoy had based his motion on that statutory provision, the result would be the same.

impartiality might be seeking to avoid the adverse consequences of his presiding over their case.").

Over 20 years ago, in *Liteky v. United States*, 510 U.S. 540 (1994), the United States Supreme Court explained that judicial rulings, routine trial administration efforts, and ordinary admonishments (whether or not legally supportable) to counsel and to witnesses, cannot serve as the basis for a recusal motion if the judicial conduct occurred during the course of judicial proceedings and "neither (1) relied upon knowledge acquired outside such proceedings nor (2) displayed deep-seated and unequivocal antagonism that would render fair judgment impossible." *Id*. at 556. As explained by the Supreme Court:

> Not *all* unfavorable disposition towards an individual (or his case) is properly described by [the terms bias or prejudice]. . . . One would not say, for example, that world opinion is biased or prejudiced against Adolf Hitler. The words connote a favorable or unfavorable disposition or opinion that is somehow wrongful or inappropriate. . . .
>
> [As a result], [t]he judge who presides at a trial may, upon completion of the evidence, be exceedingly ill disposed towards the defendant, who has been shown to be a thoroughly reprehensible person. But the judge is not thereby recusable for bias or prejudice, since his knowledge and the opinion it produced were properly and necessarily acquired in the course of the proceedings, and are indeed sometimes (as in a bench trial) necessary to completion of the judge's task. As Judge Jerome Frank pithily put it: "Impartiality is not gullibility. Disinterestedness does not mean child-like innocence. If the judge did not form judgments of the actors in those court-house dramas called trials, he could never render decisions."

*Id*. at 550-51 (quoting *In re J.P. Linahan, Inc.*, 138 F.2d 650, 654 (2d Cir. 1943)) .

Here, even accepting all of Mr. Woods' arguments as true, there is no question that the basis for the claims that the undersigned is biased arises entirely out of

information that has been gleaned through the course of these proceedings—in other words, the undersigned is alleged to be biased because of Mr. Witmer's conduct in violating procedural rules and requirements (from his misuse of the jury list, to his failure to obtain Court approval for service of subpoenas seeking victim information, to his alteration and public disclosure of a sealed transcript, to his investigator's surreptitious video recording of jurors).

As recognized by the Supreme Court, the most common basis for claims of bias or prejudice is the "extrajudicial source" doctrine,[5] but that has no applicability to the present motion. The Supreme Court has also recognized a predisposition can be wrongful or inappropriate where it is so extreme as to render the judicial officer unable to render a fair decision. This concept, sometimes referred to as "pervasive bias," has been described as: "A favorable or unfavorable predisposition can also deserve to be characterized as 'bias' or 'prejudice' because, even though it springs from the facts adduced or the events occurring at trial, it is so extreme as to display clear inability to render fair judgment." *Id*. at 551. However, such a situation is a rare occurrence. *Id*. at 554.

Indeed, the Supreme Court has summarized two salient points to be considered in the context of a recusal motion.

First, judicial rulings alone almost never constitute a valid basis for a bias or partiality motion. In and of themselves (i.e., apart from surrounding comments or accompanying opinion), they cannot possibly show reliance

---

[5]     The Supreme Court described the "extrajudicial source" doctrine as having "not much doctrine to the doctrine," and suggested that the better description would be the "extrajudicial source factor." *Liteky*, 510 U.S. at 554-55.

upon an extrajudicial source; and can only in the rarest circumstances evidence the degree of favoritism or antagonism required (as discussed below) when no extrajudicial source is involved. Almost invariably, they are proper grounds for appeal, not for recusal.

*Id.* at 555 (citation omitted); *see United States v. Cain*, 05-CR-360-A, 2017 WL 1456980, at *5 (W.D.N.Y. April 25, 2017) ("[A] party's dissatisfaction with his legal circumstances or unhappiness with a court's legal rulings or other case-management decisions does not constitute a valid basis for recusal.").

Second, opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge.

