UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK



UNITED STATES OF AMERICA,

v.

**DECISION AND ORDER**

6:14-CR-06181 EAW

MATTHEW NIX and EARL McCOY,

Defendants.

I.    **INTRODUCTION**

Defendants Matthew Nix ("Nix") and Earl McCoy ("McCoy") (collectively, "Defendants") were charged in a Third Superseding Indictment returned on January 5, 2017, with 12 counts alleging violations of the Hobbs Act, 18 U.S.C. § 1951(a), and related firearms and narcotics charges, all in connection with a spree of violent home invasions during 2014. (Dkt. 165). Trial commenced on February 13, 2017, and concluded on March 17, 2017, with the jury convicting Defendants on all 12 counts. (Dkt. 229; Dkt. 266; Dkt. 267). Sentencing is presently scheduled for September 8, 2017. (Dkt. 350).

Nix and McCoy aggressively defended the case before and during trial, and the intensity of that defense only continued after the jury returned its verdict.[1] Defendants' post-verdict activities spawned further hearings, appearances, and motion practice, with

---

[1]    To illustrate, even though this case has been pending since October 2014, approximately 30% of the docket entries have been generated in the few months following the verdict.

- 1 -

Defendants attacking various aspects of the trial, from the jury selection to the jury instructions. Among the issues raised by Defendants was that one of the jurors in this case—"Juror No. 3"[2]—was a convicted felon who failed to disclose his criminal history during jury selection. Juror No. 3's felon status was not discovered until, post-verdict, counsel for Nix uncovered this information based on a "hunch." (Dkt. 327 at 6-9). Arguing that Juror No. 3's felon status tainted the impartiality of the jury, Defendants have filed motions pursuant to Fed. R. Crim. P. 33 seeking a new trial. (Dkt. 286; Dkt. 289).

Defendants had a fundamental constitutional right to a fair trial, and this Court is responsible for ensuring that they were afforded that right. Central to that right is the Sixth Amendment's guarantee to a trial by an impartial jury. *See also United States v. Nelson*, 277 F.3d 164, 206 (2d Cir. 2002) ("[Q]uite apart from offending the Sixth Amendment, trying an accused before a jury that is actually biased violates even the most minimal standards of due process."). "An impartial jury is one in which all of its

---

[2] This District's Jury Plan as amended on October 31, 2016 ("the Jury Plan"), adopted pursuant to the Jury Selection and Service Act of 1968, 28 U.S.C. §§ 1861 *et seq.*, and approved by the Judges of the Western District of New York and the Reviewing Panel of the Judicial Council for the United States Court of Appeals for the Second Circuit, provides for a general rule that the names and personal information concerning jurors and prospective jurors should not be publicly disclosed. *See* United States District Court, Western District of New York, *Jury Plan*, at 9-10 (Oct. 2016), www.nywd. uscourts.gov/sites/default/files/2016%20Jury%20Plan%20-%20FINAL-WebVersion.pdf. Consistent with the Jury Plan, and based on the nature of the allegations directed at Juror No. 3, this Court determined that publicly revealing Juror No. 3's name would not be in the interests of justice (Dkt. 332) and, accordingly, the juror in question will be referred to herein as "Juror No. 3" or "J.B."

members, not just most of them, are free of interest and bias." *United States v. Parse*, 789 F.3d 83, 111 (2d Cir. 2015).

However, in the words of the Supreme Court, Defendants were "entitled to a fair trial but not a perfect one, for there are no perfect trials." *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 553 (1984) (internal quotation marks and citation omitted). In other words, although Defendants were unquestionably entitled to an impartial jury, they may not, post-verdict, challenge the selection of jurors who, in hindsight and with additional information, Defendants wished had not been selected. After a thorough consideration of the evidence and the parties' arguments, the Court concludes that the presence of Juror No. 3 did not destroy the impartiality of the jury in this case. Juror No. 3, a convicted felon who was not qualified to serve, admittedly blundered his way onto the jury—but he did not smuggle his way onto the jury through intentional deceit. As a result, Defendants are not entitled to a new trial, and, for the reasons discussed below, the motions pursuant to Fed. R. Crim. P. 33 (Dkt. 286; Dkt. 289) based upon Juror No. 3's alleged bias are denied.[3]

## II.   **BACKGROUND**

### A.   *Jury Selection—February 13, 2017*

Jury selection occurred on February 13, 2017. (*See* Dkt. 328). From a venire of 83, the Court sat a panel of 36 prospective jurors for the proposed 16-member jury (12

---

[3]   Defendants' post-verdict motions also raise a number of other issues in an effort to obtain an acquittal or new trial pursuant to Fed. R. Crim. P. 29(c) or 33. (*See* Dkt. 286; Dkt. 289). The Court will address those issues in a separate Decision and Order.

jurors and 4 alternates). Prospective jurors were excused for cause and replaced from the venire as the Court questioned the panel of prospective jurors. Each prospective juror had completed a questionnaire mailed to him or her in advance by the Clerk's Office. The questionnaire asked, among other things, for information about prior felony convictions.[4]

Juror No. 3, an African American male, was the sixth prospective juror called by the Court's deputy clerk, and he was seated in the sixth seat of the panel of 36. (*Id.* at 29). After all prospective jurors were placed under oath (*id.* at 30), the Court proceeded to ask questions of the panel.

Juror No. 3 responded to the Court's questions shortly after the questioning began, when the Court questioned the prospective jurors about their availability to sit for the trial that was estimated to last five weeks:

| | |
|---|---|
| JUROR NO. 3: | Hello, my name is [J.B.]. I'm self employed. |
| . . . | |
| THE COURT: | What do you do [J.B.]? |
| JUROR NO. 3: | I have my own cleaning business. Right now it's covered because I'm working at night. I don't know if I can do that for five weeks. |
| THE COURT: | You tell me what you would be able to do. |
| JUROR NO. 3: | I don't know. I have contracted and these people rely on me to clean the businesses. |

---

[4] The questionnaire asked each prospective juror: "Have you ever been convicted, either by your guilty or nolo contendere plea or by a court or jury trial, of a state or federal crime for which punishment could have been more than one year in prison?" (*See* Court Ex. 15 at 7). If that question was answered in the affirmative, the individual was prompted to answer additional questions.

| THE COURT: | Do you typically clean during the day[?] |
|---|---|
| JUROR NO. 3: | No, at nighttime.  And I have a couple of contracts during the daytime, too. |
| THE COURT: | Only you know whether or not you can manage it. We're going to be in session typically from 9 to 1. You would have the afternoons, typically, would be free and there would be some days where we'll be going full days.  Obviously we're not meeting on the weekends.  You tell me whether or not you think you could do it. |
| JUROR NO. 3: | I have a contract that gets Tuesday and Friday morning.  I don't know if she will allow me not to do it for five weeks. |
| THE COURT: | During the break, would you be able to contact the person. |
| JUROR NO. 3: | Not really, I don't have my phone.  It's in the car. |
| THE COURT: | If during the lunch break – |
| JUROR NO. 3: | Yes. |
| THE COURT: | We'll have about an hour lunch break, would you be able to make a call to see if it would work. |
| JUROR NO. 3: | Yes. |

(*Id.* at 40-42).[5]

---

[5]     The transcript filed at Docket 328, as well as other transcripts referenced in this Decision and Order, were filed under seal in order to protect the identity and personal information of jurors and prospective jurors, including Juror No. 3, from public disclosure consistent with the Court's Jury Plan. *See* note 2, *supra*.  The portions that are quoted in this Decision and Order have been redacted, where necessary, to avoid public disclosure of the identity of jurors and prospective jurors.

After the first break, Juror No. 3 revealed that he had been able to "switch everything around" and, therefore, he would be able to serve if selected. (*Id.* at 86-87). Juror No. 3 did not speak for the rest of the day in response to the Court's *voir dire* questions, until the Court asked for biographical information from each juror at the end of the *voir dire*. (*See id.* at 245). As a result, Juror No. 3 did not respond to any of the following questions that were asked of the entire panel:[6]

    (1)    "Has anyone ever been the victim of a home robbery?" (*id.* at 97);

    (2)    "Has anyone ever served on a jury before?" (*id.* at 205);

    (3)    "Has anyone ever been a defendant in a criminal case?" (*id.* at 214);

    (4)    "Has anyone ever visited a jail or correctional facility other than in connection with . . . your educational curriculum" (*id.* at 229);

    (5)    "Has anyone had anyone close to them, other than what we already discussed, I know we covered this, anyone close to them convicted of a crime?" (*id.* at 239).

Similarly, Juror No. 3 did not offer any information in response to the Court's "catch-all" questions asked toward the end of *voir dire*: whether there was "anything in fairness to

---

[6]    To be clear, the questions asked by the Court that are relevant to these post-verdict motions are the ones set forth above. In various parts of their submissions, as well as during the evidentiary hearing, Defendants argue that Juror No. 3 failed to provide accurate answers to certain questions that, in fact, were never asked by the Court during *voir dire*. (*See, e.g.*, Dkt. 363 at 11 ("Have you ever been convicted of a felony? If so, have your civil rights been restored?" and "Have you ever been the victim of a home robbery or burglary?"); Dkt. 340 at 2 (criticizing Juror No. 3 for falsely responding to the questions "[H]ave you ever been convicted of a felony?" and "[H]ave you ever been to a correctional facility . . . ?"); Dkt. 359 at 156 (defense counsel stating, at the evidentiary hearing, "I know the jurors were asked about prostitution"), 160-61 (the Court clarifying that the only reference to prostitution occurred during a sidebar, and the panel of prospective jurors was not asked about prostitution)).

both sides that you think we should know that we haven't covered already" (*id.* at 221), and "[i]s there anything that you think we should know that we haven't covered up to this point?" (*id.* at 257).

Juror No. 3 was one of two African American males seated in the panel of 36 prospective jurors.[7] Like Juror No. 3, prospective juror "T.P." was also called by the Court's deputy clerk during the initial seating. (*Id.* at 30). T.P was seated in seat 26 of the panel of 36. (*Id.*). And like Juror No. 3, T.P. remained quiet throughout much of the *voir dire* until the Court asked each prospective juror at the end of jury selection to provide biographical information.[8] (*See id.* at 252). Also like Juror No. 3, T.P. was a convicted felon and failed to disclose that information either when completing the questionnaire mailed by the Clerk's Office or in response to the Court's *voir dire* questions. (*See* Court Ex. 3A). However, unlike Juror No. 3, T.P.'s felon status was discovered during jury selection when, prior to exercising peremptory challenges, the Government disclosed that it had run a background check on T.P. and discovered his undisclosed criminal history. (Dkt. 328 at 269-75; *see also* Court Ex. 3B; Court Ex. 3C).

When the Government brought to the attention of the Court and defense counsel its discovery of T.P.'s criminal history, counsel for McCoy accused the Government of targeting the racial minorities on the jury. (Dkt. 328 at 270 ("I'm concerned if an African

---

[7] Both Defendants are African American males.

[8] The only time that T.P. spoke before providing biographical information was when another prospective juror, A.B., an African American female who was ultimately seated on the jury as Juror No. 6, indicated in response to the Court's questions that she knew T.P. as the son of her former pastor. T.P. denied knowing Juror No. 6. (*See id.* at 218-19).

American comes in and the FBI is running record checks on him, they probably did that with the other one, too.")). The Government denied defense counsel's accusations, and ultimately the issue was resolved with the Government agreeing to use one of its peremptory challenges to strike T.P. (*Id.* at 270-75).

As it turns out, the Government had not run a background check on any other prospective juror, including Juror No. 3 (Dkt. 308 at ¶ 3(A)), and Juror No. 3's criminal history was not discovered until after the return of the verdict. One of the issues Nix raises in his post-verdict motion is the Government's background check on T.P. (Dkt. 289 at ¶¶ 83-84).[9] Thus, Defendants seek a new trial both because an African American prospective juror who failed to disclose his criminal history was excused from the jury, and because an African American prospective juror who failed to disclose his criminal history was *not* excused from the jury.