*Liteky*, 510 U.S. at 555. As a result, expressions of "impatience, dissatisfaction, annoyance, and even anger," cannot serve as the basis for a recusal motion, and a "judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune." *Id.* at 556; *see United States v. Carlton*, 534 F.3d 97, 100 (2d Cir. 2008) ("[A] judge's comments during a proceeding that are 'critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge.' The judge's opinions or comments must demonstrate 'such a high degree of favoritism or antagonism as to make fair judgment impossible.'" (quoting *Liteky*, 510 U.S. at 555)); *see also Helmsley*, 760 F. Supp. at 341 ("Litigants ought not have to face a judge where there is a reasonable question of impartiality, but they are not entitled to judges of their own

choice." (quoting H.R. Rep. No. 93-1453, 93d Cong., 2d Sess., *reprinted in* 1974 U.S. Code Cong. & Admin. News 6351, 6355)).

Moreover, hostility or antagonism directed to a party is distinguishable from that directed to a party's counsel. As explained by Circuit Judge Walker in *Helmsley*, where he sat by designation as a district judge and denied a recusal motion in a case where the defense attorney had actively opposed his confirmation by the United States Senate to the Second Circuit Court of Appeals:

> [C]ourts have drawn a sharp distinction between alleged hostility between judge and party and alleged hostility between judge and attorney. Except in 'extreme' and 'rare' cases, the appearance of hostility on the part of the judge toward an attorney has been ruled an insufficient basis for recusal. Courts have ruled that the appearance of judicial hostility or favoritism must be toward a party to warrant recusal. Thus, where a judge had disparaged an attorney's testimony, called him an 'untrustworthy manipulator,' called his partner a 'name dropper' and described their conduct as 'dirty work,' recusal was not called for because even such an attitude toward the attorney did not reasonably call into question the judge's ability to rule impartially as to the attorney's client.

760 F. Supp. at 342 (citations omitted); *see Drexel Burnham*, 861 F.2d at 1314 ("[B]ias against a lawyer, even if found to exist, without more is not bias against his client.").

When a judge perceives counsel to be violating the rules of conduct and of the court, she is not only authorized to admonish counsel, but should do so. *See In re Int'l Bus. Machs. Corp.*, 618 F.2d 923, 929 (2d Cir. 1979) ("A timid judge, like a biased judge, is intrinsically a lawless judge." (quoting *Wilkerson v. McCarthy*, 336 U.S. 53, 65 (1949) (Frankfurter, J., concurring))). Thus, for example, in *Drexel Burnham*, the Second Circuit rejected the contention that sharp exchanges between judge and counsel, based on the judge's view that counsel had engaged in misconduct, demonstrated bias. Instead, the

Second Circuit concluded that the exchanges were "well within the acceptable boundaries of courtroom exchange." 861 F.2d at 1316; *see also Int'l Bus. Machs.*, 618 F.2d at 932 ("We have examined the record and are persuaded that while occasional flareups toward counsel have undoubtedly occurred, there is no indication that this is other than sporadic. Such isolated instances are undoubtedly endemic to a trial of this dimension, and do not provide any basis for finding personal prejudice against IBM, as distinct from its counsel."); *S.E.C. v. Razmilovic*, No. CV-04-2276 (SJF)(WDW), 2010 WL 2540762, at *4 (E.D.N.Y. June 14, 2010) ("Bias or prejudice connotes an unfavorable opinion that is somehow wrongful or inappropriate because it is undeserved, rests on knowledge one ought not to possess, or is excessive." (quoting *Groden v. Random House, Inc.*, 61 F.3d 1045, 1053 (2d Cir. 1995))).

### LEGAL STANDARD REGARDING SCOPE OF HEARING

The motion for recusal is based, in part, on the underlying notion that this Court's determination to conduct the evidentiary hearing concerning Juror No. 3, by requesting that counsel propose questions for the Court to ask in the first instance, and then reserving on whether to allow counsel to ask questions, is fundamentally flawed. Defendants' argument relies on the D.C. Circuit Court of Appeals' decisions in *United States v. Boney*, 977 F.2d 624 (D.C. Cir. 1992) ("*Boney I*") and *United States v. Boney*, 68 F.3d 497 (D.C. Cir. 1995) ("*Boney II*").