B.    *Discovery of Juror No. 3's Felon Status*

Post-verdict, Defendants filed motions pursuant to Fed. R. Crim. P. 29(c) and 33 raising a number of issues, including the discovery that Juror No. 3 may be a convicted felon. (Dkt. 286-1 at ¶¶ 8-22; Dkt. 289 at ¶¶ 36-50).[10] The Government filed papers in opposition to the motions, and, among other things, indicated that it was unaware of Juror

---

[9]     Again, the Court will address the issue involving T.P., along with the other issues Defendants raise in their motions filed pursuant to Fed. R. Crim. P. 29(c) and 33, in a separate Decision and Order.

[10]     Juror No. 3 was mistakenly referenced as Juror No. 4 in some of the earlier post-verdict filings and transcripts, including by the Court. At the appearance on May 15, 2017, it was clarified that the juror in question is Juror No. 3. (*See* Dkt. 327 at 23; *see also* Dkt. 344 at 2 n.1).

No. 3's felon status until the issue was raised in Defendants' post-trial filings. (Dkt. 296 at 5-11). Defendants filed reply papers (Dkt. 299; Dkt. 300), and, due to the competing allegations about the background checks on the jurors in the case, the Court directed each counsel to disclose, by affidavit, information about any background checks conducted on jurors or prospective jurors. (Dkt. 302). Counsel for each party filed affidavits (Dkt. 306; Dkt. 308; Dkt. 309), and a hearing was conducted on May 15, 2017 (*see* Dkt. 327).

At the appearance on May 15, 2017, counsel for Nix indicated that he performed the criminal background check post-verdict on Juror No. 3 based on "a hunch." (*Id.* at 6-9). The Court determined that it would hold an evidentiary hearing concerning Juror No. 3 (*id.* at 25-27), and the Court scheduled a further appearance for May 25, 2017 (*id.* at 28-29). At the Court's direction, the United States Marshals Service served Juror No. 3 with an Order directing his appearance on May 25, 2017. (Dkt. 315; Dkt. 317).

On May 25, 2017, Juror No. 3 appeared in Court, was advised of his rights, and, at his request, counsel was appointed to represent him. (Dkt. 329 at 5-7). The Court set a date to conduct an evidentiary hearing: June 12, 2017. (*Id.* at 11). The Court also heard argument from counsel on the scope of the hearing, and it reserved decision on whether it would allow counsel to question Juror No. 3, indicating that the Court was going to initiate the questions and any questions that the parties wanted asked needed to be submitted to the Court in advance. (*Id.* at 37-41; *see, e.g.*, Dkt. 312).[11] On June 9, 2017,

---

[11] The legal support for the Court having broad discretion to control the means and manner of any inquiry of Juror No. 3 in these post-verdict proceedings is discussed in detail in the Decision and Order filed on June 9, 2017, and will not be repeated here. (*See* Dkt. 344 at 16-22).

the U.S. Attorney's Office provided an immunity letter to Juror No. 3. (*See* Dkt. 358 at 70[12]).

C. *The Evidentiary Hearing*

The evidentiary hearing commenced on June 12, 2017, and continued on June 14, 2017 (Dkt. 358; Dkt. 359). Only the Court asked questions on the first day of the hearing, but counsel were permitted to ask questions during the second day of the hearing. (*See* Dkt. 358; Dkt. 359).

Juror No. 3, a 47-year-old African American male (*see* Dkt. 358 at 76; *see, e.g.*, Court Ex. 14), testified that he did not have a high school diploma or G.E.D., but had been educated up until the 11th grade (Dkt. 358 at 71). He has five children (*id.* at 71-72) and is self-employed as a cleaner (*id.* at 71; *see, e.g.*, Court Ex. 14). He described his marital status as single (Dkt. 358 at 72), although when questioned further about his marital status, it was revealed that he is separated but not legally divorced (*id.* at 94-95).

Juror No. 3 acknowledged that he completed the Court's juror questionnaire online (*id.* at 73), and he inaccurately answered "No" in response to Question No. 6, which asked: "Have you ever been convicted either by your guilty or nolo contendere plea or by a court or jury trial, of a state or federal crime for which punishment could have been more than one year in prison?" (*id.* at 74; *see* Court Ex. 14; Court Ex. 15).

---

[12]    References to the page numbers for the transcripts filed at Dockets 358 and 359 are to the actual page numbers of the transcript, not to the electronically-designated pages from CM/ECF.

Juror No. 3 explained his reasoning for answering inaccurately as follows: "At the time, I thought that it meant 21 and over." (Dkt. 358 at 74). Juror No. 3 offered a similar explanation as to why he had not offered this information during the Court's questions during *voir dire* (*id.* at 86-88), but he acknowledged that his answers were not accurate:

Q    But I never said 21 and up, did I?

A    No, you did not.

Q    And the questionnaire didn't say 21 and up, did it?

A    No, it did not.

Q    And as you sit here now, would you agree with me that you did not answer those questions truthfully?

A    Yes.

(*Id.* at 89).

While admitting that he had been convicted of at least one felony, Juror No. 3 displayed a hazy memory concerning the number of prior felony convictions and arrests.

Q    Can you tell me how many crimes punishable by more than one year in prison or felonies have you been convicted of?

A    Truthfully, I don't remember, your Honor.

(*Id.* at 75). Juror No. 3 did offer that he could recall being convicted of a felony where he "was accused of breaking into a clothing store" when he was 17 or 18 years old. (*Id.* at 76). He testified that he was sentenced to two to four years in prison, but that sentence was satisfied by serving six months in "shock camp." (*Id.* at 78). However, Juror No. 3 did not recall several facts surrounding this conviction, such as: if the charge was resolved through a plea or trial (*id.* at 76); where the shock camp was located (*id.* at 78);

- 11 -

the name of one of his co-defendants (*id.* at 77); if he was prosecuted in federal or state court (*id.* at 79); and the name of the judge who sentenced him (*id.*).

Initially, Juror No. 3 testified that he did not know if he had been convicted of any other felonies other than the one involving the clothing store:

> Q    Other than that felony conviction [involving the burglary of the clothing store], do you know if you were convicted of any other prior felonies?
>
> A    No, I don't.

(*Id.* at 80). He testified that he had been arrested, although the only arrest that he was initially able to recall involved a stolen car when he was 17 or 18 years old, and he testified that he could not recall how it was resolved. (*Id.*). However, later during the first day of the hearing, Juror No. 3 testified that he was convicted of the incident involving the stolen car:

> Q    How did the—I may have asked you this, I'm not sure—how did the stolen motor vehicle charge get resolved?
>
> A    I'm not sure.
>
> Q    In other words, do you know if you were convicted or not?
>
> A    Yes.
>
> Q    You were convicted?
>
> A    Yes.
>
> Q    But you don't know if you were convicted by a plea or by a trial?
>
> A    No, I don't.
>
> Q    And as you sit here now, you don't know if you served—you don't recall serving any time for that conviction—

- 12 -

A       No, I—

Q       —is that fair to state?

A       Yes, your Honor.

(*Id.* at 87-88).

Juror No. 3 testified that he was falsely accused of both the clothing store burglary

and the stolen car crime:

Q       So, you were falsely accused of this crime [involving the clothing
        store burglary]?

A       Yes.

(*Id.* at 79).

Q       And if I understand correctly, you did not actually engage in the
        burglary of the clothing store, correct?

A       Yes.

Q       What about the stolen vehicle, did you actually steal a vehicle?

A       No.

(*Id.* at 84-85).  However, during the second day of the hearing, when confronted with his

signed confession about the burglary of the clothing store, Juror No. 3 ultimately

admitted his involvement and that he provided the Court false testimony on the subject.

(Dkt. 359 at 181-84).  When the Court confronted him about why he failed to testify

accurately, Juror No. 3 had no explanation:

Q       So, why did you not answer my question accurately when I first
        asked it of you?

A       Don't know.

Q      You don't know?

A      No.

Q      Isn't it fair to state that you'd prefer not to be honest about your prior criminal history?

A      Truthfully, I don't think about my prior history, to tell you the truth. I don't think about it.

Q      Well, we're here on it right now.

A      Yes, we are.

Q      So we're talking about it right now.
       Isn't it fair to state that you'd prefer not to be honest about your prior criminal history?

A      No.

(*Id.* at 183; *see id.* at 231 (admitting that Juror No. 3 provided false testimony during first day of the hearing about his involvement in the clothing store burglary)). In response to Nix's counsel's questions, Juror No. 3 also admitted that he remembered stealing a car and switching the license plates. (*Id.* at 225).

A number of additional arrests were reflected in the records obtained by the parties in preparation for the evidentiary hearing. Juror No. 3 appeared to have no memory of those arrests:

Q      Do you recall being arrested in 1986 for assault in the second degree?

A      No, I don't.

Q      Do you recall being arrested in March of 1987 for petit larceny?

A      No.

- 14 -

| Q | And in connection with that arrest, do you recall you were convicted and were sentenced to two work Saturdays; do you have any recollection of that? |
|---|---|
| A | No. |
| Q | What about a conviction in November 1987 for petit larceny where you served 14 days in the Monroe County Jail; does that sound familiar to you? |
| A | Truthfully, your Honor, I don't remember none of this stuff. That was 28 years ago. |

(Dkt. 358 at 81-82).

| Q | Do you recall being arrested in July of 1989 for burglary in the second degree for illegal entry of a dwelling? |
|---|---|
| A | No, I do not. |
| | . . . |
| Q | Do you recall burglarizing a home in May of 1989? |
| A | No, I do not. |

(*Id*. at 84). In addition, during the second day of the hearing, Juror No. 3 was questioned by the Court about reports concerning two separate alleged domestic violence incidents (one in 1993 and the other in 1999)—one of which he recalled but for which he denied being arrested, and the other of which he had no recollection. (Dkt. 359 at 176-77). During questioning by Nix's counsel, Juror No. 3 appeared to have some recollection of a petit larceny conviction on March 10, 1987 (*id.* at 215-16), and possibly an assault charge when he was 16 (*id.* at 214-15), although it was impossible to distinguish at that point whether Juror No. 3 was testifying based on his memory or his review of records.

In addition, other than his six-month stint at shock camp for the clothing store burglary, Juror No. 3 indicated he had no memory of being incarcerated for any other period of time, other than possibly overnight for the stolen vehicle charge:

Q  Do you recall ever serving any time in the Monroe County Jail?

A  Not at all, no, I don't.

Q  I mean, as you sit here right now, can you tell me whether or not you've been to the Monroe County Jail?

A  Yes, I've been there.

Q  And tell me in connection with why you've been there.

A  For the stolen car.

Q  Okay.  And, so, tell me about the time—I mean, were you kept overnight for the stolen car?

A  Yes.

Q  So, how long were you kept overnight for the stolen car, do you recall?

A  I don't remember how long.  I think I got out the next day on my own recognizance, I think.  I'm not sure.

. . . .

Q  Do you recall being sentenced for that case [the stolen car case] in April of 1988, does that sound as though it may be correct?

A  It sounds like it's correct, the year, yes.

Q  If records indicated that you served six months in the Monroe County Jail for that, would those be accurate?

A  All I remember is shock camp, six months in shock camp.  I don't remember doing six months in jail.

Q    So if I understand correctly, you recall possibly spending a night in jail in connection the stolen car arrest, correct?

A    Yes.

Q    And you recall six months in shock camp correct?

A    Yes.

Q    But is there any other time that you recall of serving time either in prison or jail in any capacity?

A    Don't remember.

Q    Is there anything that would refresh your recollection?

A    Not really.

(Dkt. 358 at 82-83).   When confronted during the second day of the hearing with the certified copy of his conviction involving the stolen vehicle, which indicated that he served six months in the Monroe County Jail in 1988, Juror No. 3 continued to insist that he had no recollection of serving that time.   (Dkt. 359 at 185-86).   In response to questioning by McCoy's counsel, Juror No. 3 indicated that he did not share information about his prior sentences because "[s]he [referencing the Court] said visited a jail.   I assume she meant visiting somebody else, not me actually going to jail.   That's why I didn't tell her."   (*Id.* at 197).   Juror No. 3 also responded to the Court's questions during the first day of the hearing that with respect to his actual time in jail, as with the convictions, he assumed the questions applied to incidents only when he was 21 or older. (Dkt. 358 at 88-89).