In *Boney I*, the defendants claimed that their Sixth Amendment right to an impartial jury was violated because, after trial, it was discovered that one of the jurors was a convicted felon. The district court rejected the defendants' request for a hearing on

the issue of bias, and the D.C. Circuit Court of Appeals reversed, reasoning that allegations of juror partiality based on undisclosed felon status required a hearing in which the defendants have the opportunity to prove actual bias, particularly because lying about one's felon status "raises at least the inference that the juror had an undue desire to participate in a specific case, perhaps because of partiality." 977 F.2d at 634. On remand, the district court conducted a hearing, but the scope of that hearing was severely restricted. 68 F.3d at 499-501. Indeed, the undersigned has reviewed the publicly-available transcript of that hearing, (*United States v. Holloman*, 1:89-CR-00381 EGS, Dkt. 22 (D.D.C. June 30, 1994)), and even a cursory review of the transcript reveals that the district court was simply going through the motions.[6] The district court left the decision on the ultimate issue—whether the juror was biased—for the juror to, in essence, answer based on two cursory, generic questions. Thus, not surprisingly, when the case went up to the D.C. Circuit again, the case was sent back with clear instructions to conduct a more fulsome hearing with attorney involvement. As explained by the circuit court in *Boney II*:

> The court, however, asked the juror only two, overly general, questions regarding bias, and refused to ask several more probing inquiries submitted by [defense] counsel. . . . In light of the specific facts of this case, we hold that the court's inquiry was insufficient to assess the potential bias of the juror. Accordingly, we remand for a second evidentiary hearing.

68 F.3d at 498-99.

---

[6]     In fact, when the case was remanded for a third time to the district court, the judge's fundamental disagreement with the appellate court was readily apparent, and in fact, led to the judge's decision to recuse himself from any further involvement in the case. *United States v. Boney*, 942 F. Supp. 47, 48 (D.D.C. 1996).

However, by no means did *Boney II* set a bright-line rule, even in the D.C. Circuit, that an evidentiary hearing concerning juror bias must always allow for questioning by the attorneys. As the court explained: "Because 'sufficiency' is a dynamic concept, and techniques for achieving a sufficiently detailed inquiry may vary, our review of juror-bias hearings is necessarily case specific. The outer limits on the District Court's discretion, therefore, cannot be measured against a fixed set of procedural requirements." *Id.* at 501 (citation omitted). The court in *Boney II* expressly recognized that "in some cases questioning by counsel may be inappropriate," but, under the circumstances present there, determined that questioning by counsel for both parties should have been allowed. *Id.* at 503.

Of course, *Boney I* and *Boney II* were decided in the D.C. Circuit—not the Second Circuit. Thus, while instructive and helpful in providing guidance concerning the appropriate scope of a hearing, they do not bind this Court. There is no question that in the Second Circuit the questioning of jurors during *voir dire* is entrusted to the "broad discretion of the trial judge . . . and an appellate court will not interfere with the manner in which it has been conducted absent a clear abuse of discretion." *United States v. Salameh*, 152 F.3d 88, 121 (2d Cir. 1998) (quotation marks omitted).

Defendants rely on the Second Circuit's decision in *United States v. Parse*, 789 F.3d 83 (2d Cir. 2015), where the district court allowed counsel to conduct an examination of the juror during the evidentiary hearing. However, based on a review of both the district court's decision and appellate court decision, it does not appear as though the appropriate scope of the hearing was disputed. Moreover, at least based upon

the information known at this point, the facts of *Parse* appear far different than the situation presented here.

Although not cited by any of the parties, this Court's own research, conducted after the appearance on May 25, 2017, discovered the case of *United States v. Shakur*, 723 F. Supp. 925 (S.D.N.Y. 1988), *aff'd*, 888 F.2d 234 (2d Cir. 1989), which appears particularly applicable. In *Shakur*, after a six-month trial, the jury convicted both defendants on all counts. *Id.* at 927. About one month after the return of the jury verdict, the foreperson telephoned the district court chambers and advised a law clerk that an investigator for the defendants had contacted her to request an interview. *Id.* The district court instructed the juror not to participate in any such interview, and convened a hearing with counsel. *Id.* Defense counsel explained that they sought to interview the jury foreperson because they believed that she knew two of the defense witnesses. *Id.* The jury foreperson had also previously disclosed to the deputy court clerk post-verdict that she recognized one of the defense witnesses. *Id.* The jury foreperson also disclosed communications between another trial juror and a prospective juror. *Id.* at 927-28.