In response to the Court's questions, Juror No. 3 expressed his belief that his civil rights had been restored because of the age of his criminal convictions, and he also denied knowing that his criminal history would have disqualified him from jury service:

Q     As far as you know, were your civil rights ever restored?

A     I thought they were.

Q     And why did you think they were?

A     Because it happened 20 years ago. I assumed that they were.

Q     Are you able to vote?

A     Yes.

Q     Did you know that a prior felony conviction, without having your civil rights restored, would have disqualified you from jury service in this case?

A     No, I did not.

. . .

Q     Would you agree with me, as you sit here now, that you did not answer this questionnaire correctly, this question number six?

A     Yes.

Q     And can you tell me, at the time that you answered it, did you know that you were answering that question inaccurately?

A     No, I did not.

Q     And what was your understanding of what the question was seeking, what information?

A     Like I said, I thought it meant from 21 and up. I assumed that. That's what I assumed.

Q     Why did you assume that?

A    Because I thought everything that I did back then was expunged or whatever. I didn't know that it was a felony still on there.

Q    And you thought it was expunged because of your age?

A    Yes.

(*Id.* at 85-86).

Juror No. 3 denied that his prior criminal history impacted his ability to be fair and impartial, and he denied being biased in favor of either Defendants or the Government. (*Id.* at 90; *see also id.* at 93; Dkt. 359 at 170). He also denied sympathizing or identifying with the cooperating witnesses in this case because of his criminal history. (Dkt. 358 at 91-92; Dkt. 359 at 170-71). Similarly, he denied working with law enforcement or prosecuting agencies as a cooperating witness and he had no recollection of cooperating against his co-defendants in the clothing store burglary case. (Dkt. 358 at 95).[13]

---

[13]    When questioned by Nix's counsel during the second day of the hearing, Juror No. 3 was asked whether he cooperated with law enforcement when he confessed to crimes and named his co-defendants, to which Juror No. 3 responded "I guess so." (Dkt. 359 at 222). The Court did not find this line of questioning particularly illuminating given counsel's tone and the leading nature of the questions. Indeed, at the conclusion of the first day of the hearing, the Court indicated to counsel that it would allow them to ask questions and not prohibit them from asking leading questions. However, the Court also gave fair warning that due to perceived comprehension issues on the part of Juror No. 3, eliciting admissions from Juror No. 3 with leading questions was not going to be particularly helpful in aiding the Court's credibility assessment. (Dkt. 358 at 138). Thus, although the Court overruled various objections by the Government during this line of questioning by Nix's counsel because the Court believed that counsel generally should have been permitted to pursue their questioning in the manner that they deemed appropriate, the Court did not find that means of questioning—leading questions in a confrontational tone—helpful in reaching a credibility assessment of Juror No. 3. Moreover, and in any event, there is no evidence that Juror No. 3 received a benefit in exchange for his confession or naming of co-defendants, nor is there any evidence that he testified at a trial against any co-defendant, like the cooperating witnesses in this case.

Juror No. 3 testified that he was aware at the time of the hearing of the fact that his son had been convicted of a crime (*id.* at 93), but *at the time of jury selection* he had not spoken to his son in three or four years, and, as a result, he was not aware of his son's conviction during jury selection. (*Id.* at 93-94; Dkt. 359 at 167). Juror No. 3 denied knowing of anyone else who was close to him who had been convicted of a crime (Dkt. 358 at 94-95; Dkt. 359 at 212-13), and he similarly denied visiting any family member or close friend in jail (Dkt. 358 at 95).

Juror No. 3 testified that he had been previously called for two other juries, and in one of those cases he was selected, but the jury never reached a verdict because the defendant pleaded guilty.[14] (Dkt. 358 at 100-01; Dkt. 359 at 169). Juror No. 3 testified that he answered other juror questionnaires the same way he did in this case because he assumed the convictions were not part of his record if they occurred before the age of 21. (Dkt. 358 at 101). In response to questioning by McCoy's counsel, Juror No. 3 denied any recollection of being asked during *voir dire* about his prior jury service, but then appeared to recall the question but could not recall if he had answered it:

Q       And do you recall being asked if you'd ever sat on a jury before?

A       No, I don't. It was a long day.

. . .

---

[14]     Counsel for Nix makes reference in his post-hearing submission to Juror No. 3's prior jury service occurring on July 6, 2015 (Dkt. 369 at 14), although nothing in the record supports that information. It appears as though counsel for Nix may have spoken to "counsel for OCA" about Juror No. 3's state court jury service (*id.*), although, again, nothing in the record supports this conclusion other than this passing reference in Nix's post-hearing memorandum.

Q      And do you recall her [referencing the Court] asking if anybody had ever sat on a jury before?

A      Yes.

Q      And do you recall whether or not you answered that question?

A      No, I don't.

Q      Did you tell her that you had sat on a jury before?

A      I don't know if I told her yes or no.

(Dkt. 359 at 193-94).

During the second day of the hearing, Juror No. 3 was questioned about an incident in October 1999, in which his home was broken into and various items were stolen, including jewelry and his wife's checkbook. (*Id.* at 172). The records regarding this incident were produced on June 13, 2017, in response to a subpoena served by counsel for Nix (and, thus, were not available on the first day of the hearing). Juror No. 3 testified that he did not share this information in response to the Court's questions during *voir dire* because "truthfully, it slipped my mind, forgot all about it." (*Id.* at 173). Juror No. 3 testified that he had remembered the burglary only when the documents were produced in response to the subpoena. (*Id.*). Juror No. 3 denied having any recollection of the event at *voir dire* or during the trial, and testified that he recalled the incident only after being presented with the subpoenaed documents:

Q      When did you remember it?

A      When I saw the documents.

Q      So within the last 24 hours?

A    Yes.

Q    On Monday, before you had seen those documents, did you have any
     memory of this incident?

A    No, I did not.

Q    . . . Were there any other occasions where you were living in a home
     and it was burglarized or robbed?

A    Nope.

Q    Is this the only time?

A    It's the only time.

Q    Well, wasn't it a pretty significant event in your life?

A    Not really because we weren't there.  Just came home and the house
     was broken into.

Q    . . . [D]id your memory at all get refreshed about that sitting through
     a five-week trial dealing with home invasion?

A    No, it did not.

Q    I mean, that never once occurred to you?

A    No, it did not.

Q    And it wasn't until you saw the actual police report in this case that I
     provided to counsel yesterday that this – that you remember this?

A    Yes.

(*Id.* at 173-74).  The records from this incident indicate that Juror No. 3's wife was the

primary point of contact with law enforcement after the incident (Court Ex. 17), which

was consistent with Juror No. 3's testimony that his wife handled the matter.  (Dkt. 359 at

201).

D. *Certified Certificates of Conviction*

Based on the certified certificates of conviction procured by McCoy's counsel and introduced at the evidentiary hearing as Court Exhibits 21 and 22, the fact of the prior felony convictions is plainly established.

On March 9, 1988, Juror No. 3 pleaded guilty to criminal possession of stolen property in the fourth degree (a class E felony). (Court Ex. 21). The certificate of conviction reflected the imposition of a sentence on April 6, 1988, of six months in the Monroe County Jail. (*Id.*). This conviction involved the stolen car. Juror No. 3 was 18 years old at the time of this conviction and sentence.

On September 26, 1989, Juror No. 3 pleaded guilty to burglary in the third degree (a class D felony), and he was sentenced to two to four years in the New York State Department of Corrections on January 11, 1990. (Court Ex. 22). Juror No. 3 testified that in lieu of serving two to four years in prison, he spent six months in shock camp. (Dkt. 358 at 78). This conviction involved the clothing store burglary. Juror No. 3 was 19 years old at the time of this conviction and sentence.

E. *Post-Hearing Submissions*

In accordance with the schedule set by the Court, McCoy filed his post-hearing memorandum on July 7, 2017. (Dkt. 363). In that submission, McCoy argues that Juror No. 3's felony conviction alone warrants the granting of a new trial, without any showing of bias. (*Id.* at 8-10). Alternatively, McCoy argues that both prongs of the *McDonough*

test[15] have been satisfied (*id.* at 10-17), contending that Juror No. 3 was involved in conduct similar to the conduct at issue in this case so as "raise the possibility that an inferred bias exists" and the "potential for substantial emotional involvement" (*id.* at 15), and as a result, Juror No. 3 would have been excused for cause if he gave honest answers during *voir dire*. McCoy concedes in his submission that it "is unknown . . . why [Juror No. 3] lied during *voir dire*" (*id.* at 17; *see also id.* at 19), but contends that the material and repeated lies by Juror No. 3 make his presence on the jury "incompatible with our truth-seeking process. . . ." (*Id.* at 18). McCoy does not specify any actual bias that has been demonstrated on the part of Juror No. 3, but rather contends that the Court should infer bias and order a new trial as a result. (*See id.* at 17-23).

On July 8, 2017, counsel for Nix emailed his post-hearing submission to the Court and counsel, and then filed that submission on July 19, 2017. (Dkt. 369). In that submission, among other things, Nix refers to alleged prior drug convictions related to alleged siblings of Juror No. 3. (*Id.* at 11).[16] Nix also argues that one of the Government's potential law enforcement witnesses in this case was involved in the investigation of Juror No. 3's clothing store burglary, and since Juror No. 3 was

---

[15] As discussed further below, the "*McDonough* test" is a two-prong test to evaluate a motion for a new trial based on incorrect responses by a juror during *voir dire*, based on the Supreme Court's decision in *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548 (1984).

[16] Nix's post-hearing submission refers to various exhibits, such as Exhibits 5 and 6 allegedly pertaining to Juror No. 3's siblings' criminal history—but there are no exhibits attached to the post-hearing submission. (*See* Dkt. 369). Nix may be referencing the documents filed at Docket 366, which was mistakenly filed as a "motion" but consisted of only exhibits and, thus, was terminated as a motion by the Court. (*See* Dkt. 367).

convicted based on that law enforcement witness' efforts, "[h]e would remember him." (*Id.* at 13). He also argues that another Government witness was involved in the investigation related to Juror No. 3's son. (*Id.*). Indeed, Nix contends that Juror No. 3 has "had bad experiences with law enforcement." (*Id.* at 12). However, the thrust of Nix's post-hearing submission is that Juror No. 3 necessarily identified with the cooperating witnesses in this case, and, therefore, he must have been biased against Defendants. (*See id.* at 22).

In accordance with the schedule set by the Court, the Government filed its post-hearing memorandum of law on July 21, 2017. (Dkt. 370). The Government argued that Juror No. 3's non-responsive answers and demeanor during the hearing demonstrated that he had difficulty understanding questions put to him by the Court and counsel. (*Id.* at 2 ("He appeared nervous and uncomfortable and, at times, defensive, which is understandable (in additional to his lack of comprehension) considering he was ordered to appear in court, read his rights in open court as if he were under arrest, assigned an attorney, and publicly questioned under oath by a federal judge, two criminal defense lawyers, and a federal prosecutor.")). The Government argues that the evidentiary hearing did not reflect a "'searching inquiry' by the defense to vindicate a constitutional right" but rather it reflected "an all-out attack with the singular focus of trying to make the juror look like a liar at every turn, for the sole purpose of getting out from under the consequences of the constitutionally valid guilty verdicts after a full, fair and impartial trial by a jury they chose." (*Id.* at 2-3). The Government challenges the nature of the questioning by defense counsel, contending that it was "done in a sarcastic,

condescending and goading manner" and that before the hearing, those same counsel "had already publicly vilified [Juror No. 3] as a liar and unfairly blamed him for the plight of their clients." (*Id*. at 4). The Government contends that Defendants have failed to establish that Juror No. 3 intentionally lied during jury selection, nor have they demonstrated that honest answers would have required the Court to excuse Juror No. 3 because of actual or implied bias, or justified his excusal due to inferred bias against Defendants or in favor of the Government. (*Id*. at 4-5). In short, the Government submits that Defendants have failed to meet their burden under the *McDonough* test.