The district court determined that no further inquiry was necessary with respect to the foreperson's alleged familiarity with one of the defense witnesses, but a further factual inquiry was required with respect to the other witness and with respect to the contact by the other juror and the prospective juror. *Id.* at 928. The district court directed that the defense witness testify with counsel and defendants present, but with the district court conducting the inquiry. *Id.* Counsel were permitted to suggest questions to the court prior to and during the examination. *Id.* In addition, the district court questioned

- 19 -

the foreperson and the other juror who allegedly had discussions with a prospective juror *in camera* with counsel being permitted to file suggested questions. *Id.* The defendants complained about the procedure utilized by the district court, contrasting it with the interrogation of another juror while the trial was in progress (where counsel were present during the inquiry). However, the district court rejected those challenges, noting that "[p]ost-verdict inquiries of jurors stand upon a different procedural footing than when the jurors are still sitting in the trial. . . ." *Id.* at 928 n.2. Ultimately, the court rejected the defendants' requests for a new trial based upon alleged juror improprieties.

On appeal, the Second Circuit rejected the defendants' challenges to the process utilized by the district court, stating as follows:

> Having reviewed the extensive record developed on this issue, and [District] Judge Haight's thoughtful treatment of the arguments presented by counsel, we are convinced that the district court conducted appropriate proceedings and reached a conclusion that is consistent with our decisions in this area. Therefore, without further comment, we affirm the denial of defendants' motion for a new trial or for further proceedings on the ground of jury bias for substantially the same reasons set forth in the district court's memorandum and order of July 29, 1988.

888 F.2d 234, 237 (2d Cir. 1989) (citations omitted). In other words, in *Shakur*, where the post-verdict motions for a new trial were based, in part, on alleged juror bias because the juror was familiar with one of the defense witnesses, the Second Circuit endorsed the district court's procedure of interviewing the jurors *in camera* and with no direct questioning by counsel.

The conclusion in *Shakur* is supported by other decisions from the Second Circuit Court of Appeals addressing post-verdict evidentiary hearings involving jurors. As the

court explained in *United States v. Ianniello*, 866 F.2d 540 (2d Cir. 1989), in conducting a post-verdict evidentiary hearing concerning alleged extrinsic influence on a jury, "its scope should be limited to only what is absolutely necessary to determine the facts with precision." *Id.* at 544. Thus, the Second Circuit has indicated that it is within "the district court's discretion to decide the extent to which the parties may participate in questioning the witnesses, and whether to hold the hearing in camera." *Id.*; *see also United States v. Calbas*, 821 F.2d 887, 897 (2d Cir. 1987) (approving the district court's post-verdict interviews of jurors outside presence of counsel but with an opportunity for counsel to submit questions beforehand); *United States v. Moon*, 718 F.2d 1210, 1234 (2d Cir. 1983) ("It hardly bears repeating that courts are, and should be, hesitant to haul jurors in after they have reached a verdict in order to probe for potential instances of bias, misconduct or extraneous influences.").

The Court is mindful that in this context Defendants are claiming bias on the part of Juror No. 3, and they bear the burden of demonstrating bias. *See McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556-57 (1984) ("[R]egardless of whether a juror's answer is honest or dishonest, it remains within a trial court's option, in determining whether a jury a biased, to order a post-trial hearing at which the movant has the opportunity to demonstrate actual bias or, in exceptional circumstances, that the facts are such that bias is to be inferred." (Blackmun, J., concurring)). Indeed, in the recusal motion, Mr. Wood argues that this point makes the Court's reliance on the First Circuit's decision in *United States v. Boylan*, 898 F.2d 230 (1st Cir. 1990)—where the court asked the questions and did not allow counsel to query the juror—inappropriate. However, as

noted above, the *Shakur* decision depended, in part, on claims of juror bias, and the Second Circuit not only endorsed the district court's asking of questions, but also that the jurors were examined *in camera* outside the presence of counsel.

Of course, one of the concerns that repeatedly appears in the post-verdict context involving juror hearings is running afoul of Fed. R. Evid. 606(b) concerning post-verdict testimony from jurors. *See Calbas*, 821 F.2d at 896 ("The limited inquiry conducted by the district court here was entirely appropriate under the circumstances. The court wisely refrained from allowing the inquiry to become an adversarial hearing, so as to minimize intrusion on the jury's deliberations."). *Cf. Pena-Rodriguez v. Colorado*, 137 S. Ct. 855 (2017) (finding that where juror makes a clear statement that indicates he or she relied on racial stereotypes or animus to convict a criminal defendant, the Sixth Amendment requires that the no-impeachment rule give way in order to permit the trial court to consider the evidence of the juror's statement and any resulting denial of the jury trial guarantee). Thus, any post-verdict inquiry of jurors must be carefully and firmly regulated, and it appears evident that the trial court is well within its discretion to fashion the appropriate procedures for doing so.