Defendants filed their post-hearing reply memoranda on July 28, 2017. (Dkt. 371; Dkt. 372). Nix argues that the "prosecution is very tolerable of perjury in a federal courtroom when it suits them" and that, contrary to the Government's arguments, every response from Juror No. 3 at the hearing "was more deceitful and mendacious than the next." (Dkt. 371 at 2). McCoy challenges the Government's description of the hearing as "pure invention" and "especially outlandish" given the plans that the Court put in place with respect to the conduct of the hearing. (Dkt. 372 at 2). McCoy continues that "lying at voir dire because of embarrassment or some other benign reason might be understandable, [but] multiple lying at the hearing and indeed committing perjury is another thing altogether." (*Id*. at 4). McCoy submits that "perhaps Juror #3's inability to accept his past led to the same pattern of false answers." (*Id*. at 8). McCoy argues that a challenge for cause by the Government would have been granted if Juror No. 3 had disclosed his criminal history. (*Id*. at 9). McCoy also argues that Defendants would have

raised a successful cause challenge if they had known about the burglary involving Juror No. 3's home. (*Id.*).

## III.   **LEGAL STANDARD**

Pursuant to the Jury Selection and Service Act of 1968, 28 U.S.C. §§ 1861 *et seq.* ("JSSA"), Juror No. 3's prior felony convictions made him statutorily ineligible to serve on the jury in this case. *See* 28 U.S.C. § 1865(b)(5) (disqualifying from jury service any person who "has a charge pending against him for the commission of, or has been convicted in a State or Federal court of record of, a crime punishable by imprisonment for more than one year and his civil rights have not been restored").   However, this information was never disclosed during *voir dire*, and it is too late for any statute-based challenge to Juror No. 3's service. *See id.* § 1867(a), (e) (providing that the procedures under the JSSA are exclusive means to challenge jury not selected in conformity with the provisions of the JSSA, and setting final deadline to challenge as before the *voir dire* examination begins); Dkt. 381 at 3-6 (discussing the untimeliness of any challenge by Defendants to jury under JSSA); *see also United States v. Silverman*, 449 F.2d 1341, 1344 (2d Cir. 1971) (finding where there was a substantial failure to comply with § 1865(b)(2), but the challenge was not raised until after the return of the verdict, the defendant's "attack on that conviction cannot be founded on [the juror's] disqualification under the statute"); *United States v. Harmon*, 21 F. Supp. 3d 1042, 1049 (N.D. Cal. 2014) (finding § 1865(b)(5) "is a statutory bar as applied to prospective jurors, not a constitutional requirement required under due process principles"); *cf. United States v. Boney*, 977 F.2d 624, 633 (D.C. Cir. 1992) (finding that the provisions set forth in

§ 1865(b)(5) apply to the procedures utilized by a district court to administer the jury selection process—not to a situation where a juror fails to disclose his felon status on the jury qualification form).

As a result, Defendants base their challenge to Juror No. 3's selection for this jury on the Sixth Amendment's guarantee of the right to an impartial jury. However, the "Sixth Amendment right to an impartial jury . . . does not require an *absolute bar* on felon-jurors." *Boney*, 977 F.2d at 633. As explained by the D.C. Circuit in *Boney*:

> A *per se* rule would be appropriate . . . only if one could reasonably conclude that felons are always biased against one party or another. But felon status, alone, does not necessarily imply bias. In fact, as the dissent suggests, Congress' purpose in restricting felons' jury service may stem from considerations other than a concern for biased jurors. More important, a *per se* rule requiring a new trial whenever it turns out that a felon served on a jury seems inconsistent with *McDonough*'s hostility to unnecessary new trials, and the oft-repeated axiom that "a defendant is entitled to a fair trial but not a perfect one." We think, therefore, that the Sixth Amendment guarantee of an impartial trial does not mandate a *per se* invalidation of every conviction reached by a jury that included a felon.

*Id.* at 633 (citations omitted); *see also United States v. Langford*, 990 F.2d 65, 69 (2d Cir. 1993) (rejecting the argument that a juror's intentionally false response during *voir dire* is automatic grounds for a new trial).[17]

---

[17] McCoy argues that because a convicted felon such as Juror No. 3 is *per se* disqualified pursuant to 28 U.S.C. § 1865(b)(5), the verdict must be set aside without any inquiry into Juror No. 3's reasons for not disclosing his criminal record and without any finding of bias. (Dkt. 363 at 8-10). This argument has been rejected by every circuit court to have considered the issue. *See Hanna v. Ishee*, 694 F.3d 596, 616 (6th Cir. 2012) ("[I]t is inappropriate to invalidate, as a matter of law, any conviction simply because it was reached by a jury that mistakenly included a convicted felon."); *United States v. Bishop*, 264 F.3d 535, 554 (5th Cir. 2001) ("[O]nce the trial is complete, a felon's serving as a juror is not an automatic basis for a new trial."); *Coughlin v. Tailhook Ass'n*, 112 F.3d 1052, 1059 (9th Cir. 1997) (holding that the participation of a felon-juror who is

Thus, the question as to whether Defendants' Sixth Amendment rights were violated by virtue of Juror No. 3's selection to the jury necessarily centers on whether his presence destroyed the impartiality of the jury; in other words, was Juror No. 3 biased? Based upon the Supreme Court's decision in *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548 (1984), the Second Circuit has adopted a two-part test that a defendant must establish in order to justify granting a new trial based upon incorrect responses by a juror during *voir dire*: (1) the defendant must first demonstrate that the

statutorily disqualified from serving "is not an automatic basis for a new trial" and the defendant must still show that the juror's participation resulted in "actual bias" to one of the parties); *United States v. Humphreys*, 982 F.2d 254, 261 (8th Cir. 1992) (holding that the participation of felon juror, who mistakenly believed that civil rights had been restored, did not justify new trial, and finding that "[i]n an effort to obtain a new trial, it is incumbent upon the defendant to clearly demonstrate that the juror's lack of qualifications presented actual bias or prejudice, affecting the juror's impartiality and impacting the fairness of the trial. A challenge after the verdict without such a showing comes too late."); *United States v. Boney*, 977 F.2d 624, 633 (D.C. Cir. 1992) (holding that felon status alone does not imply bias); *United States v. Uribe*, 890 F.2d 554, 562 (1st Cir. 1989) (holding that the fact that a felon juror technically should have been disqualified under statute does not automatically require a new trial).

McCoy contends that he is relying on the dissenting opinion in *Boney* (Dkt. 363 at 9), but a *per se* rule was rejected by the *Boney* dissent. *See Boney*, 977 F.2d at 639 (Randolph, J., dissenting) ("I would therefore reject the defendants' argument that the Sixth Amendment itself bars felons from serving on juries and requires reversal *per se* where one slips through."). McCoy also contends that he is relying on the Eleventh Circuit's decision in *Jackson v. Alabama State Tenure Commission*, 405 F.3d 1276 (11th Cir. 2005), (Dkt. 363 at 9), but *Jackson* did not adopt a *per se* rule as advocated by McCoy. Rather, *Jackson* determined that the first prong of the *McDonough* test must be satisfied—in other words, there must be a finding that the juror intentionally failed to disclose the prior felony conviction. 405 F.3d at 1288-89 (finding no reasonable possibility that juror could have forgotten three years spent in prison for murder). Moreover, to the extent *Jackson* dispensed with the second prong of the *McDonough* test, this Court finds that reasoning unpersuasive, especially in view of the other circuit courts that have rejected the *per se* rule, *and* because satisfaction of the second prong of the *McDonough* test was apparently undisputed in *Jackson*. *See id.* at 1288 ("It is undisputed that a question about prior felony convictions is material to jury service and that an honest answer from this juror would have provided a basis to challenge her for cause.").

juror "failed to answer honestly a material question on *voir dire*"; and (2) the defendant then must also demonstrate that "a correct response would have provided a valid basis for a challenge for cause"—in other words, the juror would have been excused for bias based on the correct *voir dire* response. *Langford*, 990 F.2d at 68-69 (quoting *McDonough*, 464 U.S. at 556-58); *see also United States v. Stewart*, 433 F.3d 273, 303 (2d Cir. 2006) ("[A] party alleging unfairness based on undisclosed juror bias must demonstrate first, that the juror's *voir dire* response was false and second, that the correct response would have provided a valid basis for a challenge for cause."); *United States v. Shaoul*, 41 F.3d 811, 816 (2d Cir. 1994) ("We reiterate that, in order to obtain a new trial, a defendant must show *both* that a juror gave a dishonest answer, *and* that the correct answer would have provided a basis for the defendant to challenge the juror for cause.").

The first part of the test entails a threshold requirement to show juror dishonesty. *Shaoul*, 41 F.3d at 815. In other words, the Court must assess whether Juror No. 3 deliberately lied or consciously deceived the Court, as opposed to providing inaccurate responses as a result of a mistake, misunderstanding or embarrassment. *See McDonough*, 464 U.S. at 555; *Langford*, 990 F.2d at 69-70 (finding where a juror's intentionally false statements at *voir dire* were caused by embarrassment, and there was no evidence "that she gave false answers because of any desire to sit on the jury," it was proper for the district court to deny the defendant's motion for a new trial (emphasis added)); *see, e.g., United States v. Escalera*, 536 F. App'x 27, 35 (2d Cir. 2013) ("[The defendant] points to no record evidence that the juror intentionally failed to disclose [material information during voir dire], much less that the reason for the non-disclosure was to avoid excusal

(as opposed to embarrassment) or to conceal some bias that could have prejudiced the trial."); *Dyer v. Calderon*, 151 F.3d 970, 984 (9th Cir. 1998) ("Not all jurors may walk a perfectly straight line. A distracted juror might fail to mention a magazine he subscribes to. An embarrassed juror might exaggerate the importance of his job. Few voir dires are impeccable, and most irregularities can be shrugged off as immaterial to the fairness of the trial.").

With respect to the second part of the test, the Court must determine if it would have granted a hypothetical cause challenge if Juror No. 3 had responded accurately to the Court's questions. *Stewart*, 433 F.3d at 304 (citing *United States v. Greer*, 285 F.3d 158, 171 (2d Cir. 2002)); *see United States v. Blackwell*, 436 F. App'x 192, 196 (4th Cir. 2011) ("[A] '*McDonough* claim necessarily fails unless the court would have committed reversible error—that is, abused its discretion—in failing to dismiss a juror.'" (citation omitted)).

This second part of the test is really the most crucial. *Stewart*, 433 F.3d at 305 ("The significant factor, however, is that the District Court found that even if it were established that [the juror's] responses were false as alleged, none of the correct answers would have supported an inference that he was biased or prejudiced against [the defendants] or had prejudged the evidence."). The critical determination is not simply whether the lies in question are deliberate, but rather whether "*the deliberateness of the particular lies evidenced partiality.*" *Id.* (quoting *Greer*, 285 F.3d at 172-73); *see also Greer*, 285 F.3d at 170-71 (finding it unnecessary to determine whether juror dishonestly answered questions at *voir dire* because "the District Court did not exceed its allowable

discretion in finding that those omissions and misstatements did not satisfy *McDonough*'s prong two").

A juror's dishonesty under the first part of the test "is among the 'factors to be considered' in the ultimate determination of bias . . . [but] an analysis of bias is required even if the juror's erroneous response was deliberate." *Greer*, 285 F.3d at 173. It is important to consider the dishonesty in the second part of the test because it can show "a personal interest in this particular case that was so powerful as to cause the juror to commit a serious crime [by lying during *voir dire*]." *United States v. Colombo*, 869 F.2d 149, 151 (2d Cir. 1989). In other words, a bright line does not divide the two prongs of the test, and there is some blurring of the factors to be considered under each prong.

"Challenges for cause are generally based on actual bias, implied bias, or inferable bias." *Greer*, 285 F.3d at 171 (citing *United States v. Torres*, 128 F.3d 38, 43 (2d Cir. 1997)). As explained by the Second Circuit:

> Actual bias is bias in fact. Implied bias, by contrast, is bias presumed as a matter of law. Finally, inferred bias is available when actual or implied bias does not apply. "Bias may be inferred when a juror discloses a fact that bespeaks a risk of partiality sufficiently significant to warrant granting the trial judge discretion to excuse the juror for cause, but not so great as to make mandatory a presumption of bias."