## RECUSAL ANALYSIS

In the context of this case law and factual background, the Court considers the pending motion to recuse.

As an initial matter, notwithstanding Mr. Wood's allegations, the undersigned is not biased or prejudiced against either of the defense counsel, let alone Defendants. The undersigned is, however, deeply troubled by Mr. Witmer's conduct as outlined above.

The undersigned has formed an opinion about the inappropriateness of Mr. Witmer's conduct, but that opinion is based upon facts that have been learned through the course of the legal proceedings. Moreover, the opinion is directed to the inappropriateness of Mr. Witmer's conduct—not to the merits of the case or the post-verdict motions.

Moreover, the Court's views are not so extreme as to prevent the Court from handling this matter in an objective and unbiased manner. The undersigned does not doubt that Mr. Witmer's sole motive in engaging in unprofessional and potentially unethical conduct,[7] is to advocate as aggressively as he can on behalf of his client, who is facing a significant prison sentence. However, zealous advocacy must yield to the Court's rules and procedures. Furthermore, the undersigned is troubled that the conduct is not isolated, and it does not appear that Mr. Witmer was readily forthcoming about his investigator's post-verdict interviews of jurors—indeed, two court appearances (March 29, 2017, and May 15, 2017) and a Court Order directing the filing of an affidavit about post-verdict juror communication (Dkt. 302), did not reveal the full extent of the contact. It was only upon the production of the actual DVD of the investigator's interviews that the full extent of the contact, including the surreptitious videotaping, was revealed. What further troubles the undersigned is that this was, by his own admission, Mr. Witmer's first federal criminal trial, and yet despite the Court's repeated admonitions, he appears

---

[7]     A lawyer cannot insulate himself from an ethical challenge by retaining an investigator to engage in the unethical conduct. *See* N.Y. Rules of Professional Conduct, Rule 5.3, codified at 22 N.Y.C.R.R. § 1200.0. Whether it is unethical for an attorney to secretly record a conversation, as the Government notes in its opposition papers, is subject to debate among bar association opinions. (*See* Dkt. 336 at 3 n.2). However, in the instant case, there is the additional consideration that the secret recording occurred in violation of established Court precedent and rules.

undeterred by what even co-defense counsel has referred to as inappropriate conduct. Even as recently as June 5, 2017 (*i.e.*, after the most recent court appearance), Mr. Witmer filed a motion where he continues to defend his conduct in conducting the post-verdict interviews, (Dkt. 325 at ¶ 41 ("It is without doubt that there were reasonable grounds to undertake interviews based on the current procedural posture. . . .")), and instead contends that somehow the Government did something wrong by contacting the Court when it became aware of the post-verdict interviews and accepting calls from a juror who was upset by the contact, (*id.* at ¶¶ 41-47). Despite the Court's repeated admonishments, Mr. Witmer continues to defend his investigator's surreptitious video recordings. (*Id.* at ¶ 51 ("It is extremely fortunate that the investigator did tape the conversations that was [sic] between a juror and himself."); *see also* Dkt. 329 at 45 (defending the investigator's conduct of surreptitiously video recording jurors stating "thank God, that he did do that to protect himself in this case because the government tried to imply that he was calling himself a government agent when he went to go talk with the juror")). In other words, no matter how many times the Court confronts Mr. Witmer with his conduct and advises him as to the rules or other regulations that he is violating, he appears incredulous as to the inappropriateness of his conduct.

Mr. Wood complains that he is being unfairly penalized for Mr. Witmer's conduct—this argument is not only incorrect, but it misses the point. The Court intends to conduct an appropriate evidentiary hearing in this case to thoroughly explore the allegations of bias with respect to Juror No. 3, and it will consider any appropriate questions from counsel (as well as any supplements based on the testimony). However,

the Court will not allow the hearing to be a free-wheeling, no-holds-barred exploration of any issue that defense counsel would like to explore. Mr. Wood is correct that he has not utilized any information gleaned from Mr. Witmer's inappropriate post-verdict conduct in support of his post-verdict motions, but, by his own admission, none of the information discovered by Mr. Witmer's inappropriate conduct was of any value. (Dkt. 322-1 at ¶ 10).