*Id.* (citations omitted). At least in the Second Circuit, it is unsettled whether either implied or inferred bias may serve as the basis for a post-trial allegation of jury partiality. *See id.* at 172.

There is only one instance where the Second Circuit[18] has found a reason to overturn a verdict on the basis of juror nondisclosure under *McDonough*—in the case of *United States v. Parse*, 789 F.3d 83 (2d Cir. 2015). *Cf. Stewart*, 433 F.3d at 303 (observing, pre-*Parse*, that this "Court has never found reason to overturn a verdict on the basis of juror nondisclosure under *McDonough* and only once, . . . has remanded for an evidentiary hearing on the matter"); *United States v. Colombo*, 909 F.2d 711 (2d Cir. 1993) (having previously remanded to the district court to conduct post-trial hearing regarding allegations that juror deliberately lied during *voir dire*, finding upon appeal after remand that district court's finding that juror had not intentionally withheld information was not clearly erroneous).

*Parse* involved a situation where, after a verdict was returned in favor of the Government, a juror sent a letter to the Government praising its performance but lamenting the acquittals on some of the counts as to one of the defendants (Parse). 789 F.3d at 90. That letter prompted further investigation by defense counsel and a revelation that the juror had lied extensively during *voir dire* about her criminal history, her background, and a host of other information, including the fact that she was an attorney facing disciplinary action. *Id.* at 91. The district court ordered an evidentiary hearing to go forward, and the juror initially refused to appear, prompting an arrest warrant to be

---

[18] Defendants have relied heavily on the case of *United States v. Eubanks*, 591 F.2d 513 (9th Cir. 1979). (*See* Dkt. 363 at 15-16). Not only is *Eubanks* from outside the Second Circuit, but it was decided prior to *McDonough* and does not employ the two-part test. While the Court has reviewed *Eubanks*, as well as other cases outside the Circuit dealing with this issue, the Court has relied, as it must, on the decisions from the Second Circuit Court of Appeals addressing the issue post-*McDonough*.

issued. *Id.* The hearing ultimately went forward, and the juror admitted lying during *voir dire* "to make herself more 'marketable' as a juror. . . ." *Id.* In other words, the juror admitted that she created a fictional profile to make herself more attractive as a juror. *Id.* at 91-92. The district court concluded that the juror's false answers "were attributable neither to a desire to avoid embarrassment nor to honest mistakes," *id.* at 92, but rather were "premeditated and deliberate," *id.* at 93 (quoting *United States v. Daugerdas*, 867 F. Supp. 2d 445, 469 (S.D.N.Y. 2012)). The district court further concluded that the juror "was 'a pathological liar and utterly untrustworthy,'" describing the lies as "breathtaking" and "calculated to prevent the Court and the parties from learning her true identity, which would have prevented her from serving on the jury." *Id.* at 92 (quoting *Daugerdas*, 867 F. Supp. 2d at 468-70). The juror lied in response to clear and unambiguous *voir dire* questions, and the district court rejected any contention that the juror was somehow confused by the questions, particularly given her status as an attorney. *Id.* Moreover, the events about which the juror lied were "recent, personally significant, and directly affected her qualifications to serve as a juror." *Id.* (quoting *Daugerdas*, 867 F. Supp. 2d at 469).

> Her arrests and suspensions from the practice of law were not the result of youthful indiscretions or errors on the part of police or courts. . . . There is no dispute that [the juror] was aware of her prior convictions, her attorney disciplinary problems, and her personal injury suit at the time she answered the Court's questions under oath. There is also no question that she made a conscious decision to hide them from the Court.

*Id.* at 92 (quoting *Daugerdas*, 867 F. Supp. 2d at 469). As a result, the district court concluded that the juror was actually biased against the defendants, but with respect to

the defendant Parse, the district court concluded that his counsel was aware of these issues during the trial and failed to raise the issue until after the verdict, thus waiving any claim. *Id.* at 93, 101-02.

On appeal, the Second Circuit explained that a new trial was required where "the juror's false responses 'obstructed the *voir dire* and indicated an impermissible partiality on the juror's part.'" *Id.* at 110 (quoting *Colombo*, 869 F.2d at 151).

> Where the juror has lied for the purpose of securing a seat on the jury—a mission apparently "so powerful as to cause the juror to commit a serious crime"—it "reflect[s] an impermissible partiality on the juror's part." Such conduct not only suggests a view on the merits and/or knowledge of evidentiary facts but is also quite inconsistent with an expectation that a prospective juror will give truthful answers concerning her or his ability to weigh the evidence fairly and obey the instructions of the court. . . . [C]ertainly when possible non-objectivity is secreted and compounded by the deliberate untruthfulness of a potential juror's answer on *voir dire*, the result is deprivation of the defendant's rights to a fair trial. Where the juror has deliberately concealed information, "bias" is to be "presume[d]."

*Id.* at 111 (citations omitted). The Second Circuit concluded that the district court appropriately determined that the juror's presence caused the jury not to be impartial, and furthermore, that the record did not support the conclusion that Parse had waived his challenge.

> In these circumstances—in which a juror aligned herself with the government, lied pervasively in voir dire for the purpose of avoiding dismissal for cause, believed prior to the presentation of any evidence that the defendants were "'crooks'" and expressly mentioned [the defendant] as a target of her efforts to persuade the other jurors to convict—a refusal to order a new trial for Parse would seriously affect the fairness, integrity, and public reputation of judicial proceedings.

*Id.* at 120. Thus, the Second Circuit reversed the district court's denial of the motion for a new trial as to Parse. *Id.*

## IV. FIRST PRONG OF *McDONOUGH*–FAILURE TO ANSWER HONESTLY MATERIAL QUESTION ON VOIR DIRE

### A. *General Assessment of Juror No. 3*

Defendants contend that, like the juror in *Parse*, Juror No. 3 deliberately lied during *voir dire* and continued his lies during the evidentiary hearing before this Court. (*See, e.g.*, Dkt. 363 at 17; Dkt. 369 at 53). The Government contends that Juror No. 3 was tricked and attacked by defense counsel, and, at most, displayed a lack of recall and comprehension that resulted in the inaccurate answers during *voir dire* and confusion during the evidentiary hearing. (Dkt. 370 at 1-2).

An analysis of Juror No. 3's credibility under the first prong of the *McDonough* test is a more nuanced inquiry than posited by either the Government or Defendants. Having observed Juror No. 3's facial expressions, demeanor, and intonation while he testified during the two-day evidentiary hearing, including when he responded to the Court's questions, it was apparent that Juror No. 3 had problems understanding the questions and expressing himself clearly. In part, this appeared attributable to nervousness. Juror No. 3 was questioned in open court before Defendants and their counsel, Government counsel, and a large number of spectators. The courtroom was significantly more crowded during the evidentiary hearing involving Juror No. 3 than it had been at any point during the five-week trial.[19]

---

[19]    Of course, a way to avoid this would have been for the Court to examine Juror No. 3 in chambers outside the presence of the public and without the parties being present. The Second Circuit appears to have approved this process in *United States v. Shakur*, 888 F.2d 234 (2d Cir. 1989), *aff'g* 723 F. Supp. 925 (S.D.N.Y. 1988). Here, the Court ultimately adopted a process that attempted to balance the various competing interests at

The testimony must also be viewed through the lens of one with Juror No. 3's educational background. Juror No. 3 appeared neither sophisticated nor bright. He exhibited poor comprehension during the evidentiary hearing and difficulties providing understandable and clear answers. As an example, the following answers were elicited during the Court's questions:

Q    Do you recall being asked by me during jury selection whether you had ever been a defendant in a criminal case?

A    Yes.

Q    And you didn't *respond* to that question, correct?

A    No.

Q    And can you tell me why you didn't *respond* to that question?

A    Because I didn't think it *responded* to me at the time.

Q    What?

A    I didn't think it *responded* to me at the time.

. . .

Q    But my question was had you ever been a defendant in a criminal case. You had been a *defendant* in a criminal case, correct?

A    I don't understand what you mean, your Honor.

Q    So you don't know what I mean when I'm saying *defendant*–

A    Yes.

---

play, including Defendants' very real and legitimate interests in being present during any questioning of Juror No. 3 and the public's critically important right to access court proceedings. However, a downside to the process employed in this case is that, in the Court's view, it ultimately impacted Juror No. 3's testimony because of his nervousness and discomfort.

(Dkt. 358 at 86-87 (emphasis added)).

The above exchange plainly depicts Juror No. 3's vocabulary challenges. He repeatedly utilizes the Court's reference to "respond" in its questions to provide his answers, even though answering the question with reference to that word is plainly an incorrect use of the word "respond." Similarly, he exhibits difficulty understanding the meaning of the word "defendant." The Court did not view this testimony as intentionally deceptive. Juror No. 3 did not display attributes of cleverness. Rather, Juror No. 3 displayed vocabulary and comprehension issues that the Court interpreted as impacting the substance of his testimony. In the Court's view, Juror No. 3 was what he seemed: a relatively simple individual with a lack of education and sophistication who had difficulty comprehending certain areas of inquiry.[20]

Thus, in assessing Juror No. 3's credibility, the Court must exercise caution against viewing Juror No. 3's testimony from the Court's own educational or socio-economic background. As recognized by the Supreme Court, "jurors are not necessarily experts in English usage. Called as they are from all walks of life, many may be uncertain as to the meaning of terms which are relatively easily understood by lawyers and judges." *McDonough*, 464 U.S. at 555.

---

[20] The Court's impression of Juror No. 3 in this regard is supported by numerous exchanges that occurred throughout the two-day hearing, including, for example, the exchange concerning Juror No. 3's name and the naming of Juror No. 3's son that occurred during a sidebar discussion during the second day of the hearing. (*See* Dkt. 359 at 202-05)

In addition, as discussed below, the Court finds that Juror No. 3 provided false testimony at the evidentiary hearing concerning his criminal record. However, based upon the Court's observations of Juror No. 3 during the evidentiary hearing, including his demeanor, tone, and facial expressions, along with the substance of his testimony, the Court does not discredit the entirety of his testimony even though some parts of it were plainly false. *See Van Buren v. Cargill, Inc.*, 10-CV-701S, 2016 WL 231399, at *7 & n.5 (W.D.N.Y. Jan. 19, 2016) ("[F]*alsus in uno* merely permits, but does not require, a finder of fact to disregard the entirety of the testimony." (citing *United States v. Weinstein*, 452 F.2d 704, 713 (2d Cir. 1971) ("The maxim '*Falsus in uno, falsus in omnibus*' has been well said to be itself 'absolutely false as a maxim of life.'" (citation omitted)).

B. *Deliberate Lies*

Against this backdrop, the Court must assess whether Juror No. 3 intentionally gave false answers during *voir dire*. The Court will first address the information supplied that was unrelated to the criminal background of Juror No. 3.[21]

---

[21] Defendant Nix contends that Juror No. 3 intentionally misstated his marital status as "single" during *voir dire*, when in fact he is still legally married. (Dkt. 369 at 15). The Court disagrees. At the evidentiary hearing, Juror No. 3 also testified that he was "single," but then when asked follow-up questions, he revealed that he is separated but not legally divorced. (Dkt. 358 at 72, 94-95). It was also revealed at the evidentiary hearing that although Juror No. 3 saw his wife at his daughter's graduation in the prior month, before that time, he had not seen her for about three or four years. (Dkt. 359 at 213). At the *voir dire*, follow-up questions about the marital status of Juror No. 3 were not asked.

Defendant Nix also contends that Juror No. 3 failed to reveal that his brother "Derrick" was murdered in a stabbing and the accused was acquitted at trial (Dkt. 369 at 15), but no questions during *voir dire* would have elicited this information, and furthermore, Juror No. 3 was not asked questions about this at the evidentiary hearing. (*See* Dkt. 359 at 157-58).