The Court has never suggested or implied that it wished Juror No. 3's criminal background had never been discovered, nor has the Court ever suggested or implied that the information should not have been brought to its attention.[8]  Certainly, it would have been preferable if the information was discovered earlier (at a time when the available remedies would have been different), and the Court is left unsatisfied by the explanation of Mr. Witmer's purported "hunch" leading him to the discovery of the information. However, there is no information in the record before the Court showing that that Mr. Witmer had this information during the course of the trial.[9]

As the Court indicated on May 25, 2017, Mr. McCoy and Mr. Nix are co-defendants in this case (not because this Court refused to grant a severance, as alleged by Mr. Wood, but rather because they were indicted for engaging in a criminal conspiracy

---

[8]  In fact, the Court is holding an evidentiary hearing on the issue, even though the Government filed papers opposing any such hearing. (*See* Dkt. 296 at 10).

[9]  Even if Mr. Witmer was aware of this information during the course of the trial, it would likely not impact the Court's decision to go forward with an evidentiary hearing regarding Juror No. 3's alleged bias. *See Parse*, 789 F.3d at 119 (reviewing for plain error and reversing even if defendant's attorneys waived the objection to the juror's service because they knew, prior to the conclusion of the jury's deliberations, of the juror's statutory disqualification and bias).

together).   As a result, the evidentiary hearing must necessarily occur with both Defendants and their counsel present, and the procedures that govern the evidentiary hearing must be fashioned with both parties in mind.

In any event, and more importantly, while the Court was candidly admitting its concerns at the appearance on May 25, 2017, the fact is that even without the issues raised by Mr. Witmer's post-verdict conduct, the Court would nonetheless approach the evidentiary hearing in the exact same manner.  First, as discussed above, this approach is fully supported by Second Circuit case law, and, in fact, it appears that courts are well advised to keep firm control over any post-verdict inquiry of jurors.   Second, any evidentiary hearing must be conducted with caution in view of the requirements of Rule 606(b).  It will be much easier for the Court to monitor compliance with that Rule by asking the questions itself, as opposed to allowing counsel to question Juror No. 3 and having to rule on objections in an *ad hoc* manner.  Finally, the Court has <u>not</u> indicated that it will not allow questioning by counsel—it has reserved on that issue because, as indicated at the May 25, 2017, appearance, the determination in that regard is going to depend, in part, on Juror No. 3's initial testimony.  In other words, at this point, despite the inflammatory allegations that Defendants have launched against Juror No. 3, absolutely nothing has been proven and the Court needs to gather additional information before it will be in a position to definitively rule on the extent to which the issue should be explored and whether it will allow questioning by counsel.

Finally, Mr. Wood criticizes the Court for not criticizing Juror No. 3, as though this somehow demonstrates the Court's alleged bias.  This Court will be presiding over

an evidentiary hearing concerning Juror No. 3, and it will need to make factual determinations, based in part on its credibility assessments of Juror No. 3. Again, at this stage, despite Defendants' allegations, nothing has been proven, and it would be entirely inappropriate for this Court to be opining about Juror No. 3's alleged conduct or otherwise opining on the ultimate issues that the Court will need to decide.

## GOVERNMENT'S MOTION TO STRIKE

The Government requests that the Court strike paragraphs 14 through 18 of Mr. Wood's affirmation, arguing that the inclusion of these paragraphs "smacks of a threat: either you agree with McCoy's arguments set forth herein or you will further prove your partiality against the defense." (Dkt. 336 at 5).

As in any case, this Court will do its best to decide the issues raised by the post-verdict motions, including the alleged juror bias and the scope of the hearing, based upon its assessment of the facts and its understanding of the law. Defendants' criticisms of the undersigned will not influence the outcome in any way—either in favor of the Government's position or in favor of Defendants' position. Thus, although the Court does not dispute the notion that the recusal motion is a transparent attempt by defense counsel to alter the Court's determinations as to the scope of the hearing, it will have no impact on the manner in which the hearing is conducted, and the Government's motion to strike is denied.

## <u>CONCLUSION</u>

For the reasons set forth above, the Court denies the recusal motion (Dkt. 322) and the motion to strike (Dkt. 336).

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated: June 9, 2017
Rochester, New York