1. *Answers Unrelated to Juror No. 3's Criminal Background*

   a. *Burglary of Juror No. 3's Home*

It was revealed at the evidentiary hearing that Juror No. 3 had his home burglarized in October 1999, but he never shared that information in response to the Court's question: "Has anyone ever been the victim of a home robbery?" (Dkt. 328 at 97). The Government argues that Juror No. 3 was the victim of a home "burglary," not a "robbery," and he was never asked during *voir dire* about being the victim of a burglary. (Dkt. 370 at 16). Although technically correct, the Court does not find the Government's argument persuasive, particularly in view of the burglaries described by other prospective jurors in response to the Court's question about a "home robbery." (*See* Dkt. 328 at 97-101).

However, based on Juror No. 3's demeanor, tone, and appearance when questioned at the evidentiary hearing about the home burglary—which occurred almost 20 years ago—the Court is convinced that the incident had completely slipped his mind. Moreover, the Court agrees with the Government's argument that no correlation exists between the violent home invasions described during the trial and the burglary of Juror No. 3's home, such that the trial testimony should have been expected to trigger Juror No. 3's recollection about the burglary. When he was questioned about the home burglary and his failure to disclose the information, Juror No. 3 appeared genuinely surprised that he had not earlier recalled the burglary. Moreover, the documentary evidence involving the burglary suggests that Juror No. 3's wife was the primary point of contact with law enforcement following the incident. Thus, the Court easily concludes that Juror No. 3 did

not intentionally fail to disclose information about this burglary from 1999. *See, e.g.,* *Harmon*, 21 F. Supp. 3d at 1052 ("[C]ourts 'must be tolerant, as jurors may forget incidents long buried in their minds, misunderstand a question or bend the truth a bit to avoid embarrassment. The Supreme Court has held that an honest yet mistaken answer to a voir dire question rarely amounts to a constitutional violation.'" (quoting *Dyer*, 151 F.3d at 973)).

       *b.*    *Criminal Convictions of Individuals "Close" to Juror No. 3*

Defendants also contend that Juror No. 3 failed to disclose the criminal convictions related to his brother "Gary," his sister "Cynthia," his son, and his wife "Tracey." (Dkt. 369 at 15). The Court asked during *voir dire* whether "anyone close to" the prospective jurors had been convicted of a crime. (Dkt. 328 at 239). Juror No. 3 did not reveal any information in response to this question.

At the evidentiary hearing, in response to Nix's counsel's questions, Juror No. 3 testified that he had not seen his brother "Gary" in three or four years, and he was unaware of his brother's criminal convictions for multiple drug offenses. (Dkt. 359 at 212). Similarly, Juror No. 3 testified that he was unaware of his son's criminal convictions at the time of jury selection, and he had not seen him in about three or four years. (Dkt. 358 at 93-94; Dkt. 359 at 167, 212). Juror No. 3 also was unaware of any arrests of his wife from whom he is separated (but not legally divorced). (Dkt. 359 at 213). Juror No. 3 was not asked any questions about his knowledge of the criminal record of his sister "Cynthia," or when he last saw her.

Thus, there is no basis for the Court to conclude that Juror No. 3 failed to provide material information on this subject during *voir dire* because the record indicates that Juror No. 3 was not aware of the convictions and Juror No. 3 did not view himself as close to the individuals in question. *See, e.g., United States v. Stewart*, 317 F. Supp. 2d 432, 438 (S.D.N.Y. 2004) (recognizing ambiguity in questions as to whether somebody "close" to juror had been victim of crime, and finding that defendants could not "demand a new trial because a juror failed to place the broadest possible construction on those questions"), *aff'd*, 433 F.3d 273 (2d Cir. 2006).

      *c.*      *Prior Jury Service*

During *voir dire*, the Court questioned the prospective jurors about their prior jury service by asking: "Has anyone ever *served* on a jury before?" (Dkt. 328 at 205 (emphasis added)). In the Court's view, the question was straightforward, and in response a number of prospective jurors provided information regarding their prior jury experience. (*Id.* at 205-13). In addition to providing the parties with information that may be utilized during peremptory challenges, the primary purpose of the Court's questions on this topic was to ensure that nothing about that prior jury service would impact a prospective juror's ability to be fair and impartial. In other words, prior jury service does not, in and of itself, normally constitute a basis for a cause challenge.

Juror No. 3 did not respond to the question during *voir dire*. This topic was addressed during both days of the evidentiary hearing. During the first day of the hearing, the Court elicited the following testimony:

Q      Have you ever *served* on any other juries?

- 42 -

A        I was called for two but they took the plea, so I didn't have to.

(Dkt. 358 at 100-01 (emphasis added)).  In other words, Juror No. 3 suggested that he

"didn't have to" serve on any prior juries because the cases were resolved through pleas.

No follow-up questions were asked during the first day of the hearing.

During the second day of the hearing, the Court again addressed the topic during

its questioning:

Q        Now, you had mentioned, I believe, that there were other occasions
         where you were summoned for jury duty?

A        Yes.

Q        And this was in state court, not federal court–

A        Yes.

Q        –correct?  Did you ever, like, actually *get selected* or did you get put
         in the box?

A        I was selected.

. . .

Q        On how many occasions were you selected?

A        Once.

Q        And do you remember the type of case?

A        No, I don't.

Q        Was it civil or criminal?

A        I believe it was criminal.

Q        But the case, the jury did not ultimately deliberate in that case?

| A | No, the person took the plea. |
|---|---|

. . .

| Q | How long ago was this where you were *selected to serve* on a jury? |
|---|---|
| A | A few years ago. |

. . .

| Q | And is that the only other time that you've been called for jury service, other than this incident? |
|---|---|
| A | There was one other time before that, too. |
| Q | And were you *selected* in that case? |
| A | Nope. |
| Q | Did you ever get put into the box and asked questions? |
| A | No. |
| Q | And this was before the other time that you just mentioned? |
| A | Yes. |
| Q | Do you know how long ago that was?  • |
| A | Probably about a year before that. |

(Dkt. 359 at 168-70 (emphasis added)).

When questioned by counsel for McCoy, Juror No. 3 initially denied any recollection of being asked about prior jury service during *voir dire*, responding "[i]t was a long day." (*Id.* at 193). Counsel for McCoy then asked the questions again:

| Q | And do you recall her [the Court] asking if anybody had ever *sat on a jury* before? |
|---|---|
| A | Yes. |

Q    And do you recall whether or not you answered that question?

A    No, I don't.

Q    Did you tell her that you sat on a jury before?

A    I don't know if I told her yes or no.

(*Id.* at 193-94 (emphasis added)).

The Court believes the questions about prior jury service were straightforward, particularly in light of the responses of the other prospective jurors, including one prospective juror who indicated that, like Juror No. 3, he had been selected for a jury but "about halfway through the case the defendant copped a plea." (*See* Dkt. 328 at 211). As a result, Juror No. 3 should have disclosed his prior selection to serve on a jury in response to the Court's *voir dire* questions, even though that jury ultimately did not deliberate.

However, the Court is hard-pressed to conclude that Juror No. 3 intentionally withheld this information in response to the Court's questions, or somehow tried to deliberately mislead the Court and the parties by not revealing this information. There is no conceivable reason for Juror No. 3 not wanting to disclose this information. The explanation for Juror No. 3's non-disclosure could be his misunderstanding of the scope of the question—equating prior "service" as requiring actual deliberation—and again, the Court must assess Juror No. 3's responses in view of his educational background and perceived comprehension issues as noted above. Alternatively, the explanation could simply be attributed to Juror No. 3 being distracted and not paying close enough attention

to the questions that were being asked at that point during *voir dire* (which was later in the day). Under any scenario, the Court does not believe that Juror No. 3 intentionally withheld this information or intentionally lied about this topic during *voir dire*. Moreover, even if Juror No. 3 intentionally lied about his prior jury service, the Court has difficulty concluding that that the subject dealt with a "material" issue as required under the *McDonough* test.

### d. *Summary of Findings*

For the reasons set forth above, the Court concludes that Juror No. 3 did not deliberately fail to honestly answer the *voir dire* questions related to the home burglary in 1999 and the criminal history of anyone "close" to him. The Court's assessment of Juror No. 3's answers (or lack thereof) concerning prior jury service is a closer call, but on balance, the Court concludes that Juror No. 3 did not intentionally fail to reveal information during *voir dire* about that prior jury service, and even if he had, the information about Juror No. 3's prior jury service would not, in and of itself, rise to the level of materiality required under the first prong of the *McDonough* test.

### 2. *Answers Related to Juror No. 3's Criminal Background*

Whether Juror No. 3 deliberately lied about his criminal background during *voir dire* is a more difficult question. The questions related to Juror No. 3's criminal background were included in the questionnaire mailed in advance to prospective jurors, which asked:

> "Have you ever been convicted, either by your guilty or nolo contendere plea or by a court or jury trial, of a state or federal crime for which punishment could have been more than one year in prison?"

(Court Ex. 15). Juror No. 3 incorrectly answered this question by checking "No." (*Id.*). In addition, Juror No. 3 did not respond to the following *voir dire* questions asked of the panel as whole: "Has anyone ever been a defendant in a criminal case?" (Dkt. 328 at 214) and, "Has anyone ever visited a jail of correctional facility other than in connection with . . . your educational curriculum?" (*id.* at 229).

In assessing whether Juror No. 3 deliberately lied in responding to these questions (or in not responding), the Court must recognize that two jurors (Juror No. 3 and T.P.) failed to accurately respond to the Court's questions on these topics. Certainly, the Court could justifiably conclude that these two individuals intentionally attempted to mislead the Court and the parties about their criminal background. However, it is at least arguable that more direct questioning during *voir dire* on this topic may have elicited the information. In other words, the information may have been disclosed if the Court had directly asked each juror whether he or she had been "arrested" (a question that was not asked), "convicted" of "any crime" (again, a question that was not asked), or ever "been to a jail" (as opposed to a "visit" to a jail, as was asked).

Although the Court accepts full responsibility for the framing of the questions, Defendants never requested any follow-up on these issues during *voir dire*. *See* Fed. R. Crim. P. 24(a)(2)(B) ("If the court examines the jurors, it must permit the attorneys for the parties to submit further questions that the court may ask if it considers them proper."). In fact, it was the Government that wanted these issues explored further during the *voir dire*. (*See* Dkt. 328 at 227 (asking that the Court ask whether "anyone close to

you" had been a defendant in a criminal case, and whether any prospective juror had "visited a jail")). Moreover, neither Defendant proposed questions regarding the prospective jurors' criminal background as part of their requested *voir dire* questions. (*See* Dkt. 173 (McCoy proposed *voir dire*); Dkt. 178 (Nix proposed *voir dire*)). Again, it was the Government that requested questions on this topic as part of its proposed *voir dire* questions. (*See* Dkt. 170 at 6).

Juror No. 3 unquestionably failed to reveal his criminal record in response to the juror questionnaire and the Court's *voir dire* questions. By all accounts, the convictions at issue occurred before Juror No. 3 reached the age of 21, and that was the explanation offered by Juror No. 3 as to why he did not reveal the convictions: he did not believe that they counted because of their age (approximately 30 years old). (*See* Dkt. 358 at 74, 85-87).[22] Juror No. 3 also told the Court that that was the reason he did not respond affirmatively to the question about visiting a jail (*id.* at 88-89), and he also told McCoy's counsel that he assumed the question was directed at "visiting" another individual as opposed to serving time in jail himself (Dkt. 359 at 197).

---

[22] Although there was evidence of two domestic violence incidents after Juror No. 3 reached the age of 21 (*see* Court Ex. 16 (incident from 1999) and Court Ex. 18 (incident from 1993)), Juror No. 3 could not recall one of the incidents, and he denied being arrested in connection with the incident that he did recall. (Dkt. 359 at 176-177). The documents reflecting these incidents do not plainly indicate that an arrest was made (*see* Court Ex. 18 (indicating that a "warrant" is "advised"), nor is there any information in the record about the disposition with respect to these incidents (*see* Gov't Ex. 900 (criminal history printout run on the NYSID database for Juror No. 3, which does not contain any reference to arrests for these domestic violence incidents)). Thus, based on the record before the Court, it does not appear that Juror No. 3 would have needed to disclose this information in response to either the questionnaire or the *voir dire* questions.

The problem with accepting Juror No. 3's explanation is that he plainly provided false testimony at the evidentiary hearing regarding his criminal record. In other words, although it is at least debatable whether Juror No. 3 lied about his criminal history during *voir dire*, there is no question that he lied about his criminal history during the evidentiary hearing. Juror No. 3 initially denied any recollection of a felony conviction other than the one related to the clothing store burglary, but then, upon further questioning, he did admit to the felony conviction involving the stolen vehicle. (Dkt. 358 at 75-76, 80, 87-88).

Juror No. 3 exhibited a hazy recollection of his criminal record, including the two felony convictions. Although Juror No. 3's poor recollection is understandable in view of the convictions' temporal remoteness, the age of the convictions cannot explain Juror No. 3's false testimony that he was wrongly accused of both the clothing store burglary and stolen vehicle incident. (*Id.* at 79, 84-85). Juror No. 3 first claimed that he did not actually burglarize the clothing store or know the criminal purpose of the visit to the clothing store. (*Id.* at 84-85; Dkt. 359 at 180). Similarly, Juror No. 3 denied stealing a vehicle. (Dkt. 358 at 85).

However, during the second day of the hearing, when confronted with his signed confessions regarding these two incidents, Juror No. 3 admitted that he was involved in the clothing store burglary and that he had earlier testified falsely regarding the event. (Dkt. 359 at 179-84, 231). Juror No. 3 also admitted, in response to Nix's counsel's questions, to stealing a vehicle and switching the license plates. (*Id.* at 225).

Additionally, although Juror No. 3 denied any recollection of spending time in jail other than the six months spent in shock camp, the documentary evidence in this case suggests that Juror No. 3 spent six months in the Monroe County Jail for the stolen vehicle conviction in 1988. (Court Ex. 21). In addition, although the Court agrees with the Government that, to some extent, the so-called admissions that defense counsel— particularly Nix's counsel—procured during the evidentiary hearing are not particularly helpful to any credibility assessment given the tone and nature of the questioning,[24] the

---

[24]    For example, at the end of the second day of the hearing, when being questioned by Nix's counsel, the following exchange occurred:

Q    How many times have you been to jail?

A    I don't know.  I don't think about how many time I been to jail.  I don't know.  I don't look at my record.  I don't think about it so I don't know.

Q    Does seven sound right?

A    I don't know. . . . I don't know.  You tell me.  I don't know.

Q    So you would need someone to tell you how many times you've been to jail?

A    Like I said, I don't think about it.  It's not something I get up in the morning and think about.  I don't think about that stuff.

. . .

Q    Do you think you've been to jail more than five times?

A    Probably.

(Dkt. 359 at 217-18).  Although the Court allowed this line of questioning and overruled the Government's objections, it was apparent to the Court that Juror No. 3 was extremely frustrated at this point, and the exchange quoted above is not helpful to the Court in assessing Juror No. 3's credibility or discovering the truth about his times in jail.  In other

fact is that Juror No. 3 lied during the evidentiary hearing in response to *the Court's questions*. Juror No. 3 was not tricked—he deliberately offered false testimony at the evidentiary hearing regarding his criminal history.

The Court does not doubt that Juror No. 3's inaccurate testimony regarding his criminal record was due, in part, to the age of the convictions. However, given Juror No. 3's false testimony during the evidentiary hearing about his culpability for the two felony convictions, the Court does not credit Juror No. 3's explanation that he was confused by the *voir dire* questions or thought that the questions applied to criminal convictions only after the age of 21. Based on Juror No. 3's continued refusal to disclose the full extent of his criminal history during the evidentiary hearing—until faced with documentary evidence of the same—the Court concludes that Juror No. 3 failed to respond truthfully to the juror questionnaire and the Court's *voir dire* questions as they pertained to both his criminal convictions and his exposure to a jail.

However, this finding does not mean that the Court concludes that Juror No. 3 provided false information about his criminal record in an effort to intentionally deceive the Court so as to be selected to serve on the jury. Here, Juror No. 3 did not lie "for the purpose of securing a seat on the jury," *Parse*, 789 F.3d at 111, nor can his lies be characterized as "premeditated and deliberate" so as to hide his true identity and ensure his selection on the jury, *id.* at 92-93. Rather, as revealed by Juror No. 3's continued lies

words, although Juror No. 3 likely was incarcerated for more than just the six months in shock camp, and although the documentary evidence in the form of the certified certificate of conviction marked as Court Exhibit 21 at least suggests that he also spent six months in the Monroe County Jail, the reality is that the record is unclear as to the exact amount of incarceration served by Juror No. 3.

at the evidentiary hearing, his motives had nothing to do with securing a seat on this jury. The Government granted Juror No. 3 immunity for his testimony at the evidentiary hearing *except for any perjured testimony*, and yet Juror No. 3 refused to be honest about his criminal past at the hearing until confronted with documentary evidence. Juror No. 3 repeatedly testified at the evidentiary hearing that he does think about or focus on his criminal record. A more sophisticated witness may have been able to articulate a reason for his refusal to be honest about his criminal past—whether it be embarrassment, concern that the criminal record could impact his job as a cleaner, or a desire to simply block that part of his distant past. Instead, Juror No. 3 testified that he did not believe the convictions counted because they occurred before he was 21 years old. Juror No. 3 has applied a similar interpretation when answering juror questionnaires in the past.

The Court is not persuaded that Juror No. 3 misunderstood the scope of the questions as only applying to convictions at the age of 21 and older, when responding to either this Court or other courts in the past. However, the Court is convinced that the reason for Juror No. 3's inaccurate responses is not some nefarious motive; rather, the reason more likely originates from the simple fact that, at 47 years old, Juror No. 3 would prefer to shut out any recollection of his criminal history—the most recent of which (if the domestic violence incident from 1999 is included) was about 20 years ago, and most of which occurred when he was a teenager. *Cf. Parse*, 789 F.3d at 111 ("Where the juror has lied for the purpose of securing a seat on the jury—a mission apparently 'so powerful as to cause the juror to commit a serious crime'—it 'reflect[s] an impermissible partiality on the juror's part. . . .'" In the present case, the record amply supports the findings of the

district court that [the juror] repeatedly lied during voir dire . . . and that she did so in order to be chosen as a juror." (quoting *Colombo*, 869 F.2d at 151) (emphasis added)); *Langford*, 990 F.2d at 69 ("[A] juror who . . . has deliberately responded falsely to a material question on voir dire precisely because she wanted to sit on the case, should be presumed not to be impartial." (emphasis added)).

Thus, although the Court finds that Juror No. 3 testified falsely about certain information during the hearing that was conducted on June 12 and 14, 2017, it rejects the notion that Juror No. 3 testified falsely about *all* matters that were covered during that hearing, and it further rejects the notion that Juror No. 3 intentionally deceived the Court during *voir dire* as to his criminal history so as to gain a seat on the jury. Although Juror No. 3's *voir dire* answers regarding his criminal history were inaccurate, the Court cannot conclude that they rise to the level of intentional falsehood necessary to satisfy the first prong of the *McDonough* test.

## V.    SECOND PRONG OF *McDONOUGH*—BIAS

The Court concedes that the issues at play concerning the inaccuracy of Juror No. 3's disclosed criminal history with respect to the first prong of the *McDonough* test present a close question. Moreover, as noted above, the second prong of the *McDonough* test is the most critical. Thus, the Court will proceed to consider whether a correct response to the Court's *voir dire* questions would have required excusing Juror No. 3 for cause—in other words, whether the Court would have granted a hypothetical challenge if Juror No. 3 had responded accurately to the Court's questions. Unlike the first prong, resolution of the second prong is not a close question. The Court concludes that Juror

No. 3's lies, even if deliberate, did not evidence partiality so as to violate the Sixth Amendment.

As an initial matter, with the exception of Juror No. 3's prior criminal record, none of the other alleged inaccurate *voir dire* responses from Juror No. 3 would have even triggered a challenge for cause. Other jurors responded by disclosing prior jury service, being close to those who had been convicted of a crime, and being the victims of home burglaries (including suffering the theft of jewelry and other items of value (*see* Dkt. 328 at 97-101)). Yet none of those prospective jurors were challenged for cause, nor could they have been appropriately challenged for cause.

In addition, in many respects, the Court does not need to analyze how it would have handled a hypothetical challenge for cause due to Juror No. 3's criminal record, because, in the Court's view, based on Defendants' reaction to the disclosure of T.P.'s criminal history, Defendants would *not* have made a cause challenge. The Court is hard-pressed to credit Defendants' newfound aversion to jury service by a convicted felon given their reaction to the disclosure that T.P. was a convicted felon, and particularly when (at least Nix) continues to press the issue related to T.P. in post-verdict motion practice. *Defendants* would not have challenged Juror No. 3 for cause if he had revealed the full extent of his criminal history during *voir dire*—rather, the *Government* would have likely claimed bias and sought to excuse Juror No. 3.[26]

---

[26] Of course, if Juror No. 3's criminal history was revealed during *voir dire*, he would have been statutorily disqualified pursuant to the JSSA, as opposed to any common-law based cause challenge. However, as discussed above, given the procedural posture of this case, it is too late to launch a challenge pursuant to the JSSA.

Notwithstanding the above, the Court will examine whether actual bias, implied bias or inferred bias is properly attributable to Juror No. 3.

A.    *Actual Bias*

The Second Circuit has described actual bias as follows:

> Actual bias is "bias in fact"—the existence of a state of mind that leads to an inference that the person will not act with entire impartiality. A juror is found by the judge to be partial either because the juror admits partiality, or the judge finds actual partiality based upon the juror's voir dire answers.

*Torres*, 128 F.3d at 43 (citations omitted). "[A] finding of actual bias 'is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province.'" *Id.* at 44 (quoting *Wainwright v. Witt*, 469 U.S. 412, 428 (1985)).

The record in this case is barren of any evidence of actual bias on the part of Juror No. 3 against Defendants. Indeed, although Defendants argue in a conclusory manner that the convictions should be set aside because of actual bias, they make no real attempt to demonstrate actual bias. (*See, e.g.*, Dkt. 363 at 17 (merely listing that "[t]he testimony of Juror #3 demonstrated actual, implied or inferred bias")).

This was plainly not a case of Juror No. 3 wanting to hide information about his past to make himself more marketable as a juror, like the juror in *Parse*. Early in the *voir dire*, Juror No. 3 expressed reservations about serving because of his job responsibilities. (Dkt. 328 at 41). During the jury selection, Juror No. 3 was frustrated with the Court about the length of the proceedings (*see* Dkt. 359 at 238-39), and in fact, once selected to serve, he left the courtroom as the Court was still informing the jurors about some housekeeping matters (*see* Dkt. 327 at 32).

Moreover, the Court's observations of Juror No. 3—both during *voir dire* and throughout the trial—led to the inescapable conclusion that Juror No. 3 was by no means an overzealous or enthusiastic juror. Juror No. 3 had expressive features that the Court interpreted as reflecting his displeasure with being selected to sit on a 5-week trial. Juror No. 3 did his duty, but his body language did not depict somebody who was relishing the experience.

McCoy contends that Juror No. 3's expressed displeasure with the lateness of the proceedings on the day of jury selection should not be taken to infer that he was not enthusiastic about serving on the jury. (Dkt. 363 at 19). However, that is not the only basis for the Court's conclusion that Juror No. 3 was not pleased about being selected to serve on the jury. His facial expressions and body language throughout the trial caused the Court to conclude that, if he had a choice, Juror No. 3 would have elected not to sit on the jury. This included rolling his eyes at the Court when the jury had to be repeatedly excused from the courtroom during the defense presentation of the case, and appearing displeased when the court was in session for full days.

Given the fact that Juror No. 3 was working at nights to keep up with his cleaning business (Dkt. 358 at 98 (Juror No. 3 testifying that he worked until 1:00 AM after serving on the jury)), it is certainly understandable that he was not savoring the experience of sitting on this case. Indeed, it was a long trial, and perhaps each of the jurors would have elected to be someplace else if given the choice. Regardless, this Court had the definite and firm impression that Juror No. 3 was less than pleased when selected to serve on the jury.

As a result, the Court was quite surprised when, during the hearing, Juror No. 3 initially testified that, in fact, he wanted to serve "[b]ecause I was picked. It's my right, I'm assuming." (Dkt. 358 at 44). Ultimately, Juror No. 3 gave varying responses about his interest in serving, and the Court believes that Juror No. 3 was initially confused by the Court's questioning. (*See id.* at 96-100). Yet, given Juror No. 3's varying statements about his interest in serving on the jury, the Court cannot rely on the substance of Juror No. 3's testimony in assessing this issue—what Juror No. 3 said on this topic is of little or no value. However, the Court has considered its observations of Juror No. 3 throughout the trial. It also believes Juror No. 3's reaction in the form of tone, facial expression, and demeanor, to a particular line of questioning by the Government at the hearing, was revealing:

Q     . . . did you have in your mind, I'm not going to say anything about my 27-year-old felony conviction because that way I can wind up on this jury?

A     (Laughing.)

Q     Is that what happened?

A     No, it's not.

Q     You laughed when I said that. Does that seem ridiculous in your mind?

A     Yes, it does.

Q     Why is that ridiculous to you?

A     Because I have better things to do than to sit here for five weeks. If I knew that, I would have told her then and I wouldn't have been on the jury at all.

(Dkt. 359 at 236-37).

There is no evidence that Juror No. 3 knew that disclosure of his criminal record would have disqualified him from jury service. The Court believes that if Juror No. 3 had known this information, his reluctance to be honest about his criminal history would have likely been overcome by a desire to avoid jury service. In sum, the Court finds that there is no evidence of actual bias on the part of Juror No. 3, in favor of or against either the Government or Defendants. Even evaluating the facts in the light most favorable to Defendants (which is not the standard), no actual bias has been shown in this case. There is just no proof that Juror No. 3 intentionally lied to smuggle his way onto the jury.

### B.   *Implied Bias*

Implied bias is reserved for "extreme situations," *Greer*, 285 F.3d at 172 (quoting *Smith v. Phillips*, 455 U.S. 209, 222 (1982)), and "'deals mainly with jurors who are related to the parties or who were victims of the alleged crime itself,'" *id.* (quoting *Torres*, 128 F.3d at 45). As explained by the Second Circuit:

> Implied or presumed bias is "bias conclusively presumed as a matter of law." It is attributed to a prospective juror regardless of actual partiality. In contrast to the inquiry for actual bias, which focuses on whether the record at voir dire supports a finding that the juror was in fact partial, the issue for implied basis is whether an average person in the position of the juror in controversy would be prejudiced. And in determining whether a prospective juror is impliedly biased, "his statements upon voir dire [about his ability to be impartial] are totally irrelevant."

*Torres*, 128 F.3d at 45 (citations omitted). It is unsettled in the Second Circuit whether implied bias may serve as the basis for a post-trial allegation of jury partiality. *See Greer*, 285 F.3d at 172.

This is not a case of implied bias. There is no fact in the record which, had it been elicited during jury selection, would have required the Court to automatically assume bias on the part of Juror No. 3 or that Juror No. 3 was prejudiced against Defendants or in favor of the Government. Juror No. 3 is not related to any of the parties, victims, witnesses, attorneys, and he was not a victim of the charged crimes. Moreover, as discussed above, Juror No. 3's felon status does not justify a *per se* finding of bias as a matter of law. At best, Defendants cite to Juror No. 3's potential knowledge of one of the identified law enforcement witnesses in the case (who never ultimately testified) because he is the same individual who investigated Juror No. 3's clothing store burglary. Yet, even if Juror No. 3 recalled the name of the investigator (and there is no evidence that he did), this would not support a finding of implied bias against Defendants.

C.   *Inferred Bias*

From a review of Defendants' submissions, it is apparent that the central focus of their argument is that it should be inferred, from Juror No. 3's inaccurate answers and undisclosed information, that he was biased against Defendants. "[A] finding of inferred bias is, by definition, within the discretion of the trial court." *Id.* As explained by the Second Circuit in *Torres*:

> Bias may be inferred when a juror discloses a fact that bespeaks a risk of partiality sufficiently significant to warrant granting the trial judge discretion to excuse the juror for cause, but not so great as to make mandatory a presumption of bias. There is no *actual* bias because there is no finding of partiality based upon either the juror's own admission or the judge's evaluation of the juror's demeanor and credibility following voir dire questioning as to bias. And there is no *implied* bias because the disclosed fact does not establish the kind of relationship between the juror

and the parties or issues in the case that mandates the juror's excusal for cause.

Nonetheless, inferable bias is closely linked to both of these traditional categories. Just as the trial court's finding of actual bias must derive from voir dire questioning, so the court is allowed to dismiss a juror on the ground of inferable bias only after having received responses from the juror that permit an inference that the juror in question would not be able to decide the matter objectively. . . . [O]nce facts are elicited that permit a finding of inferable bias, then, just as in the situation of implied bias, the juror's statements as to his or her ability to be impartial become irrelevant. . . .

[C]ases in which a juror has engaged in activities that closely approximate those of the defendant on trial are particularly apt [for an inference of bias].

128 F.3d at 47.[27] Like implied bias, it is unsettled in the Second Circuit whether inferred bias may serve as the basis for a post-trial challenge based on jury partiality. *See Greer*, 285 F.3d at 172.

As an initial matter, the Court must assess any claim of inferred bias in light of Defendants' attitude about Juror No. 3 before they were convicted. Defendants wanted Juror No. 3—the only African American male remaining after the removal of T.P.—on the jury. During the first day of the trial, the Court raised an issue after opening statements as to whether Juror No. 3 had dozed off during the Government's opening

---

[27] It should be noted that *Torres* is factually distinguishable from the instant case, in that it dealt with a trial court's exercise of discretion during *voir dire* to excuse a prospective juror who had engaged in criminal conduct similar to the crimes on trial—as opposed to a challenge to a juror post-verdict. In any event, *Torres* simply stands for the proposition that the trial judge "acted within her discretion in finding that the 'inquiries made of [Juror No. 7] revealed a sufficient factual basis' to allow the court to draw the inference—especially given the hypertechnical nature of the offense of structuring—that that the juror would be unable to divorce her consideration of this case from her own structuring experience." 128 F.3d at 48.

statement.[29] The Court observed that Juror No. 3 had made a noise that could have been a snore, and the Government observed that his eyes were closed and then opened after making the noise. In response, defense counsel denied that Juror No. 3 had his eyes closed or was sleeping, and objected to the Court making any further inquiry. The Court indicated that it would continue to observe Juror No. 3 (as well as the rest of the jurors), and, ultimately, no further inquiry was required. However, defense counsels' objections demonstrate that they perceived Juror No. 3 as an individual who was potentially in their corner, not the opposite. Indeed, Defendants' attitude in this regard is only further reinforced by their reaction to the removal of the other African American male (T.P.) because of his undisclosed felony convictions. *See Stewart*, 317 F. Supp. 2d at 439 (rejecting defendants' argument that nondisclosures by juror would have provided sufficient basis for a challenge for cause, citing to defendants' "vigorous[]" argument against the Government's challenge to another prospective juror who failed to disclose similar information).

Additionally, the information disclosed about Juror No. 3's criminal history does not support an inference of bias against Defendants. The fact that Juror No. 3 has been previously arrested and convicted of two prior felonies—including convicted for burglarizing a clothing store and possibly arrested for burglarizing a home[30]—does not

---

[29]    The Court's recitation of this part of the trial is based upon its notes, since a transcript has not yet been prepared for this part of the trial.

[30]    There is some evidence in the record that Juror No. 3 may have been arrested for burglarizing a home in May of 1989 (when he was 19 years old). However, Juror No. 3

justify a finding of bias against Defendants, and Defendants cannot articulate any reasonable basis for concluding otherwise. The fact that neither Defendant requested that any issue about prospective jurors' criminal histories be explored during *voir dire*, necessarily reflects Defendants' lack of concern with having criminals serve on the jury. Rather, this was the Government's concern, and in fact, McCoy even admits that it would have been the Government who challenged Juror No. 3 for cause if his criminal history had been revealed. (Dkt. 372 at 9). *See Stewart*, 317 F. Supp. 2d at 442 ("[D]efendants have still failed to demonstrate how that information would have supported a for-cause challenge of [the juror]. It is difficult to see how information concerning [the juror's] son's conviction for an attempted robbery—a crime unrelated to the crimes charged in this case—could justify an inference that [the juror] would be biased against these defendants. If anything, a prospective juror with a family member who had been convicted of a crime would more likely be considered biased in *favor* of criminal defendants.").

Similarly, Nix contends that Juror No. 3 is biased because he "had bad experiences with law enforcement." (Dkt. 369 at 12). Not only is there no evidence of this in the record, but even if that was correct, any potential bias would be more likely directed at the Government, not Defendants. Again, to support this point, one need only review the focus of Defendants' and the Government's requested *voir dire*. (*See* Dkt. 170 at 5; Dkt. 173 at 2-3; Dkt. 178 at 2-5).

---

had no recollection of this alleged incident, and there is no evidence that he was convicted of this crime. (*See* Dkt. 358 at 84).

The primary thrust of Defendants' claimed inferred bias is the contention that Juror No. 3 must have been biased against Defendants because he would have necessarily identified with the cooperators in this case. However, just because Juror No. 3 was a defendant in the criminal justice system with co-defendants does not mean that he actively cooperated with law enforcement. There is no evidence that Juror No. 3 was offered some benefit in exchange for cooperation against any co-defendant or that he testified against co-defendants. At best, there is evidence that Juror No. 3 confessed to his crimes and implicated his co-defendants. There is just no evidence in the record to support the inference that, because of his criminal past, Juror No. 3 sympathized with the cooperating witnesses in this case, and thus was biased against Defendants.

More to the point, Juror No. 3's criminal history is from some 30 years ago. That criminal history is just too remote to support a finding of inferred bias. There is nothing in the record to suggest that Juror No. 3's criminal past reflected bias against Defendants, let alone that it even came into his thought processes when sitting on this jury. In fact, by all accounts, Juror No. 3 went to great lengths to avoid any thoughts about his criminal past.

Moreover, this Court genuinely believes that Juror No. 3 had no recollection of being the victim of a home burglary, but, even if he did recall that incident, the remoteness and lack of similarity to the crimes at issue in this case again negates any finding of inferred bias. In other words, the Court has necessarily taken into account not just its findings about Juror No. 3's failure to respond accurately during *voir dire* concerning his criminal history, but also the other claims made by Defendants as to Juror

No. 3's alleged false answers, including the fact that Juror No. 3 was a victim of a home burglary about 20 years ago and his various family members' alleged criminal records. Even crediting Defendants' allegations about Juror No. 3's false answers, the Court cannot conclude that this supports an inference of bias against Defendants on the part of Juror No. 3. The incidents are just too remote and, on balance, do not support a finding of bias against Defendants.

In sum, the record does not provide a basis to infer bias. Even if the first prong of the *McDonough* test was satisfied, there is no evidence of extreme deceit (such as in *Parse*) that would support the showing required under *McDonough*'s second prong. Put simply, the Court does not believe that the "deliberateness of [Juror No. 3's] particular lies evidenced partiality," *Stewart*, 433 F.3d at 305 (citation omitted); and even if Juror No. 3 did intentionally attempt to deceive the Court, the deliberateness of his lies is not sufficiently intentional or premeditated so as to, in and of themselves, establish bias under the second prong. *Cf. Colombo*, 869 F.2d at 151 (if juror deliberately provided false information by not disclosing that brother-in-law was a lawyer for the government so that she could sit on the case, then both prongs of *McDonough* would be satisfied).

## VI.   <u>CONCLUSION</u>

For the reasons set forth above, the Court denies Defendants' motions pursuant to

Fed. R. Crim. P. 33 (Dkt. 286; Dkt. 289) to the extent the motions are based upon Juror

No. 3's alleged bias.

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated: August 24, 2017
        Rochester, New York